## In the United States District Court
## For the District of Columbia

Hewlett-Packard Company,

        Plaintiff (Complainants),

        v.

Acer, Inc. and Acer America Corporation,

        Defendants (Respondents).

**Misc. Action No.:07-335**
Judge: Thomas F. Hogan

## AMENDED APPLICATION FOR THE ISSUANCE OF LETTERS ROGATORY

## I.    <u>NOTICE</u>

Hewlett-Packard Company ("HP") through and by its counsel, respectfully applies for the

issuance by the Court of the attached Letters Rogatory pursuant to 28 U.S.C. § 1781, Rule 28(b)

of the Federal Rules of Civil Procedure, and the recommendations by Administrative Law Judge

Paul J. Luckern. *See* Appendix A, Recommendations for Issuance of Letters Rogatory. The

Letters Rogatory are addressed to the Appropriate Judicial Authority in Taiwan and request the

production of documents and depositions of the following five Taiwanese companies:

Quanta Computer, Inc. ("Quanta")
No. 188, Wen Hwa 2nd Rd
Kuei Shan Hsiang, Tao Yuan Shien
Taiwan, R.O.C.

Compal Electronics, Inc. ("Compal")
No. 581, Rueiguang Rd.
Neihu District, Taipei City 114
Taiwan R.O.C.

MStar Semiconductor, Inc. ("MStar")
4F-1, No. 26, Tai-Yuan St.
ChuPei Hsinchu Hsien,
Taiwan 302 R.O.C.

Realtek Semiconductor, Inc. ("Realtek")
No. 2, Innovation Road Ii,
Hsinchu Science Park,
Hsinchu 300,
Taiwan, R.O.C.

Silicon Integrated Systems Corporation ("SIS")
No. 581, Rueiguang Rd.
Neihu District, Taipei City 114
Taiwan R.O.C.

## II.    INTRODUCTION

HP respectfully requests the issuance of Letters Rogatory to secure important technical

documents and information from the above-identified Taiwanese companies.  Issuance of the

requested Letters Rogatory is appropriate because these Taiwanese companies are in sole

possession of technical documents important to the International Trade Commission's

investigation of Acer, Inc. and Acer America Corporation's (collectively, "Respondents")

importation practices.

HP is presently a Complainant in the Matter of *Certain Personal Computers and Digital

Display Devices*, U.S. Int'l Trade Comm'n Investigation No. 337-TA-606 (the "-606

Investigation").  In the -606 Investigation, Respondents are accused of importing certain personal

computers and digital display devices in violation of the Tariff Act of 1930.  In particular, HP

alleges that Acer infringes U.S. Patent No. 6,691,236; U.S. Patent No. 6,894,706; U.S. Patent

No. 6,029,119, and U.S. Patent No. 5,353,415 (collectively, the "Patents-in-Suit").  The

complaint further alleges that the accused products are imported into the United States for or by

Respondents.  Appendix B, Affidavit of Gregory J. Lundell at ¶ 3 ("Lundell Decl.").

Although the International Trade Commission is permitted to issue letters rogatory[1], it is still necessary for HP to come before this Court because foreign courts may not recognize the International Trade Commission as a "court" for purposes of responding to a letter rogatory. Accordingly, this Application is accompanied by recommendations from Administrative Law Judge Paul J. Luckern, the presiding ALJ in the -606 Investigation, that this Court issue the attached Letters Rogatory on HP's behalf. Appendix A. ALJ Luckern's recommendations are based on his knowledge of this case and his approval that HP's request for discovery is necessary.

## III.    THE TAIWANESE COMPANIES

The above-identified Taiwanese companies are each in possession of documents that are not readily available to HP unless obtained for directly from each company. Each of the companies fall within one of two categories. First, Quanta and Compal are original design manufacturers ("ODMs") for Respondents' personal computers and displays. Lundell Decl. at ¶¶ 4-5. As ODMs, Quanta and Compal build the accused products based on Respondents' specifications and are responsible for developing engineering solutions to meet these specifications. *Id.* These ODMs' design and manufacturing activities implicate each of the Patents-in-Suit. Moreover, this ODM relationship makes it likely that Respondents will not be able to provide evidence of the relevant technical details concerning the accused products.

Second, MStar, Realtek, and SIS design and manufacture specialized components used in Respondents' accused products. *Id.* at ¶¶ 6-8. MStar and Realtek design and manufacture scalar chips used in Respondents digital displays. *Id.* at ¶¶ 6-7. These scalar chips implicate United States Patent No. 6, 894,706. SIS designs and manufactures chipsets and video controllers used

---

[1] Congress used the term "tribunal" in 28 U.S.C. § 1781 to refer to "investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts." *Intel Corp. v. Advanced Micro Devices , Inc.*, 542 U.S. 241, 258 (2004).

in Respondents' accused personal computers. *Id.* at ¶¶ 8. SIS's components implicate United States Patent No. 6,029,119 and United States Patent No. 6,691,236. Again, it is unlikely that Respondents will be in possession of the documents describing the technical details of these specialized components. Indeed, Respondents have claimed that their ODMs and third party component makers are in exclusive possession of the technical documents HP seeks. Accordingly, HP must request these documents directly from Respondents' ODMs and component makers.

## IV.     CONCLUSION

For these reasons, HP requests that the Court approve and sign the Letters Rogatory. HP further requests that after the Court has signed the Letters, the Clerk of this Court authenticate the Court's signature under the seal of this Court, and that the Letters be thereafter returned by the Clerk to HP's counsel.

Dated: August 28, 2007

By: _____

JAMES M. HEINTZ    /BAR NO. 456410
DLA PIPER US LLP
1200 19th Street, NW. 7th Floor
Washington, DC 20036-2414
Telephone:  202-861-3900
Facsimile:   202-223-2085

Attorneys for Plaintiffs
Hewlett-Packard Company

# APPENDIX A

**Attachment A**

## In the United States District Court
## For the District of Columbia

In the Matter of:

CERTAIN PERSONAL COMPUTERS AND DIGITAL
DISPLAY DEVICES

Civil Action No. Misc._____

RECOMMENDATION FOR
ISSUANCE OF A LETTER
ROGATORY

DEPONENT: QUANTA
COMPUTER, INC.

The undersigned Administrative Law Judge finds that the evidence Complainant Hewlett

Packard Company ("HP") seeks pursuant to its Proposed Letters Rogatory is reasonably

necessary to fully investigate HP's claims of infringement against Respondents Acer, Inc. and

Acer America Corporation. Accordingly, the undersigned recommends that the District Court

for the District of Columbia issue, under its seal and signature, the attached letter rogatory to the

Appropriate Judicial Authority in Taiwan and the certified translation of the same. (Attachment

A)

A letter rogatory is the appropriate method of gathering necessary evidence outside of the

United States. Rule 28(b) of the Federal Rules of Civil Procedure contemplates gathering

evidence through a deposition in a foreign country pursuant to a properly issued and appropriate

letter rogatory. *See* Fed. R. Civ. P. 28 ("Depositions may be taken in a foreign country . . . (2)

pursuant to a letter of request (whether or not captioned a letter rogatory, . . . A [letter rogatory]

shall be issued on application and notice and on terms that are just and appropriate.") Moreover,

28 U.S.C. § 1781(a)(2) authorizes the State Department to transmit such a letter rogatory to the appropriate foreign judicial authorities. In this case, HP's Proposed Letter Rogatory solicits international judicial assistance in obtaining critical evidence abroad needed for our pending investigation into alleged patent infringing imports of certain digital display devices and meets the standards set forth for letters rogatory according to the United States Department of State and the American Institute of Taiwan, the statutory non-profit corporation responsible for maintaining relations with Taiwan. See 22 U.S.C. §§ 3305, 3306.

In order to comply with the statutory time limitations on International Trade Commission investigations, the undersigned respectfully request the Court to assign a judge and, if needed, schedule a hearing to expedite the issuance of the letter of request.

Respectfully submitted this 23rd day of August, 2007,

Paul J. Luckern
Administrative Law Judge
United States International Trade Commission
500 E Street, S.W., Room 317
Washington, D.C. 20436

Address for Return of Issued Letter Rogatory:

James M. Heintz, Esq.
DLA Piper US LLP
1200 19th Street, NW
Washington, DC 20036-2412

**Attachment A**

## In the United States District Court
## For the District of Columbia

| |
|---|
| In the Matter of: |
| CERTAIN PERSONAL COMPUTERS AND DIGITAL DISPLAY DEVICES |

Civil Action No. Misc._____

RECOMMENDATION FOR
ISSUANCE OF A LETTER
ROGATORY

DEPONENT: COMPAL
ELECTRONICS INC.

The undersigned Administrative Law Judge finds that the evidence Complainant Hewlett

Packard Company ("HP") seeks pursuant to its Proposed Letters Rogatory is reasonably

necessary to fully investigate HP's claims of infringement against Respondents Acer, Inc. and

Acer America Corporation. Accordingly, the undersigned recommends that the District Court

for the District of Columbia issue, under its seal and signature, the attached letter rogatory to the

Appropriate Judicial Authority in Taiwan and the certified translation of the same. (Attachment

A)

A letter rogatory is the appropriate method of gathering necessary evidence outside of the

United States. Rule 28(b) of the Federal Rules of Civil Procedure contemplates gathering

evidence through a deposition in a foreign country pursuant to a properly issued and appropriate

letter rogatory. *See* Fed. R. Civ. P. 28 ("Depositions may be taken in a foreign country . . . (2)

pursuant to a letter of request (whether or not captioned a letter rogatory, . . . A [letter rogatory]

shall be issued on application and notice and on terms that are just and appropriate.") Moreover,

28 U.S.C. § 1781(a)(2) authorizes the State Department to transmit such a letter rogatory to the appropriate foreign judicial authorities. In this case, HP's Proposed Letter Rogatory solicits international judicial assistance in obtaining critical evidence abroad needed for our pending investigation into alleged patent infringing imports of certain digital display devices and meets the standards set forth for letters rogatory according to the United States Department of State and the American Institute of Taiwan, the statutory non-profit corporation responsible for maintaining relations with Taiwan. See 22 U.S.C. §§ 3305, 3306.

In order to comply with the statutory time limitations on International Trade Commission investigations, the undersigned respectfully request the Court to assign a judge and, if needed, schedule a hearing to expedite the issuance of the letter of request.

Respectfully submitted this 23rd day of August, 2007,

Paul J. Luckern
Administrative Law Judge
United States International Trade Commission
500 E Street, S.W., Room 317
Washington, D.C. 20436

Address for Return of Issued Letter Rogatory:

James M. Heintz, Esq.
DLA Piper US LLP
1200 19th Street, NW
Washington, DC 20036-2412

**Attachment A**

## In the United States District Court
## For the District of Columbia

In the Matter of:

CERTAIN PERSONAL COMPUTERS AND DIGITAL
DISPLAY DEVICES

Civil Action No. Misc._____

RECOMMENDATION FOR
ISSUANCE OF A LETTER
ROGATORY

DEPONENT: MSTAR
SEMICONDUCTOR INC.

The undersigned Administrative Law Judge finds that the evidence Complainant Hewlett

Packard Company ("HP") seeks pursuant to its Proposed Letters Rogatory is reasonably

necessary to fully investigate HP's claims of infringement against Respondents Acer, Inc. and

Acer America Corporation. Accordingly, the undersigned recommends that the District Court

for the District of Columbia issue, under its seal and signature, the attached letter rogatory to the

Appropriate Judicial Authority in Taiwan and the certified translation of the same. (Attachment

A)

A letter rogatory is the appropriate method of gathering necessary evidence outside of the

United States. Rule 28(b) of the Federal Rules of Civil Procedure contemplates gathering

evidence through a deposition in a foreign country pursuant to a properly issued and appropriate

letter rogatory. *See* Fed. R. Civ. P. 28 ("Depositions may be taken in a foreign country . . . (2)

pursuant to a letter of request (whether or not captioned a letter rogatory, . . . A [letter rogatory]

shall be issued on application and notice and on terms that are just and appropriate.") Moreover,

28 U.S.C. § 1781(a)(2) authorizes the State Department to transmit such a letter rogatory to the appropriate foreign judicial authorities. In this case, HP's Proposed Letter Rogatory solicits international judicial assistance in obtaining critical evidence abroad needed for our pending investigation into alleged patent infringing imports of certain digital display devices and meets the standards set forth for letters rogatory according to the United States Department of State and the American Institute of Taiwan, the statutory non-profit corporation responsible for maintaining relations with Taiwan. See 22 U.S.C. §§ 3305, 3306.

     In order to comply with the statutory time limitations on International Trade Commission investigations, the undersigned respectfully request the Court to assign a judge and, if needed, schedule a hearing to expedite the issuance of the letter of request.

Respectfully submitted this 23rd day of _____, 2007,

Paul J. Luckern
Administrative Law Judge
United States International Trade Commission
500 E Street, S.W., Room 317
Washington, D.C. 20436

Address for Return of Issued Letter Rogatory:

James M. Heintz, Esq.
DLA Piper US LLP
1200 19th Street, NW
Washington, DC 20036-2412

**Attachment A**

**In the United States District Court
For the District of Columbia**

| | |
|---|---|
| In the Matter of:<br><br>CERTAIN PERSONAL COMPUTERS AND DIGITAL<br>DISPLAY DEVICES | Civil Action No. Misc._____<br><br>RECOMMENDATION FOR<br>ISSUANCE OF A LETTER<br>ROGATORY<br><br>DEPONENT: REALTEK<br>SEMICONDUCTOR INC. |

The undersigned Administrative Law Judge finds that the evidence Complainant Hewlett Packard Company ("HP") seeks pursuant to its Proposed Letters Rogatory is reasonably necessary to fully investigate HP's claims of infringement against Respondents Acer, Inc. and Acer America Corporation. Accordingly, the undersigned recommends that the District Court for the District of Columbia issue, under its seal and signature, the attached letter rogatory to the Appropriate Judicial Authority in Taiwan and the certified translation of the same. (Attachment A)

A letter rogatory is the appropriate method of gathering necessary evidence outside of the United States. Rule 28(b) of the Federal Rules of Civil Procedure contemplates gathering evidence through a deposition in a foreign country pursuant to a properly issued and appropriate letter rogatory. *See* Fed. R. Civ. P. 28 ("Depositions may be taken in a foreign country . . . (2) pursuant to a letter of request (whether or not captioned a letter rogatory, . . . A [letter rogatory] shall be issued on application and notice and on terms that are just and appropriate.") Moreover,

28 U.S.C. § 1781(a)(2) authorizes the State Department to transmit such a letter rogatory to the appropriate foreign judicial authorities. In this case, HP's Proposed Letter Rogatory solicits international judicial assistance in obtaining critical evidence abroad needed for our pending investigation into alleged patent infringing imports of certain digital display devices and meets the standards set forth for letters rogatory according to the United States Department of State and the American Institute of Taiwan, the statutory non-profit corporation responsible for maintaining relations with Taiwan. See 22 U.S.C. §§ 3305, 3306.

In order to comply with the statutory time limitations on International Trade Commission investigations, the undersigned respectfully request the Court to assign a judge and, if needed, schedule a hearing to expedite the issuance of the letter of request.

Respectfully submitted this 23rd day of August, 2007,

Paul J. Luckern
Administrative Law Judge
United States International Trade Commission
500 E Street, S.W., Room 317
Washington, D.C. 20436

Address for Return of Issued Letter Rogatory:

James M. Heintz, Esq.
DLA Piper US LLP
1200 19th Street, NW
Washington, DC 20036-2412

**Attachment A**

**In the United States District Court**
**For the District of Columbia**

| | |
|---|---|
| In the Matter of:<br><br>CERTAIN PERSONAL COMPUTERS AND DIGITAL DISPLAY DEVICES | Civil Action No. Misc._____<br><br>RECOMMENDATION FOR ISSUANCE OF A LETTER ROGATORY<br><br>DEPONENT: SILICON INTEGRATED SYSTEMS CORP. |

The undersigned Administrative Law Judge finds that the evidence Complainant Hewlett Packard Company ("HP") seeks pursuant to its Proposed Letters Rogatory is reasonably necessary to fully investigate HP's claims of infringement against Respondents Acer, Inc. and Acer America Corporation. Accordingly, the undersigned recommends that the District Court for the District of Columbia issue, under its seal and signature, the attached letter rogatory to the Appropriate Judicial Authority in Taiwan and the certified translation of the same. (Attachment A)

A letter rogatory is the appropriate method of gathering necessary evidence outside of the United States. Rule 28(b) of the Federal Rules of Civil Procedure contemplates gathering evidence through a deposition in a foreign country pursuant to a properly issued and appropriate letter rogatory. *See* Fed. R. Civ. P. 28 ("Depositions may be taken in a foreign country . . . (2) pursuant to a letter of request (whether or not captioned a letter rogatory, . . . A [letter rogatory] shall be issued on application and notice and on terms that are just and appropriate.") Moreover,

28 U.S.C. § 1781(a)(2) authorizes the State Department to transmit such a letter rogatory to the appropriate foreign judicial authorities. In this case, HP's Proposed Letter Rogatory solicits international judicial assistance in obtaining critical evidence abroad needed for our pending investigation into alleged patent infringing imports of certain digital display devices and meets the standards set forth for letters rogatory according to the United States Department of State and the American Institute of Taiwan, the statutory non-profit corporation responsible for maintaining relations with Taiwan. See 22 U.S.C. §§ 3305, 3306.

In order to comply with the statutory time limitations on International Trade Commission investigations, the undersigned respectfully request the Court to assign a judge and, if needed, schedule a hearing to expedite the issuance of the letter of request.

Respectfully submitted this 23rd day of August, 2007,

Paul J. Luckern
Administrative Law Judge
United States International Trade Commission
500 E Street, S.W., Room 317
Washington, D.C. 20436

Address for Return of Issued Letter Rogatory:

James M. Heintz, Esq.
DLA Piper US LLP
1200 19th Street, NW
Washington, DC 20036-2412

# APPENDIX B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Hewlett-Packard Company,

      Plaintiff (Complainants),

      v.

Acer, Inc. and Acer America Corporation,

      Defendants (Respondents).

Misc. Action No.:_____
Judge:

## DECLARATION OF GREGORY J. LUNDELL

I, Gregory J. Lundell, hereby declare:

1.     I am an associate at the law firm of DLA Piper US LLP.  My address is 2000 University Avenue, East Palo Alto, CA 94303.

2.     I am counsel to the requesting party, Hewlett-Packard Company ("HP"), the Complainant in the Investigation No. 337-TA-606, pending before Administrative Law Judge Paul J. Luckern at the United States International Trade Commission.

3.     The underlying proceeding is based on a complaint filed by HP against Respondents Acer, Inc. and Acer America Corporation (collectively, "Respondents") on April 19, 2007, pursuant to Section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337.  The complaint alleges infringement of U.S. Patent No. 6,029,119, U.S. Patent No. 6,894,706, U.S. Patent No. 5,353,415, and U.S. Patent No. 6,691,236, (collectively, "the Patents-In-Suit").  The accused products are certain personal computers and digital display devices.  The complaint further alleges that the accused products have been imported into the United States.

4.      Quanta Computer, Inc. ("Quanta") is an original design manufacturer ("ODM") for Respondents. As an ODM, Quanta is responsible for designing and manufacturing desktop computers, portable computers (including, e.g., notebook and/or tablet computers), and digital displays for Respondents according to Respondents' specifications. Quanta, therefore, has crucial information relating to the design and manufacture of the accused products and their component parts. Quanta's principle address is: No. 188, Wen Hwa 2nd Rd, Kuei Shan Hsiang, Tao Yuan Shien, Taiwan, R.O.C.

5.      Compal Electronics, Inc. ("Compal") is an original design manufacturer ("ODM") for Respondents. As an ODM, Compal is responsible for designing and manufacturing desktop computers, portable computers (including, e.g., notebook and/or tablet computers), and digital displays for Respondents according to Respondents' specifications. Compal, therefore, has crucial information relating to the design and manufacture of the accused products and their component parts. Compal's principle address is: No. 581, Rueiguang Rd., Neihu District, Taipei City 114, Taiwan R.O.C.

6.      MStar Semiconductor, Inc. ("MStar") designs and manufactures scalar chips for inclusion in Respondents' digital displays. MStar, therefore, has crucial information relating to the design, manufacture, and function of the scalar chips used in the accused products. MStar's principle address is: 4F-1, No. 26, Tai-Yuan St., ChuPei Hsinchu Hsien, Taiwan 302 R.O.C.

7.      Realtek Semiconductor, Inc. ("Realtek") designs and manufactures scalar chips for inclusion in Respondents' digital displays. Realtek, therefore, has crucial information relating to the design, manufacture, and function of the scalar chips used in the accused products. Realtek's principle address is: No. 2, Innovation Road Ii, Hsinchu Science Park, Hsinchu 300, Taiwan, R.O.C.

I:M\7221901.1

8.    Silicon Integrated Systems Corporation ("SIS") designs and manufactures video controller chips and chipset for inclusion in Respondents' portable computers.  SIS, therefore, has crucial information relating to the design, manufacture, and function of the chips and chipsets used in the accused products.  SIS's principle address is: No. 581, Rueiguang Rd., Neihu District, Taipei City 114, Taiwan R.O.C.

I declare under the penalty of perjury that the foregoing is true and correct.  Executed on: August 24, 2007.

**Proposed Letter Rogatory to
Quanta Computer, Inc.**

**In the United States District Court
For the District of Columbia**

Hewlett-Packard Company,

              Plaintiff (Complainant),

      v.

Acer, Inc. & Acer America Corp.,

              Defendants (Respondents).

Civil Action No. Misc. 07–335

## REQUEST FOR INTERNATIONAL ASSISTANCE – LETTER ROGATORY TO THE TAIWANESE JUDICIAL AUTHORITIES

      The United States District Court for the District of Columbia presents its compliments to the Appropriate Judicial Authority of Taiwan, and respectfully requests international judicial assistance to obtain evidence to be used in an administrative proceeding as approved by this Court in the above captioned matter. Specifically, this Court requests that the Appropriate Judicial Authority in Taiwan, by the proper and usual process of your Courts, compel the appearance of Quanta Computer, Inc. ("Quanta") statutory representative, 林百里 ("Lin Pai Li"), to testify under oath and to produce the documents identified below. This Court also requests that Appropriate Judicial Authority compel the testimony of any other Quanta representatives that Lin Pai Li may identify as knowledgeable in the listed topics. Quanta is a Taiwanese corporation located at 桃園縣龜山鄉文化村文化二路188號 ("No. 188, Wen Hwa 2nd Rd., Kuei Shan Hsiang, Tao Yuan Shien, Taiwan R.O.C.").

      Based on the representations made by Complainant Hewlett-Packard Company ("HP"), this Court believes that Quanta has knowledge regarding material facts and that it is in possession of documents that are relevant for the proper prosecution of the above captioned case. This Court also believes that assistance from the Appropriate Judicial Authority in Taiwan would

serve to further the international interests of justice and judicial cooperation.

This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the Appropriate Judicial Authority of Taiwan compels Quanta to give evidence and produce documents. This matter is set for hearing in the United States on a very short schedule and requires urgent attention from the Appropriate Judicial Authority in Taiwan.

## I.    SUMMARY OF THIS ACTION

HP has accused Respondents, Acer, Inc. and Acer America Corporation (collectively, "Respondents") of violating Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337) by importing certain products that infringe one or more of HP's patents. The Tariff Act of 1930 makes it illegal to import goods into the United States that, among other things, infringe a United States Patent. In particular, HP accuses Respondents of importing desktop computers, portable computers (including notebook computers and table PCs), and computer monitors (the "Accused Products") that infringe United States Patent No. 6,691,236 B1 (the "'236 Patent"); United States Patent No. 6,029,119 (the "'119 Patent"); United States Patent No. 5,353,415 (the "'415 Patent"); and/or United States Patent No. 6,894,706 (the "'706 Patent") (collectively, the "Patents-at-Issue"). Pursuant to HP's complaint of patent infringement, the United States International Trade Commission instituted Investigation No. 337-TA-606, which seeks to examine Respondents' importation activities. The United States Office of Unfair Import Investigations is also a party to this Investigation.

The Patents-at-Issue cover a variety of features and components in the Accused Products. The '415 Patent relates to the roles played by a central processing unit ("CPU") and its associated cache memory system in performing concurrent bus operations. The '119 Patent relates to a computer's ability to regulate its internal temperature based on monitoring the temperature and/or activities of various locations within the computer, including the central

processing unit. The '236 Patent relates to portable computer systems that conserve power by changing the performance of video graphics controller depending on the system's power source, battery condition, demands on the CPU, and/or the system state being saved to non-volatile memory (for example, when the computer goes into hibernation). The '706 Patent relates to display systems (such as an LCD monitor) capable of determining the resolution of the graphics that are received from a computer and scaling the graphics to fit the "native" resolution of the display.

On information and belief, Quanta designs and manufactures the Accused Products for Respondents. Quanta is one of several Original Design Manufacturers ("ODM") for Respondents. As an ODM, Quanta builds the Accused Products based on Respondents' specifications and is responsible for developing engineering solutions to meet these specifications. This ODM relationship with Quanta makes it is likely that Respondents will not be able to provide evidence of the relevant technical details concerning the Accused Products made by Quanta for Respondents. Therefore, HP requests this assistance to obtain the technical information it requires directly from Quanta.

## II.  DOCUMENTS AND TESTIMONY REQUESTED

This Court requests the Appropriate Judicial Authority to compel Quanta to produce to HP the types of documents listed in Attachment A to this Request.

This Court also requests the Appropriate Judicial Authority to compel Quanta to make Lin Pai Li, or another suitable representative, available to answer questions listed in Attachment B to this Request.

There is a protective order in this case to protect the confidentiality of any documents Quanta produces. The protective order is attached as Attachment C to this Request.

Therefore, this Court respectfully requests that, in the interests of justice, you issue appropriate orders, subpoenas, or other compulsory process necessary to compel the production

of the above mentioned documents and the attendance of a Quanta representative for oral testimony on the above mentioned topics. This Court also request that you specifically authorize that the oral testimony may be videotaped and audiotaped, in addition to being transcribed by a qualified court reporter.

This Court stands ready to extend similar assistance to the Courts of Taiwan in like cases. To the extent there are expenses associated with providing assistance in response to this Request, this Court will see that the Appropriate Judicial Authority in Taiwan is reimbursed by HP. HP may be contacted in Taiwan through Ms. Daisy Wang of Lee and Li, Attorneys-at-Law. Her offices are located at 7F, No. 201, Tun Hua N. Road, Taipei 105, Taiwan. She may be contacted by telephone at 866-2-2715-3300 ext. 2335.

Dated: _____, 2007
      Month, Day

                                            _____
                                            District Court Judge
                                            District Court of the District of Columbia

**ATTACHMENT A**

**DEFINITIONS**

The following definitions apply to these Document Requests.

1.    "HP" shall mean Complainant Hewlett Packard Company including, without limitation, All of its subsidiaries, affiliates, divisions, related entities, predecessors (including but not limited to Compaq Computer Corporation and Digital Equipment Corporation), successors, and Any present or former officers, directors, trustees, employees, agents, or representatives.

2.    "Quanta" shall mean Quanta Computer, Inc., and all of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys or any others acting on behalf of Quanta Computer, Inc. and any entities controlled or owned by Quanta Computer, Inc.

3.    "Respondents" shall mean Acer, Inc. and Acer America Corporation, including, without limitation, all subsidiaries, parents, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives.

4.    The terms "Document" and "Documents" shall mean and include anything in Quanta's possession, custody, or control that is printed, recorded, or stored in electronic form. Some examples of "Documents" include letters, email, memoranda, reports, agreements, technical Documents, engineering specifications, hardware specifications, software specifications, product specifications, computer code, hand written notes, financial reports, and invoices.  Any request for a "Document" includes a request for all drafts and revisions of the foregoing.

5.    The terms "Communication" and "Communications" shall mean any transfer or exchange between two or more persons of any information whether by written, oral, electronic or other means, including but not limited to personal conversations, correspondence, electronic

mail, telephone calls, facsimile communications, or telegrams.

6.    The terms "Imports" or "Imported" shall mean imported into the United States.

7.    "Digital Port" shall mean a port or connector that can be used to create a digital connection or coupling with a computer or other source (such as a cable TV set-top box), including, without limitation, a DVI-D port, a DVI-I port, or a HDMI port.

8.    "Digitally Coupled Display Device" shall mean each product Quanta designs or manufactures for Respondents that is a monitor and/or projector, and that contains a Digital Port.

9.    "Relevant Quanta Product" shall mean all desktop computers, portable computers (including, notebook computers and tablet PCs), and/or Digitally Coupled Display Device that Quanta designs, builds, manufactures, sells, delivers, Imports, and/or tests for or at the direction of Respondents.

10.    "Part" or "Component" shall mean any device contained within a Relevant Quanta Product, shipped by Quanta with a Relevant Quanta Product, Imported by Quanta into the United States and subsequently shipped with a Relevant Quanta Product, recommended for use with a Relevant Quanta Product, or manufactured, produced, or sold with a Relevant Quanta Product.

11.    The terms "any" and "all" shall include "each and every."

12.    The "'236 Patent" shall mean U.S. Patent No. 6,691,236 B1.

13.    The "'706 Patent" shall mean U.S. Patent No. 6,894,706 B1.

14.    The "'415 Patent" shall mean U.S. Patent No. 5,353,415.

15.    The "'119 Patent" shall mean U.S. Patent No. 6,029,119.

16.    "Patents-In-Suit" shall mean the '236 Patent, the '415 Patent, the '706 Patent, and the '119 Patent.

17.    "Driver" shall mean software or firmware that controls the exchange of information to or from an internal or external hardware component of a computer system.

18.    "BIOS" shall mean the basic input/output system of a computer.

19.    "ATI" shall mean ATI Technologies, Inc., including, without limitation, All of its corporate parents (including, without limitation, Advanced Micro Devices, Inc.), subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of ATI.

20.    "NVIDIA" shall mean NVIDIA Corporation, including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of NVIDIA Corporation.

21.    "AMD" shall mean Advanced Micro Devices, Inc, including, without limitation, All of its corporate parents, subsidiaries (including, without limitation, ATI), affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Advanced Micro Devices, Inc.

22.    "Intel" shall mean Intel Corporation, including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Intel Corporation.

23.    "SIS" shall mean Silicon Integrated Systems Corporation including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Silicon Integrated Systems Corporation.

24.    "VIA" shall mean VIA Technologies, Inc. including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of VIA Technologies, Inc.

25.     "ePowerManagement" shall mean the power management feature(s) of Respondents' computer systems having the designation "ePowerManagement."

26.     "AMD PowerNow!™ Technology" shall mean the power-management feature(s) of AMD processors having the designation "AMD PowerNow!™ Technology."

27.     "Enhanced Intel SpeedStep® Technology" shall mean the power management feature(s) of Intel processors having the designation "Enhanced Intel SpeedStep® technology" or "EIST®."

28.     "PowerPlay™ Technology" shall mean the power management feature(s) of ATI graphics processors having the designation "PowerPlay™."

29.     "Cool'n'Quiet ™ Technology" shall mean the technology provided by AMD that allows a computer to select CPU speed, voltage and power based on performance needs and having the designation "Cool'n'Quiet ™ Technology."

30.     "PowerMizer® Technology" shall mean the power management features(s) of NVIDIA graphics processors having the designation "PowerMizer®."

31.     "Graphics Subsystem" shall mean the hardware and software used in an Accused Product to manage the Product's display functions, including but not limited to its graphics processor and Any related Drivers.

32.     "Input Detection" shall mean receiving video or graphics signals from a computer or other source (such as a cable TV set-top box) and determining the input resolution of the image associated with those signals (e.g., determining the number of pixels per line and the number of lines per screen).

33.     "Scaling" shall mean changing the resolution of the image associated with video or graphics signals received from a computer or other source (such as a cable TV set-top box) to a different resolution, or changing the image associated with video or graphics signals received from a computer or other source, in such a manner that the resolution of the final image is different than the resolution of the original image received from the computer or other source.

34.    "Concurrent Bus Cycle Operations" shall mean bus transactions occurring or pending on two or more buses in a computer system at least partially at the same time.

## DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION No. 1:

Documents that describe the method, process, apparatus or device used to regulate the temperature in each Relevant Quanta Product.

### REQUEST FOR PRODUCTION No. 2:

Engineering specifications, software specifications, product specifications, and circuit schematics for each Relevant Quanta Product.

### REQUEST FOR PRODUCTION No. 3:

Documents, software code, or Drivers that describe how each Relevant Quanta Product measures and regulates its internal temperature.

### REQUEST FOR PRODUCTION No. 4:

Documents that describe the hardware and software used to regulate the temperature in each Relevant Quanta Product for Respondents.

### REQUEST FOR PRODUCTION No. 5:

Documents that describe how each Relevant Quanta Product alters its internal temperature in response to input from a device within the product, including, a display screen; an option card; a PCMCIA card; a processor; a graphics processor; a display; a battery; a power source; a disk drive; a fan; and/or each other peripheral device.

### REQUEST FOR PRODUCTION No. 6:

Documents that describe how each Relevant Quanta Product alters its internal

temperature in response to the status of the product or the status of a device within the product, including, the current temperature; a recent temperature change; which software applications are running; a display screen's activity; an option card's activity; a PCMCIA card's activity; a processor's activity; a graphics processor's activity; a clock frequency associated with a processor; a processor's core voltage; a battery's charge level; a power source's activity; a disk drive's activity; a fan's activity; and/or each other peripheral device's activity.

REQUEST FOR PRODUCTION No. 7:

Documents describing how each portable computer (e.g., including, but not limited to, notebook computers and/or tablet PCs) Quanta designs or manufactures for Respondents or any of the products' Components communicate a clock speed, a core voltage and/or an operating speed, performance or condition, of a graphics processor in to the processor, operating system and/or BIOS of the portable computer.

REQUEST FOR PRODUCTION No. 8:

Documents that describe the Graphics Subsystem of each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 9:

Documents that describe the processes, methods or mechanisms by which each Relevant Quanta Product changes the power consumption of its Graphics Subsystem.

REQUEST FOR PRODUCTION No. 10:

Documents that describe the processes, methods or mechanisms by which each Relevant Quanta Product switches and/or changes a clock frequency, a core voltage, and/or an operating speed or performance, of a graphics processor used in the product.

REQUEST FOR PRODUCTION No. 11:

Documents that describe the processes, methods or mechanisms by which each Relevant Quanta Product alters the operation of its graphics processor in response to: a detected low

10

battery condition; whether or not the product is running on battery power; or the demand level on the main processor, and/or whether the system state is being saved to non-volatile memory (for example when the computer goes into hibernation).

## REQUEST FOR PRODUCTION No. 12:

Documents, including engineering specifications, software specifications, schematics, or software that describe Quanta's implementation of Respondents' ePowerManagement Technology in each Relevant Quanta Product.

## REQUEST FOR PRODUCTION No. 13:

Documents, including engineering specifications, software specifications, schematics, or software that describe Quanta's implementation of AMD PowerNow!™ Technology or AMD Cool'n'Quiet™ Technology in each Relevant Quanta Product.

## REQUEST FOR PRODUCTION No. 14:

Documents that describe Quanta's implementation of each AMD processor or chipset enabled with AMD PowerNow!™ Technology or AMD Cool'n'Quiet™ Technology in each Relevant Quanta Product.

## REQUEST FOR PRODUCTION No. 15:

Documents that describe Quanta's implementation of each SIS processor or chipset in each Relevant Quanta Product.

## REQUEST FOR PRODUCTION No. 16:

Documents that describe Quanta's implementation of each VIA processor or chipset in each Relevant Quanta Product.

## REQUEST FOR PRODUCTION No. 17:

Documents, including engineering specifications, software specifications, schematics, or software that describe Quanta's implementation of Enhanced Intel SpeedStep® Technology in

each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 18:

Documents that describe Quanta's implementation of each Intel processor or chipset enabled with Enhanced Intel SpeedStep® Technology in each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 19:

Documents, including engineering specifications, software specifications, schematics, or software that describe Quanta's implementation of PowerPlay™ Technology in each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 20:

Documents that describe Quanta's implementation of each ATI graphics processor enabled with PowerPlay™ Technology in each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 21:

Documents, including engineering specifications, software specifications, schematics, or software that describe Quanta's implementation of PowerMizer™ Technology in each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 22:

Documents that describe Quanta's implementation of each NVIDIA graphics processor enabled with PowerMizer™ Technology in each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 23:

Documents that identify all suppliers, manufactures, and/or providers of motherboards, graphics chips, processors, and/or processor chipsets, used in each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 24:

Documents received from all designers or manufacturers of all processors, chipsets, motherboards, and graphics chips, that are used in each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 25:

Documents describing the speed of each Relevant Quanta Product or that product's processor, motherboard, and/or buses, including, but not limited to, timing diagrams and test results.

REQUEST FOR PRODUCTION No. 26:

All motherboard schematics for each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 27:

For each Relevant Quanta Product:

    a.  Technical Documents including datasheets, programmer's guides, hardware guides, BIOS guides, specifications, circuit schematics, Verilog, HDL, block diagrams, firmware, software, and microcode relating to the CPUs, processors, processor cores, cache systems, chipsets, memory controllers, DRAM controllers, graphics processors, Hypertransport buses, and all buses, connections, and devices located between and among these items.

    b.  The BIOS code.

    c.  Documents describing the design and operation of all cache systems (including, but not limited to, all L1 and L2 cache systems), including: Documents Relating To any buses or other electrical paths to which each cache controller is connected, Documents Relating To cache coherency, cache consistency, or cache verification, Documents Relating to any snooping performed by any cache controller, and Documents Relating to write back cycles performed by any cache controller.

d. Documents Relating to any processor or other cache controller activity that can occur when the cache controller is performing snooping.

e. Documents Relating to Concurrent Bus Cycle Operations.

f. Documents Relating to products (e.g., graphics chips) outside of the CPU(s) or processor(s) that can request data from a CPU, processor, North Bridge, memory controller, and/or from main memory.

g. Documents Relating to snooping of any bus by any cache system.

h. Documents Relating to the procedure by which the CPU(s) or processor(s) initiates an I/O operation (such as a read from an I/O port), including, but not limited to, Documents showing the circuits involved in such procedure.

i. Documents Relating to the procedure by which the CPU(s) or processor(s) will obtain data or perform a read operation from chips or devices outside of the CPU(s) or processor(s) itself (or to ports or pins on the CPU(s) or processor(s) connected to such chips or devices), including, but not limited to, Documents showing the circuits involved in such procedure.

j. Documents Relating to the procedure by which the CPU(s) or processor(s) will post data or perform a write operation to chips or devices outside of the CPU(s) or processor(s) itself (or to ports or pins on the CPU(s) or processor(s) connected to such chips or devices), including, but not limited to, Documents showing the circuits involved in such procedure.

k. Documents Relating to the procedure by which the CPU(s) or processor(s) will access, read, load, and/or run BIOS code.

l. Documents Relating to the procedure by which the CPU(s) or processor(s) will access or read data from an external graphics chip, VRAM, or frame buffer.

m. Documents identifying or Relating to the memory space that is addressable by the CPU(s) or processor(s).

14

n. Documents Relating to any register that defines the addressable memory space, including, but not limited to, Documents describing the contents of such a register or describing its values upon initialization.

o. Documents identifying or relating to the I/O space that is addressable by the CPU(s) or processor(s).

p. Documents Relating to any register that defines the addressable I/O space, including, but not limited to, Documents describing the contents of such a register or describing its values upon initialization.

q. Timing diagrams relating to any bus transactions.

REQUEST FOR PRODUCTION No. 28:

For each Relevant Quanta Product that contains more than one processor and/or processor core:

a. Documents Relating to how each core maintains cache coherency or cache consistency or performs cache verification with respect to its associated cache systems as well as the other core's associated cache systems.

b. Documents Relating to the activities or role of each core in accessing, reading, loading, and/or running BIOS code.

c. Documents Relating to the activities or role of each core in accessing or reading data from an external graphics chip, VRAM, or frame buffer.

d. Documents Relating to the crossbar switch, system request interface, hypertransport bus, or other connections between the cores.

REQUEST FOR PRODUCTION No. 29:

Documents that identify the Northbridge and Southbridge used in each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 30:

15

Documents that identify the central processing unit used in each Relevant Quanta Product.

REQUEST FOR PRODUCTION No. 31:

Documents related to all Digitally Coupled Display Devices that Quanta designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 32:

Electronic schematics and circuit designs for all Digitally Coupled Display Devices that Quanta designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 33:

Documents related to all integrated circuit chips contained within each Digitally Coupled Display Device which performs an Input Detection and/or Scaling function that Quanta designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 34:

Documents that describe all Input Detection and/or Scaling functions performed within each Digitally Coupled Display Device that Quanta designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 35:

Schematics, specifications, user manuals, installation manuals, white papers, application notes, and other technical Documents describing each Digitally Coupled Display Device that Quanta designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 36:

Schematics, specifications, user manuals, installation manuals, white papers, application notes, and other technical Documents describing each integrated circuit chip that performs an Input Detection and Scaling function within each Digitally Coupled Display Device that Quanta designs or manufactures for Respondents.

16

REQUEST FOR PRODUCTION No. 37:

Firmware or software contained in each Digitally Coupled Display Device that Quanta designs or manufactures for Respondents which performs an Input Detection and Scaling function.

REQUEST FOR PRODUCTION No. 38:

Bills of materials for each Digitally Coupled Display Device that Quanta designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 39:

Marketing Documents for each Digitally Coupled Display Device that Quanta designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 40:

Marketing Documents, including Documents Quanta has generated and received from its suppliers, for each integrated circuit chip contained within each Digitally Coupled Display Device that Quanta designs or manufactures for Respondents which performs an Input Detection and/or Scaling function.

REQUEST FOR PRODUCTION No. 41:

Communications with Respondents regarding each Digitally Coupled Display Device which performs an Input Detection and/or Scaling function that Quanta designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 42:

Testing, qualification, verification, specification, design, and development Documents related to each integrated circuit chip contained within a Digitally Coupled Display Device that performs an Input Detection and/or Scaling function that Quanta designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 43:

Documents that describe the design of any transition minimized differential signaling ("T.M.D.S.") transmitter or receiver involved in generating or sending signals to a DVI or HDMI port on all desktop or portable computers (including notebook computers and Tablet PCs), that Quanta designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 44:

Documents that identify all of the Relevant Quanta Products by part number and/or model number, internal name. marketing number, and by any other unique designation.

REQUEST FOR PRODUCTION No. 45:

Documents relating to or discussing the Patents-at-Issue or this Lawsuit.

REQUEST FOR PRODUCTION No. 46:

Communications between Quanta and Respondents regarding HP, the Patents-at-Issue, or this Litigation.

REQUEST FOR PRODUCTION No. 47:

Communications with Respondents regarding changes to any Relevant Quanta Product.

**ATTACHMENT B**

**DEFINITIONS**

The following definitions apply to these Topics of Testimony.

1.    "HP" shall mean Complainant Hewlett Packard Company including, without limitation, All of its subsidiaries, affiliates, divisions, related entities, predecessors (including but not limited to Compaq Computer Corporation and Digital Equipment Corporation), successors, and Any present or former officers, directors, trustees, employees, agents, or representatives.

2.    "Quanta" shall mean Quanta Computer, Inc., and all of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys or any others acting on behalf of Quanta Computer, Inc. and any entities controlled or owned by Quanta Computer, Inc.

3.    "Respondents" shall mean Acer, Inc. and Acer America Corporation, including, without limitation, all subsidiaries, parents, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives.

4.    The terms "Document" and "Documents" shall mean and include anything in Quanta's possession, custody, or control that is printed, recorded, or stored in electronic form. Some examples of "Documents" include letters, email, memoranda, reports, agreements, technical Documents, engineering specifications, hardware specifications, software specifications, product specifications, computer code, hand written notes, financial reports, and invoices.  Any request for a "Document" includes a request for all drafts and revisions of the foregoing.

5.    The terms "Communication" and "Communications" shall mean any transfer or exchange between two or more persons of any information whether by written, oral, electronic or other means, including but not limited to personal conversations, correspondence, electronic

19

mail, telephone calls, facsimile communications, or telegrams.

6.     The terms "Imports" or "Imported" shall mean imported into the United States.

7.     "Digital Port" shall mean a port or connector that can be used to create a digital connection or coupling with a computer or other source (such as a cable TV set-top box), including, without limitation, a DVI-D port, a DVI-I port, or a HDMI port.

8.     "Digitally Coupled Display Device" shall mean each product Quanta designs or manufactures for Respondents that is a monitor and/or projector, and that contains a Digital Port.

9.     "Relevant Quanta Product" shall mean all desktop computers, portable computers (including, notebook computers and tablet PCs), and/or Digitally Coupled Display Device that Quanta designs, builds, manufactures, sells, delivers, Imports, and/or tests for or at the direction of Respondents.

10.    "Part" or "Component" shall mean any device contained within a Relevant Quanta Product, shipped by Quanta with a Relevant Quanta Product, Imported by Quanta into the United States and subsequently shipped with a Relevant Quanta Product, recommended for use with a Relevant Quanta Product, or manufactured, produced, or sold with a Relevant Quanta Product.

11.    The terms "any" and "all" shall include "each and every."

12.    The "'236 Patent" shall mean U.S. Patent No. 6,691,236 B1.

13.    The "'706 Patent" shall mean U.S. Patent No. 6,894,706 B1.

14.    The "'415 Patent" shall mean U.S. Patent No. 5,353,415.

15.    The "'119 Patent" shall mean U.S. Patent No. 6,029,119.

16.    "Patents-In-Suit" shall mean the '236 Patent, the '415 Patent, the '706 Patent, and the '119 Patent.

17.    "Driver" shall mean software or firmware that controls the exchange of information to or from an internal or external hardware component of a computer system.

18.    "BIOS" shall mean the basic input/output system of a computer.

19.    "ATI" shall mean ATI Technologies, Inc., including, without limitation, All of its corporate parents (including, without limitation, Advanced Micro Devices, Inc.), subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of ATI.

20.    "NVIDIA" shall mean NVIDIA Corporation, including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of NVIDIA Corporation.

21.    "AMD" shall mean Advanced Micro Devices, Inc, including, without limitation, All of its corporate parents, subsidiaries (including, without limitation, ATI), affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Advanced Micro Devices, Inc.

22.    "Intel" shall mean Intel Corporation, including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Intel Corporation.

23.    "SIS" shall mean Silicon Integrated Systems Corporation including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Silicon Integrated Systems Corporation.

24.    "VIA" shall mean VIA Technologies, Inc. including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of VIA Technologies, Inc.

25.    "ePowerManagement" shall mean the power management feature(s) of Respondents' computer systems having the designation "ePowerManagement."

26.    "AMD PowerNow!™ Technology" shall mean the power-management feature(s) of AMD processors having the designation "AMD PowerNow!™ Technology."

27.    "Enhanced Intel SpeedStep® Technology" shall mean the power management feature(s) of Intel processors having the designation "Enhanced Intel SpeedStep® technology" or "EIST®."

28.    "PowerPlay™ Technology" shall mean the power management feature(s) of ATI graphics processors having the designation "PowerPlay™."

29.    "Cool'n'Quiet ™ Technology" shall mean the technology provided by AMD that allows a computer to select CPU speed, voltage and power based on performance needs and having the designation "Cool'n'Quiet ™ Technology."

30.    "PowerMizer® Technology" shall mean the power management features(s) of NVIDIA graphics processors having the designation "PowerMizer®."

31.    "Graphics Subsystem" shall mean the hardware and software used in an Accused Product to manage the Product's display functions, including but not limited to its graphics processor and Any related Drivers.

32.    "Input Detection" shall mean receiving video or graphics signals from a computer or other source (such as a cable TV set-top box) and determining the input resolution of the image associated with those signals (e.g., determining the number of pixels per line and the number of lines per screen).

33.    "Scaling" shall mean changing the resolution of the image associated with video or graphics signals received from a computer or other source (such as a cable TV set-top box) to a different resolution, or changing the image associated with video or graphics signals received from a computer or other source, in such a manner that the resolution of the final image is different than the resolution of the original image received from the computer or other source.

34.   "Concurrent Bus Cycle Operations" shall mean bus transactions occurring or pending on two or more buses in a computer system at least partially at the same time.

## **TOPICS OF TESTIMONY**

Topic No. 1:

Identify the person or people who will testify on behalf of Quanta for each of the following topics of testimony.

Topic No. 2:

Describe how each Relevant Quanta Product measures and regulates its internal temperature.

Topic No. 3:

Identify and describe the hardware and software used to regulate the temperature in each Relevant Quanta Product.

Topic No. 4:

Describe how each Relevant Quanta Product alters its internal temperature in response to input from a device within the product, including, a display screen; an option card; a PCMCIA card; a processor; a graphics processor; a display; a battery; a power source; a disk drive; a fan; and/or each other peripheral device.

Topic No. 5:

Describe how each portable computer (e.g., including, but not limited to, notebook computers and/or tablet PCs) Quanta designs or manufactures for Respondents or any of the products' Components communicate a clock speed, a core voltage and/or an operating speed, performance or condition, of a graphics processor in to the processor, operating system and/or BIOS of the portable computer.

23

Topic No. 6:

Describe how each Relevant Quanta Product alters its internal temperature in response to the status of the product or the status of a device within the product, including:

    a.  the current temperature;

    b.  a recent temperature change;

    c.  which software applications are running;

    d.  a display screen's activity;

    e.  an option card's activity;

    f.  a PCMCIA card's activity;

    g.  a processor's activity;

    h.  a graphics processor's activity;

    i.  a clock frequency associated with a processor;

    j.  a processor's core voltage;

    k.  a battery's charge level;

    l.  a power source's activity;

    m.  a disk drive's activity;

    n.  a fan's activity; and/or

    o.  each other peripheral device's activity.

Topic No. 7:

For each Relevant Quanta Product:

    a.  Identify and describe the Graphics Subsystem of each product Quanta designs or manufactures for Respondents.

    b.  Describe the processes, methods or mechanisms by which each product Quanta designs or manufactures for Respondents changes the power consumption of its Graphics Subsystem.

c.   Describe the processes, methods or mechanisms by which each product Quanta designs or manufactures for Respondents switches and/or changes a clock frequency, a core voltage, and/or an operating speed or performance, of a graphics processor used in the product in response to switching from AC power to DC battery power, detecting a low battery condition, detecting a demand level of the main processor, and/or detecting that the system state is being saved to non-volatile memory (for example when the computer goes into hibernation).

d.   Describe Quanta's implementation of Respondents' ePowerManagement Technology in each product Quanta designs or manufactures for Respondents.

e.   Describe Quanta's implementation of AMD PowerNow!™ Technology or AMD Cool'n'Quiet™ Technology in each product Quanta designs or manufactures for Respondents.

f.   Describe Quanta's implementation of each AMD processor or chipset enabled with AMD PowerNow!™ Technology or AMD Cool'n'Quiet™ Technology in each product Quanta designs or manufactures for Respondents.

g.   Describe Quanta's implementation of each SIS processor or chipset in each product Quanta designs or manufactures for Respondents.

h.   Describe Quanta's implementation of Enhanced Intel SpeedStep® Technology in each product Quanta designs or manufactures for Respondents.

i.   Describe Quanta's implementation of each Intel processor or chipset enabled with Enhanced Intel SpeedStep® Technology in each product Quanta designs or manufactures for Respondents.

j.   Describe Quanta's implementation of PowerPlay™ Technology in each product Quanta designs or manufactures for Respondents.

k.   Describe Quanta's implementation of each ATI graphics processor enabled with PowerPlay™ Technology in each product Quanta designs or manufactures for Respondents.

25

    l.   Describe Quanta's implementation of PowerMizer™ Technology in each product Quanta designs or manufactures for Respondents.

    m.   Describe Quanta's implementation of each NVIDIA graphics processor enabled with PowerMizer™ Technology in each product Quanta designs or manufactures for Respondents.

<u>Topic No. 8:</u>

For each Relevant Quanta Product:

    a.   Identify and describe all suppliers, manufactures, and/or providers of motherboards, graphics chips, processors, and/or processor chipsets.

    b.   Identify the central processing unit used in each product.

    c.   Identify the northbridge and southbridge used in each product.

    d.   Identify and describe the cache controllers in each product.

    e.   State the processor speed, and how the motherboard, cache, cache controllers and/or buses impact that speed.

    f.   Describe the method by which the product maintains cache coherency and cache consistency and performs cache verification.

    g.   Describe all snooping performed by any cache controller in the product, and describe all events that will cause such snooping to occur.

    h.   Describe all processor or other cache controller activity that can occur when a cache controller is performing snooping.

    i.   Describe all events that will cause a cache controller to perform a write back cycle to main memory.

    j.   Identify all devices other than CPU(s) and processor(s) that can request data from a CPU, processor, chipset, North Bridge, South Bridge, memory controller, or main memory.

k.  Describe the procedure by which a CPU or processor initiates a transaction on a bus external to the CPU or processor itself (such as a read operation on a Hypertransport bus), and identify all circuitry involved in such procedure.

l.  Describe the procedure by which a CPU or processor initiates an I/O operation (such as a read from an I/O port), and identify all circuitry involved in such procedure.

m. Describe the procedure by which a CPU or processor will obtain data or perform a read operation from the CPU or processor itself, and identify all circuitry involved in such procedure.

n.  Describe the procedure by which a CPU or processor will post data or perform a write operation to chips or devices outside of the CPU or processor itself, and identify all circuitry involved in such procedure.

o.  Describe the procedure by which a CPU or processor will access, read, load, and/or run BIOS code.

p.  Describe the procedure by which a CPU or processor will access or read data from an external graphics chip, VRAM, or frame buffer.

q.  Identify and describe the memory space that is addressable by the Relevant AMD Product.

r.  Identify and describe the registers that define the addressable memory space.

s.  Identify and describe the I/O space that is addressable by any CPU or processor.

t.  Identify and describe each register that defines the addressable I/O space.

Topic No. 9:

For each Relevant Quanta Product that contains more than one processor and/or processor core:

27

    a. Describe the process by which each core maintains cache coherency or cache consistency or performs cache verification with respect to its associated cache systems as well as the other core's associated cache systems.

    b. Describe the role of each core in accessing, reading, loading, and/or running BIOS code.

    c. Describe the role of each core in accessing or reading data from an external graphics chip, VRAM, or frame buffer.

Topic No. 10:

Identify the integrated circuit chips contained within each Digitally Coupled Display Device which performs an Input Detection and/or Scaling function that Quanta designs or manufactures for Respondents.

Topic No. 11:

Describe the Input Detection and/or Scaling functions performed within each Digitally Coupled Display Device that Quanta designs or manufactures for Respondents.

Topic No. 12:

Identify and describe all testing, qualification, verification, specification, design, and development Documents related to each integrated circuit chip contained within a Digitally Coupled Display Device that performs an Input Detection and/or Scaling function that Quanta designs or manufactures for Respondents.

Topic No. 13:

For each Digitally Coupled Display Device that Quanta designs or manufactures for Respondents:

    a. Describe the process or algorithm by which the Digitally Coupled Display Device performs Input Detection.

b.  Identify and describe all signals (e.g., HSync, VSync, clock, Data Enable) received from the Host Computer that are used in performing Input Detection, and describe how those signals are used to perform Input Detection.

c.  State whether the Digitally Coupled Display Device counts pixels between horizontal sync pulses to determine the horizontal resolution of the input signal received from the Host Computer, and if it does, describe the process.

d.  State whether the Digitally Coupled Display Device counts pixel clock pulses between horizontal sync pulses to determine the horizontal resolution of the input signal received from the Host Computer, and if it does, describe the process.

e.  State whether the Digitally Coupled Display Device counts horizontal lines between vertical sync pulses to determine the vertical resolution of the input signal received from the Host Computer, and if it does, describe the process.

f.  State whether the Digitally Coupled Display Device counts horizontal sync pulses between vertical sync pulses to determine the vertical resolution of the input signal received from the Host Computer, and if it does, describe the process.

g.  Describe how the Digitally Coupled Display Device uses the Data Enable signal in determining the horizontal and vertical resolutions of the input signal received from the Host Computer.

h.  Identify and describe the hardware (including but not limited all counters), software, and firmware components within the Digitally Coupled Display Device involved in Input Detection and the role played by each.

i.  Describe the process or algorithm by which the Digitally Coupled Display Device performs Scaling.

j.  Describe how the value corresponding to the native or maximum resolution of the monitor is provided to the portion of the Digitally Coupled Display Device that performs Scaling.

    k. Identify and describe the hardware, software, and firmware components within the Digitally Coupled Display Device involved in Scaling and the role played by each.

    l. State whether the Digitally Coupled Display Device complies with the DVI Specification, and if it does not comply, identify the specific portions of the DVI Specification with which the Digitally Coupled Display Device does not comply.

    m. State whether the Digitally Coupled Display Device complies with the HDMI Specification, and if it does not comply, identify the specific portions of the HDMI Specification with which the Digitally Coupled Display Device does not comply.

    n. Identify all possible resolutions received from the Host Computer upon which the Digitally Coupled Display Device can perform Input Detection and Scaling.

**Topic No. 14:**

Describe the design and functionality of any transition minimized differential signaling ("T.M.D.S.") transmitter or receiver involved in generating or sending signals to a DVI or HDMI port on all desktop or portable computers (including notebook computers and Tablet PCs), that Quanta designs or manufactures for Respondents.

**Topic No. 15:**

Describe all communications within Quanta or between Quanta and any third-party (including, but not limited to, Respondents) regarding HP, the Litigation, or any Patent-In-Suit.

**Topic No. 16:**

Describe all communications between Quanta and Respondents regarding any changes or proposed changes to any Quanta product.

**Topic No. 17:**

State whether all Documents produced by Quanta in this Litigation are authentic Quanta Documents and state whether such Documents were prepared or kept by Quanta in the ordinary course of its business activities.

<u>Topic No. 18:</u>

Identify all of the Relevant Quanta Products by part number and/or model number, internal name. marketing number, and by any other unique designation.

ATTACHMENT C

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

| In the Matter of | ) | |
| | ) | |
| CERTAIN PERSONAL COMPUTERS | ) | Investigation No. 337-TA-606 |
| AND DIGITAL DISPLAY DEVICES | ) | |
| | ) | |

Order No. 2: Protective Order

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information, as such terms are used in the Commission's Rules, 19 C.F.R. Section 210.34(a)(7),

IT IS HEREBY ORDERED THAT:

1. Confidential business information is information which has not been made public and which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, the disclosure of which information is likely to have the effect of either (1) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or (2) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such information.

2. Any information submitted, either voluntarily or pursuant to order, in this investigation, which is asserted by a supplier to contain or constitute confidential business

information shall be so designated by such supplier in writing, or orally at a deposition, conference or hearing, and shall be segregated from other information being submitted. Documents shall be clearly and prominently marked on their face with the legend: "[supplier's name] CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER," or a comparable notice. Information obtained during discovery and asserted by the supplier to be confidential under this order will be deemed to be confidential unless the administrative law judge or the Commission rules that it is not. When such information is made part of a pleading, or is offered into the evidentiary record, the party offering it must state the basis for its claimed confidentiality. Confidential information whether submitted in writing or in oral testimony shall be disclosed at a hearing only on the in camera record and shall not be made part of the public record of this proceeding. The administrative law judge or the Commission may determine that information alleged to be confidential is not confidential, or that its disclosure is necessary for the proper disposition of the proceeding, at any time before, during or after the close of the hearing herein. If such a determination is made by the administrative law judge, opportunity shall be provided to the supplier of such information to argue its confidentiality, prior to the time that such ruling becomes final.

3. In the absence of written permission from the supplier or an order by the Commission or the administrative law judge, any confidential documents or business information submitted in accordance with the provisions of paragraph 2 above shall not be disclosed to any person other than: (i) outside counsel for parties to this investigation, including necessary secretarial and clerical personnel assisting such counsel, (ii) qualified persons taking testimony involving such documents or information and necessary stenographic and clerical personnel thereof, (iii)

technical experts and their staff who are employed by outside counsel under (i) above for the

purposes of this litigation (unless they are otherwise employed by, consultants to, or otherwise

affiliated with a non-governmental party, or are employees of any domestic or foreign

manufacturer, wholesaler, retailer, or distributor of certain personal computers and digital display

devices, which are the subject of this investigation), and (iv) the Commission, the administrative

law judge, the Commission staff, and personnel of any governmental agency as authorized by the

Commission.  However see Commission rule 210.5 (b) which conforms to 19 U.S.C. §

1337(n)(2), which clarifies the list of government officers and employees who may have access

to confidential business information, and (c) which alerts suppliers to the possibility that

confidential business information may be transmitted to a federal district court, subject to such

protective order as the district court determines necessary.  This result might occur in a limited

class of cases because of 28 U.S.C. § 1659.  Past Commission practice has been to permit the

transfer of confidential business information to another court only with permission of the

supplier of the information.  Particularly where the supplier is a third party who is involved in

neither the Commission investigation nor the district court case, it is important that the supplier

be made aware that treatment of confidential information would be governed by the district

court's protective order and not that of the Commission following transmittal of the record under

this provision.  See also Commission rule 210.39 which outlines the circumstances in which the

Commission's record, including the in camera record, may be transmitted to a federal district

court, subject to such protective order as the district court determines necessary.  In addition,

referring to Commission Administrative Order No. 97-06, dated February 4, 1997, information

submitted under this Protective Order may be disclosed to technical contract personnel who are

acting in the capacity of Commission employees, for developing or maintaining the records of

this investigation or related proceedings, or in internal audits and investigations relating to the

programs and operations of the Commission pursuant to 5 U.S.C. Appendix 3. Any contract

personnel will sign appropriate non-disclosure agreements.[1] Where the supplier of information

under this order is a third party who is not involved in the Commission investigation, it is

important that the supplier be made aware of the disclosure of such information to contract

personnel by being provided a copy of the protective order.

    4. Confidential business information submitted in accordance with the provisions of

paragraph 2 above shall not be made available to any person designated in paragraph 3(i) and (iii)

unless he or she shall have first read this order and shall have agreed, by letter filed with the

Secretary of this Commission (letter of acknowledgment): (i) to be bound by the terms thereof;

(ii) not to reveal such confidential business information to anyone other than another person

designated in paragraph 3; and (iii) to utilize such confidential business information solely for

purposes of this investigation. Such letter shall also acknowledge that the signatory(ies) has

(have) read the order. Such letter shall further state which parties the person filing the letter is

involved with and shall state in what capacity he or she is a signatory to the Protective Order

(e.g., as an attorney under Paragraph 3(i) or technical expert under Paragraph 3(iii) and, in the

case of an attorney, in what jurisdictions he or she is admitted to practice. Each attorney seeking

access to confidential business information shall sign such letter individually, but clerical and

support personnel (including law clerks and paralegals) of that attorney need not sign. All letters

_____

    [1] A supplier of confidential business information may request that the administrative law judge identify said contract personnel.

4

of acknowledgment of this Protective Order shall be served on all non-parties who have

theretofore submitted confidential business information in accordance with the provisions of

paragraph 2, above.

5. Confidential business information obtained in the Commission proceeding may be

used with the consent of the supplier in a parallel district court proceeding under a protective

order issued by the district court without losing its confidential status under the protective order

in this proceeding as long as the information is not made public in the district court proceeding or

by someone who obtains the information from that source or by anyone else.

6. Confidential business information furnished by a supplier may lose its protection

under this order if it is disseminated to anyone not authorized to see it either by this protective

order or by a protective order issued by a district court in a parallel proceeding protecting

confidential business information obtained by the parties under the Commission's protective

order. Information obtained pursuant to the Commission's protective order, however, may be

produced to the district court under the district court protective order only with the consent of the

suppliers of that information.

7. If the Commission or the administrative law judge orders, or if the supplier and all

parties to the investigation agree, that access to, or dissemination of, information submitted as

confidential business information shall be made to persons not included in paragraphs 3, 5 or 6

above, such matter shall only be accessible to, or disseminated to, such persons based on the

conditions pertaining to, and obligations arising from, this order, and such persons shall be

considered subject to it unless the Commission or the administrative law judge finds that the

information is not confidential business information as defined in paragraph 1 hereof.

5

8. Any confidential business information submitted to the Commission or the administrative law judge in connection with a motion or other proceeding within the purview of this investigation shall be submitted under a designation that confidential information is contained or attached therein, pursuant to paragraph 2 above. When any confidential business information submitted in accordance with paragraph 2 above is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such confidential portions and separately label them "[supplier's name], CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER." Before a court reporter receives any such information, he or she shall have first read this order and shall have agreed in writing to be bound by the terms thereof. Alternatively, he or she shall sign the agreement included as Attachment A hereto. Copies of each such signed agreement shall be provided to the supplier of such confidential business information and to the Secretary of the Commission.

9. The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Commission or the administrative law judge rules, after proper notice and hearing, was publicly known at the time it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

10. The administrative law judge acknowledges that any document or information submitted as confidential business information pursuant to paragraph 2 above is to be treated as such within the meaning of 5 U.S.C. § 522(b)(4) and 18 U.S.C. § 1905, subject to a challenge by

6

any party pursuant to paragraph 12 below or to a final ruling by the Commission, the administrative law judge or its Freedom of Information Act Officer to the contrary, or by appeal of such a ruling, interlocutory or otherwise.

11. If no determination has been made by the administrative law judge or the Commission that the information designated as confidential by the submitter is not confidential, the persons who are recipients of such information shall take all necessary and proper steps to preserve the confidentiality of, and to protect each supplier's rights with respect to, any confidential business information designated by the supplier in accordance with paragraph 2 above.

12. The supplier of any confidential information is hereby notified that Commission regulations 19 C.F.R. § 201.19(c) through (e) generally require that the Commission will give notice to a submitter of confidential information upon the Commission's receipt of an FOIA request.

13. The supplier of any confidential information is put on notice that Commission rule 210.20 provides that only a party may move to declassify and that only then are such motions, whether brought at any time during or after the conclusion of an investigation, addressed to and ruled upon by an administrative law judge. Other requests to declassify made by non-parties, such as an FOIA request, will not be referred to the administrative law judge for consideration under the protective order.

14. If a party to this order who is a recipient of any business information designated as confidential and submitted in accordance with paragraph 2, disagrees with respect to such a designation, in full or in part, it shall notify the supplier in writing, and they will thereupon

7

confer as to the status of the subject information proffered within the context of this order. If

prior to, or at the time of, such a conference, the supplier withdraws its designation of such

information as being subject to this order, but nonetheless submits such information for purposes

of the investigation, such supplier shall express the withdrawal in writing and shall serve such

withdrawal upon all parties, the administrative law judge, and the Commission investigative

attorney. If the recipient and supplier are unable to concur upon the status of the subject

information submitted as confidential business information within ten days from the date of

notification of such disagreement, any party to this order may raise the issue of the designation of

such a status to the Commission or to the administrative law judge, and the Commission or the

administrative law judge may raise the issue of designation of the confidential status without any

request from a party. Upon notice that such confidential status of information is at issue, the

party to the investigation which submitted the information and designated it as confidential shall

have the burden of proving such confidential status.

15. No less than ten days (or any other period of time designated by the administrative

law judge) prior to the initial disclosure to the proposed expert of any confidential information

submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in

writing the name of such proposed expert and his or her educational and employment history to

the supplier. If the supplier objects to the disclosure of such confidential business information to

such proposed expert as inconsistent with the language or intent of this order or on other

grounds, it shall notify the recipient in writing of its objection and the grounds therefor prior to

the initial disclosure. If the dispute is not resolved on an informal basis within ten days of receipt

of such notice of objection, motion may be made to the administrative law judge for a ruling on

such objection. The submission of such confidential business information to such proposed expert shall be withheld pending the ruling of the administrative law judge. The terms of this paragraph shall be inapplicable to experts within the Commission or to experts from other governmental agencies who are consulted with, or used by, the Commission.

16. If confidential business information submitted in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this protective order, the party responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the supplier and the administrative law judge and, without prejudice to other rights and remedies of the supplier, make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

17. Nothing in this order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Commission, its Freedom of Information Act Officer, or the administrative law judge concerning the issue of the status of confidential business information.

18. Upon final termination of this investigation, each party that is subject to this order shall destroy or return to the supplier all items containing confidential business information submitted in accordance with paragraph 2 above, including all copies of such matter which may have been made, but not including copies containing notes or other attorney's work product that may have been placed thereon by counsel for the receiving party. All copies containing such notes or other attorney's work product shall be destroyed. Receipt of material returned to the supplier shall be acknowledged in writing. This paragraph shall not apply to the Commission, including its investigative attorney, and the administrative law judge, which shall retain such

9

material pursuant to statutory requirements and for other recordkeeping purposes, but may destroy those additional copies in its possession which are regarded as surplusage.

19. If any confidential business information which is supplied in accordance with paragraph 2 above is supplied by a non-party to this investigation, such a non-party shall be considered a "supplier" within the meaning of that term as it is used in the context of this order.

20. At or before the final termination of the investigation, copies of confidential information that was in the hands of expert witnesses must be retrieved or destroyed.

21. Except as provided in Commission rule 210.20, the jurisdiction of the administrative law judge over this order terminates upon filing of the initial determination issued at the end of the case. After that date, the Commission has jurisdiction to enforce this order and to issue reprimands and other sanctions.

22. The parties may move to amend this order, but any proposed amendment that would broaden the range of persons having access to confidential business information must be proposed and adopted before such information is supplied in reliance upon the terms of this order, unless all suppliers of confidential information consent to the amendment.

23. The Secretary shall serve a copy of this order upon all parties.

Paul J. Luckern
Administrative Law Judge

Issued: May 17, 2007

ATTACHMENT A

## NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, _____, do solemnly swear that I will not divulge any

information communicated to me in any confidential portion of the investigation or hearing in

Certain Personal Computers And Digital Display Devices, Inv. No. 337-TA-606, except as

permitted in the protective order issued in this case. I will not directly or indirectly use, or allow

the use of such information for any purpose other than that directly associated with my official

duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any

person reveal the nature of content of any information communicated during any confidential

portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the

participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is a

violation of the Federal Criminal Code and punishable by a fine of up to $10,000, imprisonment

of up to ten (10) years, or both.

Signed _____

Dated _____

Firm or affiliation

_____

_____

11

**CERTAIN PERSONAL COMPUTERS AND DIGITAL    Investigation No. 337-TA-606
DISPLAY DEVICES**

<u>CERTIFICATE OF SERVICE</u>

I, Marilyn R. Abbott, hereby certify that the attached **Order** was served by hand upon
Commission Investigative Attorney Bryan Moore, Esq., and upon the following parties via first
class mail, and air mail where necessary, on May 18, 2007.

Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, SW - Room 112
Washington, DC 20436

For Complainant Hewlett-Packard Company:

    John Allock, Esq.
    Sean C. Cunningham, Esq.
    **DLA PIPER US LLP**
    401 B Street, Suite 1700
    San Diego, CA  92101-4297

    Andrew P. Valentine, Esq.
    Alan A. Limbach, Esq.
    **DLA PIPER US LLP**
    2000 University Avenue
    East Palo Alto, CA  64303-2248

    James M. Heintz, Esq.
    **DLA PIPER US LLP**
    1200 Nineteenth Street, NW
    Washington, DC  20036-2412

**CERTAIN PERSONAL COMPUTERS AND DIGITAL**    **Investigation No. 337-TA-606**
**DISPLAY DEVICES**

<u>CERTIFICATE OF SERVICE</u> pg. 2

Respondents:

Acer Incorporated
SF, 88, Sec. 1
Hsin Tai Ru Rd., Hsichih
Taipei, Hsien 221
Taiwan, R.O.C.

Acer America Corporation
333 West San Carlos Street
Suite 1500
San Jose, CA  95110

**CERTAIN PERSONAL COMPUTERS AND DIGITAL**    **Investigation No. 337-TA-606**
**DISPLAY DEVICES**

## PUBLIC MAILING LIST

Sherry Robinson
LEXIS-NEXIS
8891 Gander Creek Drive
Miamisburg, OH   45342

Ronnita Green
Thomson West
1100 – 13th Street NW
Suite 200
Washington, DC   20005

**(PARTIES NEED NOT SERVE COPIES ON LEXIS OR WEST PUBLISHING)**

**Proposed Letter Rogatory to
Compal Electronics, Inc.**

.

**In the United States District Court
For the District of Columbia**

| | |
|---|---|
| Hewlett-Packard Company, | |
| Plaintiff (Complainant), | Civil Action No. Misc. _07-335_ |
| v. | |
| Acer, Inc. & Acer America Corp., | |
| Defendants (Respondents). | |

## REQUEST FOR INTERNATIONAL ASSISTANCE – LETTER ROGATORY TO THE TAIWANESE JUDICIAL AUTHORITIES

The United States District Court for the District of Columbia presents its compliments to the Appropriate Judicial Authority of Taiwan, and respectfully requests international judicial assistance to obtain evidence to be used in an administrative proceeding as approved by this Court in the above captioned matter. Specifically, this Court requests that the Appropriate Judicial Authority in Taiwan, by the proper and usual process of your Courts, compel the appearance of Compal Electronics, Inc. ("Compal") statutory representative, 許勝雄 ("Hsu Sheng Hsiung"), to testify under oath and to produce the documents identified below. This Court also requests that Appropriate Judicial Authority compel the testimony of any other Compal representatives that Hsu Sheng Hsiung may identify as knowledgeable in the listed topics. Compal is a Taiwanese corporation located at 台北市內湖區瑞光路581號 ("No. 581, Rueiguang Rd., Neihu District, Taipei City 114, Taiwan R.O.C.").

Based on the representations made by Complainant Hewlett-Packard Company ("HP"), this Court believes that Compal has knowledge regarding material facts and that it is in possession of documents that are relevant for the proper prosecution of the above captioned case.

1

This Court also believes that assistance from the Appropriate Judicial Authority in Taiwan would serve to further the international interests of justice and judicial cooperation.

This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the Appropriate Judicial Authority of Taiwan compels Compal to give evidence and produce documents. This matter is set for hearing in the United States on a very short schedule and requires urgent attention from the Appropriate Judicial Authority in Taiwan.

## I.     SUMMARY OF THIS ACTION

HP has accused Respondents, Acer, Inc. and Acer America Corporation (collectively, "Respondents") of violating Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337) by importing, certain products that infringe one or more of HP's patents. The Tariff Act of 1930 makes it illegal to import goods into the United States that, among other things, infringe a United States Patent. In particular, HP accuses Respondents of importing desktop computers, portable computers (including notebook computers and table PCs), and computer monitors (the "Accused Products") that infringe United States Patent No. 6,691,236 B1 (the "'236 Patent"); United States Patent No. 6,029,119 (the "'119 Patent"); United States Patent No. 5,353,415 (the "'415 Patent"); and/or United States Patent No. 6,894,706 (the "'706 Patent") (collectively, the "Patents-at-Issue"). Pursuant to HP's complaint of patent infringement, the United States International Trade Commission instituted Investigation No. 337-TA-606, which seeks to examine Respondents' importation activities. The United States Office of Unfair Import Investigations is also a party to this Investigation.

The Patents-at-Issue cover a variety of features and components in the Accused Products. The '415 Patent relates to the roles played by a central processing unit ("CPU") and its associated cache memory system in performing concurrent bus operations. The '119 Patent relates to a computer's ability to regulate its internal temperature based on monitoring the

temperature and/or activities of various locations within the computer, including the central processing unit. The '236 Patent relates to portable computer systems that conserve power by changing the performance of video graphics controller depending on the system's power source, battery condition, demands on the CPU, and/or the system state being saved to non-volatile memory (for example, when the computer goes into hibernation). The '706 Patent relates to display systems (such as an LCD monitor) capable of determining the resolution of the graphics that are received from a computer and scaling the graphics to fit the "native" resolution of the display.

On information and belief, Compal designs and manufactures the Accused Products for Respondents. Compal is one of several Original Design Manufacturers ("ODM") for Respondents. As an ODM, Compal builds the Accused Products based on Respondents' specifications and is responsible for developing engineering solutions to meet these specifications. This ODM relationship with Compal makes it is likely that Respondents will not be able to provide evidence of the relevant technical details concerning the Accused Products made by Compal for Respondents. Therefore, HP requests this assistance to obtain the technical information it requires directly from Compal.

## II.    DOCUMENTS AND TESTIMONY REQUESTED

This Court requests the Appropriate Judicial Authority to compel Compal to produce to HP the types of documents listed in Attachment A to this Request.

This Court also requests the Appropriate Judicial Authority to compel Compal to make Hsu Sheng Hsiung, or another suitable representative, available to answer questions listed in Attachment B to this Request.

There is a protective order in this case to protect the confidentiality of any documents Compal produces. The protective order is attached as Attachment C to this Request.

Therefore, this Court respectfully requests that, in the interests of justice, you issue

3

appropriate orders, subpoenas, or other compulsory process necessary to compel the production of the above mentioned documents and the attendance of a Compal representative for oral testimony on the above mentioned topics. This Court also request that you specifically authorize that the oral testimony may be videotaped and audiotaped, in addition to being transcribed by a qualified court reporter.

This Court stands ready to extend similar assistance to the Courts of Taiwan in like cases. To the extent there are expenses associated with providing assistance in response to this Request, this Court will see that the Appropriate Judicial Authority in Taiwan is reimbursed by HP. HP may be contacted in Taiwan through Ms. Daisy Wang of Lee and Li, Attorneys-at-Law. Her offices are located at 7F, No. 201, Tun Hua N. Road, Taipei 105, Taiwan. She may be contacted by telephone at 866-2-2715-3300 ext. 2335.

Dated: _____, 2007
      Month, Day

                                         _____
                                         District Court Judge
                                         District Court of the District of Columbia

## ATTACHMENT A

## DEFINITIONS

The following definitions apply to these Document Requests.

1.    "HP" shall mean Complainant Hewlett Packard Company including, without limitation, All of its subsidiaries, affiliates, divisions, related entities, predecessors (including but not limited to Compaq Computer Corporation and Digital Equipment Corporation), successors, and Any present or former officers, directors, trustees, employees, agents, or representatives.

2.    "Compal" shall mean Compal Electronics, Inc., and all of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys or any others acting on behalf of Compal Electronics, Inc. and any entities controlled or owned by Compal Electronics, Inc.

3.    "Respondents" shall mean Acer, Inc. and Acer America Corporation, including, without limitation, all subsidiaries, parents, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives.

4.    The terms "Document" and "Documents" shall mean and include anything in Compal's possession, custody, or control that is printed, recorded, or stored in electronic form. Some examples of "Documents" include letters, email, memoranda, reports, agreements, technical Documents, engineering specifications, hardware specifications, software specifications, product specifications, computer code, hand written notes, financial reports, and invoices.  Any request for a "Document" includes a request for all drafts and revisions of the foregoing.

5.    The terms "Communication" and "Communications" shall mean any transfer or exchange between two or more persons of any information whether by written, oral, electronic or other means, including but not limited to personal conversations, correspondence, electronic

5

mail, telephone calls, facsimile communications, or telegrams.

6.    The terms "Imports" or "Imported" shall mean imported into the United States.

7.    "Digital Port" shall mean a port or connector that can be used to create a digital connection or coupling with a computer or other source (such as a cable TV set-top box), including, without limitation, a DVI-D port, a DVI-I port, or a HDMI port.

8.    "Digitally Coupled Display Device" shall mean each product Compal designs or manufactures for Respondents that is a monitor and/or projector, and that contains a Digital Port.

9.    "Relevant Compal Product" shall mean all desktop computers, portable computers (including, notebook computers and tablet PCs), and/or Digitally Coupled Display Device that Compal designs, builds, manufactures, sells, delivers, Imports, and/or tests for or at the direction of Respondents.

10.    "Part" or "Component" shall mean any device contained within a Relevant Compal Product, shipped by Compal with a Relevant Compal Product, Imported by Compal into the United States and subsequently shipped with a Relevant Compal Product, recommended for use with a Relevant Compal Product, or manufactured, produced, or sold with a Relevant Compal Product.

11.    The terms "any" and "all" shall include "each and every."

12.    The "'236 Patent" shall mean U.S. Patent No. 6,691,236 B1.

13.    The "'706 Patent" shall mean U.S. Patent No. 6,894,706 B1.

14.    The "'415 Patent" shall mean U.S. Patent No. 5,353,415.

15.    The "'119 Patent" shall mean U.S. Patent No. 6,029,119.

16.    "Patents-In-Suit" shall mean the '236 Patent, the '415 Patent, the '706 Patent, and the '119 Patent.

17.    "Driver" shall mean software or firmware that controls the exchange of information to or from an internal or external hardware component of a computer system.

18.    "BIOS" shall mean the basic input/output system of a computer.

6

19.    "ATI" shall mean ATI Technologies, Inc., including, without limitation, All of its corporate parents (including, without limitation, Advanced Micro Devices, Inc.), subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of ATI.

20.    "NVIDIA" shall mean NVIDIA Corporation, including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of NVIDIA Corporation.

21.    "AMD" shall mean Advanced Micro Devices, Inc, including, without limitation, All of its corporate parents, subsidiaries (including, without limitation, ATI), affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Advanced Micro Devices, Inc.

22.    "Intel" shall mean Intel Corporation, including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Intel Corporation.

23.    "SIS" shall mean Silicon Integrated Systems Corporation including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Silicon Integrated Systems Corporation.

24.    "VIA" shall mean VIA Technologies, Inc. including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of VIA Technologies, Inc.

7

25.    "ePowerManagement" shall mean the power management feature(s) of Respondents' computer systems having the designation "ePowerManagement."

26.    "AMD PowerNow!™ Technology" shall mean the power-management feature(s) of AMD processors having the designation "AMD PowerNow!™ Technology."

27.    "Enhanced Intel SpeedStep® Technology" shall mean the power management feature(s) of Intel processors having the designation "Enhanced Intel SpeedStep® technology" or "EIST®."

28.    "PowerPlay™ Technology" shall mean the power management feature(s) of ATI graphics processors having the designation "PowerPlay™."

29.    "Cool'n'Quiet ™ Technology" shall mean the technology provided by AMD that allows a computer to select CPU speed, voltage and power based on performance needs and having the designation "Cool'n'Quiet ™ Technology."

30.    "PowerMizer® Technology" shall mean the power management features(s) of NVIDIA graphics processors having the designation "PowerMizer®."

31.    "Graphics Subsystem" shall mean the hardware and software used in an Accused Product to manage the Product's display functions, including but not limited to its graphics processor and Any related Drivers.

32.    "Input Detection" shall mean receiving video or graphics signals from a computer or other source (such as a cable TV set-top box) and determining the input resolution of the image associated with those signals (e.g., determining the number of pixels per line and the number of lines per screen).

33.    "Scaling" shall mean changing the resolution of the image associated with video or graphics signals received from a computer or other source (such as a cable TV set-top box) to a different resolution, or changing the image associated with video or graphics signals received from a computer or other source, in such a manner that the resolution of the final image is different than the resolution of the original image received from the computer or other source.

34.    "Concurrent Bus Cycle Operations" shall mean bus transactions occurring or pending on two or more buses in a computer system at least partially at the same time.

## DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION No. 1:

Documents that describe the method, process, apparatus or device used to regulate the temperature in each Relevant Compal Product.

### REQUEST FOR PRODUCTION No. 2:

Engineering specifications, software specifications, product specifications, and circuit schematics for each Relevant Compal Product.

### REQUEST FOR PRODUCTION No. 3:

Documents, software code, or Drivers that describe how each Relevant Compal Product measures and regulates its internal temperature.

### REQUEST FOR PRODUCTION No. 4:

Documents that describe the hardware and software used to regulate the temperature in each Relevant Compal Product for Respondents.

### REQUEST FOR PRODUCTION No. 5:

Documents that describe how each Relevant Compal Product alters its internal temperature in response to input from a device within the product, including, a display screen; an option card; a PCMCIA card; a processor; a graphics processor; a display; a battery; a power source; a disk drive; a fan; and/or each other peripheral device.

### REQUEST FOR PRODUCTION No. 6:

Documents that describe how each Relevant Compal Product alters its internal

temperature in response to the status of the product or the status of a device within the product, including, the current temperature; a recent temperature change; which software applications are running; a display screen's activity; an option card's activity; a PCMCIA card's activity; a processor's activity; a graphics processor's activity; a clock frequency associated with a processor; a processor's core voltage; a battery's charge level; a power source's activity; a disk drive's activity; a fan's activity; and/or each other peripheral device's activity.

REQUEST FOR PRODUCTION No. 7:

Documents describing how each portable computer (e.g., including, but not limited to, notebook computers and/or tablet PCs) Compal designs or manufactures for Respondents or any of the products' Components communicate a clock speed, a core voltage and/or an operating speed, performance or condition, of a graphics processor in to the processor, operating system and/or BIOS of the portable computer.

REQUEST FOR PRODUCTION No. 8:

Documents that describe the Graphics Subsystem of each Relevant Compal Product.

REQUEST FOR PRODUCTION No. 9:

Documents that describe the processes, methods or mechanisms by which each Relevant Compal Product changes the power consumption of its Graphics Subsystem.

REQUEST FOR PRODUCTION No. 10:

Documents that describe the processes, methods or mechanisms by which each Relevant Compal Product switches and/or changes a clock frequency, a core voltage, and/or an operating speed or performance, of a graphics processor used in the product.

REQUEST FOR PRODUCTION No. 11:

Documents that describe the processes, methods or mechanisms by which each Relevant Compal Product alters the operation of its graphics processor in response to: a detected low

10

battery condition; whether or not the product is running on battery power; or the demand level on the main processor, and/or whether the system state is being saved to non-volatile memory (for example when the computer goes into hibernation).

### REQUEST FOR PRODUCTION No. 12:

Documents, including engineering specifications, software specifications, schematics, or software that describe Compal's implementation of Respondents' ePowerManagement Technology in each Relevant Compal Product.

### REQUEST FOR PRODUCTION No. 13:

Documents, including engineering specifications, software specifications, schematics, or software that describe Compal's implementation of AMD PowerNow!™ Technology or AMD Cool'n'Quiet™ Technology in each Relevant Compal Product.

### REQUEST FOR PRODUCTION No. 14:

Documents that describe Compal's implementation of each AMD processor or chipset enabled with AMD PowerNow!™ Technology or AMD Cool'n'Quiet™ Technology in each Relevant Compal Product.

### REQUEST FOR PRODUCTION No. 15:

Documents that describe Compal's implementation of each SIS processor or chipset in each Relevant Compal Product.

### REQUEST FOR PRODUCTION No. 16:

Documents that describe Compal's implementation of each VIA processor or chipset in each Relevant Compal Product.

REQUEST FOR PRODUCTION No. 17:

Documents, including engineering specifications, software specifications, schematics, or software that describe Compal's implementation of Enhanced Intel SpeedStep® Technology in each Relevant Compal Product.

REQUEST FOR PRODUCTION No. 18:

Documents that describe Compal's implementation of each Intel processor or chipset enabled with Enhanced Intel SpeedStep® Technology in each Relevant Compal Product.

REQUEST FOR PRODUCTION No. 19:

Documents, including engineering specifications, software specifications, schematics, or software that describe Compal's implementation of PowerPlay™ Technology in each Relevant Compal Product.

REQUEST FOR PRODUCTION No. 20:

Documents that describe Compal's implementation of each ATI graphics processor enabled with PowerPlay™ Technology in each Relevant Compal Product.

REQUEST FOR PRODUCTION No. 21:

Documents, including engineering specifications, software specifications, schematics, or software that describe Compal's implementation of PowerMizer™ Technology in each Relevant Compal Product.

REQUEST FOR PRODUCTION No. 22:

Documents that describe Compal's implementation of each NVIDIA graphics processor enabled with PowerMizer™ Technology in each Relevant Compal Product.

REQUEST FOR PRODUCTION No. 23:

Documents that identify all suppliers, manufactures, and/or providers of motherboards, graphics chips, processors, and/or processor chipsets, used in each Relevant Compal Product.

REQUEST FOR PRODUCTION No. 24:

Documents received from all designers or manufacturers of all processors, chipsets, motherboards, and graphics chips, that are used in each Relevant Compal Product.

REQUEST FOR PRODUCTION No. 25:

Documents describing the speed of each Relevant Compal Product or that product's processor, motherboard, and/or buses, including, but not limited to, timing diagrams and test results.

REQUEST FOR PRODUCTION No. 26:

All motherboard schematics for each Relevant Compal Product.

REQUEST FOR PRODUCTION No. 27:

For each Relevant Compal Product:

a. Technical Documents including datasheets, programmer's guides, hardware guides, BIOS guides, specifications, circuit schematics, Verilog, HDL, block diagrams, firmware, software, and microcode relating to the CPUs, processors, processor cores, cache systems, chipsets, memory controllers, DRAM controllers, graphics processors, Hypertransport buses, and all buses, connections, and devices located between and among these items.

b. The BIOS code.

c. Documents describing the design and operation of all cache systems (including, but not limited to, all L1 and L2 cache systems), including: Documents Relating To any buses or other electrical paths to which each cache controller is connected, Documents Relating To cache coherency, cache consistency, or cache

13

verification, Documents Relating to any snooping performed by any cache controller, and Documents Relating to write back cycles performed by any cache controller.

d.  Documents Relating to any processor or other cache controller activity that can occur when the cache controller is performing snooping.

e.  Documents Relating to Concurrent Bus Cycle Operations.

f.  Documents Relating to products (e.g., graphics chips) outside of the CPU(s) or processor(s) that can request data from a CPU, processor, North Bridge, memory controller, and/or from main memory.

g.  Documents Relating to snooping of any bus by any cache system.

h.  Documents Relating to the procedure by which the CPU(s) or processor(s) initiates an I/O operation (such as a read from an I/O port), including, but not limited to, Documents showing the circuits involved in such procedure.

i.  Documents Relating to the procedure by which the CPU(s) or processor(s) will obtain data or perform a read operation from chips or devices outside of the CPU(s) or processor(s) itself (or to ports or pins on the CPU(s) or processor(s) connected to such chips or devices), including, but not limited to, Documents showing the circuits involved in such procedure.

j.  Documents Relating to the procedure by which the CPU(s) or processor(s) will post data or perform a write operation to chips or devices outside of the CPU(s) or processor(s) itself (or to ports or pins on the CPU(s) or processor(s) connected to such chips or devices), including, but not limited to, Documents showing the circuits involved in such procedure.

k.  Documents Relating to the procedure by which the CPU(s) or processor(s) will access, read, load, and/or run BIOS code.

l.  Documents Relating to the procedure by which the CPU(s) or processor(s) will access or read data from an external graphics chip, VRAM, or frame buffer.

14

m. Documents identifying or Relating to the memory space that is addressable by the CPU(s) or processor(s).

n. Documents Relating to any register that defines the addressable memory space, including, but not limited to, Documents describing the contents of such a register or describing its values upon initialization.

o. Documents identifying or relating to the I/O space that is addressable by the CPU(s) or processor(s).

p. Documents Relating to any register that defines the addressable I/O space, including, but not limited to, Documents describing the contents of such a register or describing its values upon initialization.

q. Timing diagrams relating to any bus transactions.

REQUEST FOR PRODUCTION No. 28:

For each Relevant Compal Product that contains more than one processor and/or processor core:

a. Documents Relating to how each core maintains cache coherency or cache consistency or performs cache verification with respect to its associated cache systems as well as the other core's associated cache systems.

b. Documents Relating to the activities or role of each core in accessing, reading, loading, and/or running BIOS code.

c. Documents Relating to the activities or role of each core in accessing or reading data from an external graphics chip, VRAM, or frame buffer.

d. Documents Relating to the crossbar switch, system request interface, hypertransport bus, or other connections between the cores.

REQUEST FOR PRODUCTION No. 29:

Documents that identify the Northbridge and Southbridge used in each Relevant Compal Product.

15

**REQUEST FOR PRODUCTION No. 30:**

Documents that identify the central processing unit used in each Relevant Compal Product.

**REQUEST FOR PRODUCTION No. 31:**

Documents related to all Digitally Coupled Display Devices that Compal designs or manufactures for Respondents.

**REQUEST FOR PRODUCTION No. 32:**

Electronic schematics and circuit designs for all Digitally Coupled Display Devices that Compal designs or manufactures for Respondents.

**REQUEST FOR PRODUCTION No. 33:**

Documents related to all integrated circuit chips contained within each Digitally Coupled Display Device which performs an Input Detection and/or Scaling function that Compal designs or manufactures for Respondents.

**REQUEST FOR PRODUCTION No. 34:**

Documents that describe all Input Detection and/or Scaling functions performed within each Digitally Coupled Display Device that Compal designs or manufactures for Respondents.

**REQUEST FOR PRODUCTION No. 35:**

Schematics, specifications, user manuals, installation manuals, white papers, application notes, and other technical Documents describing each Digitally Coupled Display Device that Compal designs or manufactures for Respondents.

**REQUEST FOR PRODUCTION No. 36:**

Schematics, specifications, user manuals, installation manuals, white papers, application notes, and other technical Documents describing each integrated circuit chip that performs an

Input Detection and Scaling function within each Digitally Coupled Display Device that Compal designs or manufactures for Respondents.

### REQUEST FOR PRODUCTION No. 37:

Firmware or software contained in each Digitally Coupled Display Device that Compal designs or manufactures for Respondents which performs an Input Detection and Scaling function.

### REQUEST FOR PRODUCTION No. 38:

Bills of materials for each Digitally Coupled Display Device that Compal designs or manufactures for Respondents.

### REQUEST FOR PRODUCTION No. 39:

Marketing Documents for each Digitally Coupled Display Device that Compal designs or manufactures for Respondents.

### REQUEST FOR PRODUCTION No. 40:

Marketing Documents, including Documents Compal has generated and received from its suppliers, for each integrated circuit chip contained within each Digitally Coupled Display Device that Compal designs or manufactures for Respondents which performs an Input Detection and/or Scaling function.

### REQUEST FOR PRODUCTION No. 41:

Communications with Respondents regarding each Digitally Coupled Display Device which performs an Input Detection and/or Scaling function that Compal designs or manufactures for Respondents.

### REQUEST FOR PRODUCTION No. 42:

Testing, qualification, verification, specification, design, and development Documents related to each integrated circuit chip contained within a Digitally Coupled Display Device that

performs an Input Detection and/or Scaling function that Compal designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 43:

Documents that describe the design of any transition minimized differential signaling ("T.M.D.S.") transmitter or receiver involved in generating or sending signals to a DVI or HDMI port on all desktop or portable computers (including notebook computers and Tablet PCs), that Compal designs or manufactures for Respondents.

REQUEST FOR PRODUCTION No. 44:

Documents that identify all of the Relevant Compal Products by part number and/or model number, internal name. marketing number, and by any other unique designation.

REQUEST FOR PRODUCTION No. 45:

Documents relating to or discussing HP, the Patents-at-Issue, or this Lawsuit.

REQUEST FOR PRODUCTION No. 46:

Communications between Compal and Respondents regarding HP, the Patents-at-Issue, or this Litigation.

REQUEST FOR PRODUCTION No. 47:

Communications with Respondents regarding changes to any Relevant Compal Product.

## ATTACHMENT B

## DEFINITIONS

The following definitions apply to these Topics of Testimony.

1.    "HP" shall mean Complainant Hewlett Packard Company including, without limitation, All of its subsidiaries, affiliates, divisions, related entities, predecessors (including but not limited to Compaq Computer Corporation and Digital Equipment Corporation), successors, and Any present or former officers, directors, trustees, employees, agents, or representatives.

2.    "Compal" shall mean Compal Electronics, Inc., and all of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys or any others acting on behalf of Compal Electronics, Inc. and any entities controlled or owned by Compal Electronics, Inc.

3.    "Respondents" shall mean Acer, Inc. and Acer America Corporation, including, without limitation, all subsidiaries, parents, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives.

4.    The terms "Document" and "Documents" shall mean and include anything in Compal's possession, custody, or control that is printed, recorded, or stored in electronic form. Some examples of "Documents" include letters, email, memoranda, reports, agreements, technical Documents, engineering specifications, hardware specifications, software specifications, product specifications, computer code, hand written notes, financial reports, and invoices.  Any request for a "Document" includes a request for all drafts and revisions of the foregoing.

5.    The terms "Communication" and "Communications" shall mean any transfer or exchange between two or more persons of any information whether by written, oral, electronic or

other means, including but not limited to personal conversations, correspondence, electronic mail, telephone calls, facsimile communications, or telegrams.

6.    The terms "Imports" or "Imported" shall mean imported into the United States.

7.    "Digital Port" shall mean a port or connector that can be used to create a digital connection or coupling with a computer or other source (such as a cable TV set-top box), including, without limitation, a DVI-D port, a DVI-I port, or a HDMI port.

8.    "Digitally Coupled Display Device" shall mean each product Compal designs or manufactures for Respondents that is a monitor and/or projector, and that contains a Digital Port.

9.    "Relevant Compal Product" shall mean all desktop computers, portable computers (including, notebook computers and tablet PCs), and/or Digitally Coupled Display Device that Compal designs, builds, manufactures, sells, Imports, delivers, and/or tests for or at the direction of Respondents.

10.    "Part" or "Component" shall mean any device contained within a Relevant Compal Product, shipped by Compal with a Relevant Compal Product, Imported by Compal into the United States and subsequently shipped with a Relevant Compal Product, recommended for use with a Relevant Compal Product, or manufactured, produced, or sold with a Relevant Compal Product.

11.    The terms "any" and "all" shall include "each and every."

12.    The "'236 Patent" shall mean U.S. Patent No. 6,691,236 B1.

13.    The "'706 Patent" shall mean U.S. Patent No. 6,894,706 B1.

14.    The "'415 Patent" shall mean U.S. Patent No. 5,353,415.

15.    The "'119 Patent" shall mean U.S. Patent No. 6,029,119.

16.    "Patents-In-Suit" shall mean the '236 Patent, the '415 Patent, the '706 Patent, and the '119 Patent.

17.    "Driver" shall mean software or firmware that controls the exchange of information to or from an internal or external hardware component of a computer system.

18.    "BIOS" shall mean the basic input/output system of a computer.

19.     "ATI" shall mean ATI Technologies, Inc., including, without limitation, All of its corporate parents (including, without limitation, Advanced Micro Devices, Inc.), subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of ATI.

20.     "NVIDIA" shall mean NVIDIA Corporation, including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of NVIDIA Corporation.

21.     "AMD" shall mean Advanced Micro Devices, Inc, including, without limitation, All of its corporate parents, subsidiaries (including, without limitation, ATI), affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Advanced Micro Devices, Inc.

22.     "Intel" shall mean Intel Corporation, including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Intel Corporation.

23.     "SIS" shall mean Silicon Integrated Systems Corporation including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of Silicon Integrated Systems Corporation.

24.     "VIA" shall mean VIA Technologies, Inc. including, without limitation, All of its corporate parents, subsidiaries, affiliates, divisions, related entities, predecessors, successors, and Any present or former officers, directors, trustees, employees, agents, or representatives, or any others acting on behalf of VIA Technologies, Inc.

21

25.    "ePowerManagement" shall mean the power management feature(s) of Respondents' computer systems having the designation "ePowerManagement."

26.    "AMD PowerNow!™ Technology" shall mean the power-management feature(s) of AMD processors having the designation "AMD PowerNow!™ Technology."

27.    "Enhanced Intel SpeedStep® Technology" shall mean the power management feature(s) of Intel processors having the designation "Enhanced Intel SpeedStep® technology" or "EIST®."

28.    "PowerPlay™ Technology" shall mean the power management feature(s) of ATI graphics processors having the designation "PowerPlay™."

29.    "Cool'n'Quiet ™ Technology" shall mean the technology provided by AMD that allows a computer to select CPU speed, voltage and power based on performance needs and having the designation "Cool'n'Quiet ™ Technology."

30.    "PowerMizer® Technology" shall mean the power management features(s) of NVIDIA graphics processors having the designation "PowerMizer®."

31.    "Graphics Subsystem" shall mean the hardware and software used in an Accused Product to manage the Product's display functions, including but not limited to its graphics processor and Any related Drivers.

32.    "Input Detection" shall mean receiving video or graphics signals from a computer or other source (such as a cable TV set-top box) and determining the input resolution of the image associated with those signals (e.g., determining the number of pixels per line and the number of lines per screen).

33.    "Scaling" shall mean changing the resolution of the image associated with video or graphics signals received from a computer or other source (such as a cable TV set-top box) to a different resolution, or changing the image associated with video or graphics signals received from a computer or other source, in such a manner that the resolution of the final image is different than the resolution of the original image received from the computer or other source.

34.    "Concurrent Bus Cycle Operations" shall mean bus transactions occurring or pending on two or more buses in a computer system at least partially at the same time.

## TOPICS OF TESTIMONY

### Topic No. 1:

Identify the person or people who will testify on behalf of Compal for each of the following topics of testimony.

### Topic No. 2:

Describe how each Relevant Compal Product measures and regulates its internal temperature.

### Topic No. 3:

Identify and describe the hardware and software used to regulate the temperature in each Relevant Compal Product.

### Topic No. 4:

Describe how each Relevant Compal Product alters its internal temperature in response to input from a device within the product, including, a display screen; an option card; a PCMCIA card; a processor; a graphics processor; a display; a battery; a power source; a disk drive; a fan; and/or each other peripheral device.

### Topic No. 5:

Describe how each portable computer (e.g., including, but not limited to, notebook computers and/or tablet PCs) Compal designs or manufactures for Respondents or any of the products' Components communicate a clock speed, a core voltage and/or an operating

speed, performance or condition, of a graphics processor in to the processor, operating system and/or BIOS of the portable computer.

Topic No. 6:

Describe how each Relevant Compal Product alters its internal temperature in response to the status of the product or the status of a device within the product, including:

    a.  the current temperature;

    b.  a recent temperature change;

    c.  which software applications are running;

    d.  a display screen's activity;

    e.  an option card's activity;

    f.  a PCMCIA card's activity;

    g.  a processor's activity;

    h.  a graphics processor's activity;

    i.  a clock frequency associated with a processor;

    j.  a processor's core voltage;

    k.  a battery's charge level;

    l.  a power source's activity;

    m.  a disk drive's activity;

    n.  a fan's activity; and/or

    o.  each other peripheral device's activity.

Topic No. 7:

For each Relevant Compal Product:

    a.  Identify and describe the Graphics Subsystem of each product Compal designs or manufactures for Respondents.

    b.  Describe the processes, methods or mechanisms by which each product Compal

designs or manufactures for Respondents changes the power consumption of its Graphics Subsystem.

c. Describe the processes, methods or mechanisms by which each product Compal designs or manufactures for Respondents switches and/or changes a clock frequency, a core voltage, and/or an operating speed or performance, of a graphics processor used in the product in response to switching from AC power to DC battery power, detecting a low battery condition, detecting a demand level of the main processor, and/or detecting that the system state is being saved to non-volatile memory (for example when the computer goes into hibernation).

d. Describe Compal's implementation of Respondents' ePowerManagement Technology in each product Compal designs or manufactures for Respondents.

e. Describe Compal's implementation of AMD PowerNow!™ Technology or AMD Cool'n'Quiet™ Technology in each product Compal designs or manufactures for Respondents.

f. Describe Compal's implementation of each AMD processor or chipset enabled with AMD PowerNow!™ Technology or AMD Cool'n'Quiet™ Technology in each product Compal designs or manufactures for Respondents.

g. Describe Compal's implementation of each SIS processor or chipset in each product Compal designs or manufactures for Respondents.

h. Describe Compal's implementation of each VIA processor or chipset in each product Compal designs or manufactures for Respondents.

i. Describe Compal's implementation of Enhanced Intel SpeedStep® Technology in each product Compal designs or manufactures for Respondents.

j. Describe Compal's implementation of each Intel processor or chipset enabled with Enhanced Intel SpeedStep® Technology in each product Compal designs or manufactures for Respondents.

k. Describe Compal's implementation of PowerPlay™ Technology in each product

Compal designs or manufactures for Respondents.

l.  Describe Compal's implementation of each ATI graphics processor enabled with
    PowerPlay™ Technology in each product Compal designs or manufactures for
    Respondents.

m.  Describe Compal's implementation of PowerMizer™ Technology in each product
    Compal designs or manufactures for Respondents.

n.  Describe Compal's implementation of each NVIDIA graphics processor enabled
    with PowerMizer™ Technology in each product Compal designs or manufactures
    for Respondents.

<u>Topic No. 8:</u>

For each Relevant Compal Product:

a.  Identify and describe all suppliers, manufactures, and/or providers of
    motherboards, graphics chips, processors, and/or processor chipsets.

b.  Identify the central processing unit used in each product.

c.  Identify the northbridge and southbridge used in each product.

d.  Identify and describe the cache controllers in each product.

e.  State the processor speed, and how the motherboard, cache, cache controllers
    and/or buses impact that speed.

f.   Describe the method by which the product maintains cache coherency and cache
    consistency and performs cache verification.

g.  Describe all snooping performed by any cache controller in the product, and
    describe all events that will cause such snooping to occur.

h.  Describe all processor or other cache controller activity that can occur when a
    cache controller is performing snooping.

i.   Describe all events that will cause a cache controller to perform a write back cycle
    to main memory.

26

j. Identify all devices other than CPU(s) and processor(s) that can request data from a CPU, processor, chipset, North Bridge, South Bridge, memory controller, or main memory.

k. Describe the procedure by which a CPU or processor initiates a transaction on a bus external to the CPU or processor itself (such as a read operation on a Hypertransport bus), and identify all circuitry involved in such procedure.

l. Describe the procedure by which a CPU or processor initiates an I/O operation (such as a read from an I/O port), and identify all circuitry involved in such procedure.

m. Describe the procedure by which a CPU or processor will obtain data or perform a read operation from the CPU or processor itself, and identify all circuitry involved in such procedure.

n. Describe the procedure by which a CPU or processor will post data or perform a write operation to chips or devices outside of the CPU or processor itself, and identify all circuitry involved in such procedure.

o. Describe the procedure by which a CPU or processor will access, read, load, and/or run BIOS code.

p. Describe the procedure by which a CPU or processor will access or read data from an external graphics chip, VRAM, or frame buffer.

q. Identify and describe the memory space that is addressable by the Relevant AMD Product.

r. Identify and describe the registers that define the addressable memory space.

s. Identify and describe the I/O space that is addressable by any CPU or processor.

t. Identify and describe each register that defines the addressable I/O space.

Topic No. 9:

For each Relevant Compal Product that contains more than one processor and/or processor core:

    a.  Describe the process by which each core maintains cache coherency or cache consistency or performs cache verification with respect to its associated cache systems as well as the other core's associated cache systems.

    b.  Describe the role of each core in accessing, reading, loading, and/or running BIOS code.

    c.  Describe the role of each core in accessing or reading data from an external graphics chip, VRAM, or frame buffer.

Topic No. 10:

Identify the integrated circuit chips contained within each Digitally Coupled Display Device which performs an Input Detection and/or Scaling function that Compal designs or manufactures for Respondents.

Topic No. 11:

Describe the Input Detection and/or Scaling functions performed within each Digitally Coupled Display Device that Compal designs or manufactures for Respondents.

Topic No. 12:

Identify and describe all testing, qualification, verification, specification, design, and development Documents related to each integrated circuit chip contained within a Digitally Coupled Display Device that performs an Input Detection and/or Scaling function that Compal designs or manufactures for Respondents.

Topic No. 13:

For each Digitally Coupled Display Device that Compal designs or manufactures for Respondents:

a. Describe the process or algorithm by which the Digitally Coupled Display Device performs Input Detection.

b. Identify and describe all signals (e.g., HSync, VSync, clock, Data Enable) received from the Host Computer that are used in performing Input Detection, and describe how those signals are used to perform Input Detection.

c. State whether the Digitally Coupled Display Device counts pixels between horizontal sync pulses to determine the horizontal resolution of the input signal received from the Host Computer, and if it does, describe the process.

d. State whether the Digitally Coupled Display Device counts pixel clock pulses between horizontal sync pulses to determine the horizontal resolution of the input signal received from the Host Computer, and if it does, describe the process.

e. State whether the Digitally Coupled Display Device counts horizontal lines between vertical sync pulses to determine the vertical resolution of the input signal received from the Host Computer, and if it does, describe the process.

f. State whether the Digitally Coupled Display Device counts horizontal sync pulses between vertical sync pulses to determine the vertical resolution of the input signal received from the Host Computer, and if it does, describe the process.

g. Describe how the Digitally Coupled Display Device uses the Data Enable signal in determining the horizontal and vertical resolutions of the input signal received from the Host Computer.

h. Identify and describe the hardware (including but not limited all counters), software, and firmware components within the Digitally Coupled Display Device involved in Input Detection and the role played by each.

i. Describe the process or algorithm by which the Digitally Coupled Display Device performs Scaling.

j. Describe how the value corresponding to the native or maximum resolution of the monitor is provided to the portion of the Digitally Coupled Display Device that performs Scaling.

k. Identify and describe the hardware, software, and firmware components within the Digitally Coupled Display Device involved in Scaling and the role played by each.

l. State whether the Digitally Coupled Display Device complies with the DVI Specification, and if it does not comply, identify the specific portions of the DVI Specification with which the Digitally Coupled Display Device does not comply.

m. State whether the Digitally Coupled Display Device complies with the HDMI Specification, and if it does not comply, identify the specific portions of the HDMI Specification with which the Digitally Coupled Display Device does not comply.

n. Identify all possible resolutions received from the Host Computer upon which the Digitally Coupled Display Device can perform Input Detection and Scaling.

Topic No. 14:

Describe the design and functionality of any transition minimized differential signaling ("T.M.D.S.") transmitter or receiver involved in generating or sending signals to a DVI or HDMI port on all desktop or portable computers (including notebook computers and Tablet PCs), that Compal designs or manufactures for Respondents.

Topic No. 15:

Describe all communications within Compal or between Compal and any third-party (including, but not limited to, Respondents) regarding HP, the Litigation, or any Patent-In-Suit.

Topic No. 16:

Describe all communications between Compal and Respondents regarding any changes or proposed changes to any Compal product.

30

<u>Topic No. 17:</u>

State whether all Documents produced by Compal in this Litigation are authentic Compal Documents and state whether such Documents were prepared or kept by Compal in the ordinary course of its business activities.

<u>Topic No. 18:</u>

Identify all of the Relevant Compal Products by part number and/or model number, internal name. marketing number, and by any other unique designation.

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

ATTACHMENT C

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| CERTAIN PERSONAL COMPUTERS | )  Investigation No. 337-TA-606 |
| AND DIGITAL DISPLAY DEVICES | ) |
| | ) |

Order No. 2: Protective Order

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information, as such terms are used in the Commission's Rules, 19 C.F.R. Section 210.34(a)(7),

IT IS HEREBY ORDERED THAT:

1. Confidential business information is information which has not been made public and which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, the disclosure of which information is likely to have the effect of either (1) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or (2) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such information.

2. Any information submitted, either voluntarily or pursuant to order, in this investigation, which is asserted by a supplier to contain or constitute confidential business

information shall be so designated by such supplier in writing, or orally at a deposition, conference or hearing, and shall be segregated from other information being submitted. Documents shall be clearly and prominently marked on their face with the legend: "[supplier's name] CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER," or a comparable notice. Information obtained during discovery and asserted by the supplier to be confidential under this order will be deemed to be confidential unless the administrative law judge or the Commission rules that it is not. When such information is made part of a pleading, or is offered into the evidentiary record, the party offering it must state the basis for its claimed confidentiality. Confidential information whether submitted in writing or in oral testimony shall be disclosed at a hearing only on the in camera record and shall not be made part of the public record of this proceeding. The administrative law judge or the Commission may determine that information alleged to be confidential is not confidential, or that its disclosure is necessary for the proper disposition of the proceeding, at any time before, during or after the close of the hearing herein. If such a determination is made by the administrative law judge, opportunity shall be provided to the supplier of such information to argue its confidentiality, prior to the time that such ruling becomes final.

3. In the absence of written permission from the supplier or an order by the Commission or the administrative law judge, any confidential documents or business information submitted in accordance with the provisions of paragraph 2 above shall not be disclosed to any person other than: (i) outside counsel for parties to this investigation, including necessary secretarial and clerical personnel assisting such counsel, (ii) qualified persons taking testimony involving such documents or information and necessary stenographic and clerical personnel thereof, (iii)

technical experts and their staff who are employed by outside counsel under (i) above for the

purposes of this litigation (unless they are otherwise employed by, consultants to, or otherwise

affiliated with a non-governmental party, or are employees of any domestic or foreign

manufacturer, wholesaler, retailer, or distributor of certain personal computers and digital display

devices, which are the subject of this investigation), and (iv) the Commission, the administrative

law judge, the Commission staff, and personnel of any governmental agency as authorized by the

Commission. However see Commission rule 210.5 (b) which conforms to 19 U.S.C. §

1337(n)(2), which clarifies the list of government officers and employees who may have access

to confidential business information, and (c) which alerts suppliers to the possibility that

confidential business information may be transmitted to a federal district court, subject to such

protective order as the district court determines necessary. This result might occur in a limited

class of cases because of 28 U.S.C. § 1659. Past Commission practice has been to permit the

transfer of confidential business information to another court only with permission of the

supplier of the information. Particularly where the supplier is a third party who is involved in

neither the Commission investigation nor the district court case, it is important that the supplier

be made aware that treatment of confidential information would be governed by the district

court's protective order and not that of the Commission following transmittal of the record under

this provision. See also Commission rule 210.39 which outlines the circumstances in which the

Commission's record, including the in camera record, may be transmitted to a federal district

court, subject to such protective order as the district court determines necessary. In addition,

referring to Commission Administrative Order No. 97-06, dated February 4, 1997, information

submitted under this Protective Order may be disclosed to technical contract personnel who are

3

acting in the capacity of Commission employees, for developing or maintaining the records of

this investigation or related proceedings, or in internal audits and investigations relating to the

programs and operations of the Commission pursuant to 5 U.S.C. Appendix 3. Any contract

personnel will sign appropriate non-disclosure agreements.[1] Where the supplier of information

under this order is a third party who is not involved in the Commission investigation, it is

important that the supplier be made aware of the disclosure of such information to contract

personnel by being provided a copy of the protective order.

   4. Confidential business information submitted in accordance with the provisions of

paragraph 2 above shall not be made available to any person designated in paragraph 3(i) and (iii)

unless he or she shall have first read this order and shall have agreed, by letter filed with the

Secretary of this Commission (letter of acknowledgment): (i) to be bound by the terms thereof;

(ii) not to reveal such confidential business information to anyone other than another person

designated in paragraph 3; and (iii) to utilize such confidential business information solely for

purposes of this investigation. Such letter shall also acknowledge that the signatory(ies) has

(have) read the order. Such letter shall further state which parties the person filing the letter is

involved with and shall state in what capacity he or she is a signatory to the Protective Order

(e.g., as an attorney under Paragraph 3(i) or technical expert under Paragraph 3(iii) and, in the

case of an attorney, in what jurisdictions he or she is admitted to practice. Each attorney seeking

access to confidential business information shall sign such letter individually, but clerical and

support personnel (including law clerks and paralegals) of that attorney need not sign. All letters

---

[1] A supplier of confidential business information may request that the administrative law
judge identify said contract personnel.

4

of acknowledgment of this Protective Order shall be served on all non-parties who have

theretofore submitted confidential business information in accordance with the provisions of

paragraph 2, above.

5. Confidential business information obtained in the Commission proceeding may be

used with the consent of the supplier in a parallel district court proceeding under a protective

order issued by the district court without losing its confidential status under the protective order

in this proceeding as long as the information is not made public in the district court proceeding or

by someone who obtains the information from that source or by anyone else.

6. Confidential business information furnished by a supplier may lose its protection

under this order if it is disseminated to anyone not authorized to see it either by this protective

order or by a protective order issued by a district court in a parallel proceeding protecting

confidential business information obtained by the parties under the Commission's protective

order. Information obtained pursuant to the Commission's protective order, however, may be

produced to the district court under the district court protective order only with the consent of the

suppliers of that information.

7. If the Commission or the administrative law judge orders, or if the supplier and all

parties to the investigation agree, that access to, or dissemination of, information submitted as

confidential business information shall be made to persons not included in paragraphs 3, 5 or 6

above, such matter shall only be accessible to, or disseminated to, such persons based on the

conditions pertaining to, and obligations arising from, this order, and such persons shall be

considered subject to it unless the Commission or the administrative law judge finds that the

information is not confidential business information as defined in paragraph 1 hereof.

5

8. Any confidential business information submitted to the Commission or the administrative law judge in connection with a motion or other proceeding within the purview of this investigation shall be submitted under a designation that confidential information is contained or attached therein, pursuant to paragraph 2 above. When any confidential business information submitted in accordance with paragraph 2 above is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such confidential portions and separately label them "[supplier's name], CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER." Before a court reporter receives any such information, he or she shall have first read this order and shall have agreed in writing to be bound by the terms thereof. Alternatively, he or she shall sign the agreement included as Attachment A hereto. Copies of each such signed agreement shall be provided to the supplier of such confidential business information and to the Secretary of the Commission.

9. The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Commission or the administrative law judge rules, after proper notice and hearing, was publicly known at the time it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

10. The administrative law judge acknowledges that any document or information submitted as confidential business information pursuant to paragraph 2 above is to be treated as such within the meaning of 5 U.S.C. § 522(b)(4) and 18 U.S.C. § 1905, subject to a challenge by

6

any party pursuant to paragraph 12 below or to a final ruling by the Commission, the administrative law judge or its Freedom of Information Act Officer to the contrary, or by appeal of such a ruling, interlocutory or otherwise.

11. If no determination has been made by the administrative law judge or the Commission that the information designated as confidential by the submitter is not confidential, the persons who are recipients of such information shall take all necessary and proper steps to preserve the confidentiality of, and to protect each supplier's rights with respect to, any confidential business information designated by the supplier in accordance with paragraph 2 above.

12. The supplier of any confidential information is hereby notified that Commission regulations 19 C.F.R. § 201.19(c) through (e) generally require that the Commission will give notice to a submitter of confidential information upon the Commission's receipt of an FOIA request.

13. The supplier of any confidential information is put on notice that Commission rule 210.20 provides that only a party may move to declassify and that only then are such motions, whether brought at any time during or after the conclusion of an investigation, addressed to and ruled upon by an administrative law judge. Other requests to declassify made by non-parties, such as an FOIA request, will not be referred to the administrative law judge for consideration under the protective order.

14. If a party to this order who is a recipient of any business information designated as confidential and submitted in accordance with paragraph 2, disagrees with respect to such a designation, in full or in part, it shall notify the supplier in writing, and they will thereupon

7

confer as to the status of the subject information proffered within the context of this order. If

prior to, or at the time of, such a conference, the supplier withdraws its designation of such

information as being subject to this order, but nonetheless submits such information for purposes

of the investigation, such supplier shall express the withdrawal in writing and shall serve such

withdrawal upon all parties, the administrative law judge, and the Commission investigative

attorney. If the recipient and supplier are unable to concur upon the status of the subject

information submitted as confidential business information within ten days from the date of

notification of such disagreement, any party to this order may raise the issue of the designation of

such a status to the Commission or to the administrative law judge, and the Commission or the

administrative law judge may raise the issue of designation of the confidential status without any

request from a party. Upon notice that such confidential status of information is at issue, the

party to the investigation which submitted the information and designated it as confidential shall

have the burden of proving such confidential status.

15. No less than ten days (or any other period of time designated by the administrative

law judge) prior to the initial disclosure to the proposed expert of any confidential information

submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in

writing the name of such proposed expert and his or her educational and employment history to

the supplier. If the supplier objects to the disclosure of such confidential business information to

such proposed expert as inconsistent with the language or intent of this order or on other

grounds, it shall notify the recipient in writing of its objection and the grounds therefor prior to

the initial disclosure. If the dispute is not resolved on an informal basis within ten days of receipt

of such notice of objection, motion may be made to the administrative law judge for a ruling on

such objection. The submission of such confidential business information to such proposed expert shall be withheld pending the ruling of the administrative law judge. The terms of this paragraph shall be inapplicable to experts within the Commission or to experts from other governmental agencies who are consulted with, or used by, the Commission.

16. If confidential business information submitted in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this protective order, the party responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the supplier and the administrative law judge and, without prejudice to other rights and remedies of the supplier, make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

17. Nothing in this order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Commission, its Freedom of Information Act Officer, or the administrative law judge concerning the issue of the status of confidential business information.

18. Upon final termination of this investigation, each party that is subject to this order shall destroy or return to the supplier all items containing confidential business information submitted in accordance with paragraph 2 above, including all copies of such matter which may have been made, but not including copies containing notes or other attorney's work product that may have been placed thereon by counsel for the receiving party. All copies containing such notes or other attorney's work product shall be destroyed. Receipt of material returned to the supplier shall be acknowledged in writing. This paragraph shall not apply to the Commission, including its investigative attorney, and the administrative law judge, which shall retain such

9

material pursuant to statutory requirements and for other recordkeeping purposes, but may destroy those additional copies in its possession which are regarded as surplusage.

19. If any confidential business information which is supplied in accordance with paragraph 2 above is supplied by a non-party to this investigation, such a non-party shall be considered a "supplier" within the meaning of that term as it is used in the context of this order.

20. At or before the final termination of the investigation, copies of confidential information that was in the hands of expert witnesses must be retrieved or destroyed.

21. Except as provided in Commission rule 210.20, the jurisdiction of the administrative law judge over this order terminates upon filing of the initial determination issued at the end of the case. After that date, the Commission has jurisdiction to enforce this order and to issue reprimands and other sanctions.

22. The parties may move to amend this order, but any proposed amendment that would broaden the range of persons having access to confidential business information must be proposed and adopted before such information is supplied in reliance upon the terms of this order, unless all suppliers of confidential information consent to the amendment.

23. The Secretary shall serve a copy of this order upon all parties.

Paul J. Luckern
Administrative Law Judge

Issued: May 17, 2007

ATTACHMENT A

NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, _____, do solemnly swear that I will not divulge any

information communicated to me in any confidential portion of the investigation or hearing in

Certain Personal Computers And Digital Display Devices, Inv. No. 337-TA-606, except as

permitted in the protective order issued in this case. I will not directly or indirectly use, or allow

the use of such information for any purpose other than that directly associated with my official

duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any

person reveal the nature of content of any information communicated during any confidential

portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the

participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is a

violation of the Federal Criminal Code and punishable by a fine of up to $10,000, imprisonment

of up to ten (10) years, or both.

Signed _____

Dated _____

Firm or affiliation

_____

_____

11

**CERTAIN PERSONAL COMPUTERS AND DIGITAL     Investigation No. 337-TA-606
DISPLAY DEVICES**

<u>CERTIFICATE OF SERVICE</u>

I, Marilyn R. Abbott, hereby certify that the attached **Order** was served by hand upon
Commission Investigative Attorney Bryan Moore, Esq., and upon the following parties via first
class mail, and air mail where necessary, on May 18, 2007.

*Marilyn R. Abbott*

Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, SW - Room 112
Washington, DC 20436

For Complainant Hewlett-Packard Company:

    John Allock, Esq.
    Sean C. Cunningham, Esq.
    **DLA PIPER US LLP**
    401 B Street, Suite 1700
    San Diego, CA  92101-4297

    Andrew P. Valentine, Esq.
    Alan A. Limbach, Esq.
    **DLA PIPER US LLP**
    2000 University Avenue
    East Palo Alto, CA  64303-2248

    James M. Heintz,Esq.
    **DLA PIPER US LLP**
    1200 Nineteenth Street, NW
    Washington, DC  20036-2412

**CERTAIN PERSONAL COMPUTERS AND DIGITAL      Investigation No. 337-TA-606
DISPLAY DEVICES**

<u>CERTIFICATE OF SERVICE</u> pg. 2

Respondents:

> Acer Incorporated
> SF, 88, Sec. 1
> Hsin Tai Ru Rd., Hsichih
> Taipei, Hsien 221
> Taiwan, R.O.C.
>
> Acer America Corporation
> 333 West San Carlos Street
> Suite 1500
> San Jose, CA   95110

**CERTAIN PERSONAL COMPUTERS AND DIGITAL**     **Investigation No. 337-TA-606**
**DISPLAY DEVICES**

## PUBLIC MAILING LIST

Sherry Robinson
LEXIS-NEXIS
8891 Gander Creek Drive
Miamisburg, OH   45342

Ronnita Green
Thomson West
1100 – 13th Street NW
Suite 200
Washington, DC   20005

### (PARTIES NEED NOT SERVE COPIES ON LEXIS OR WEST PUBLISHING)

# Proposed Letter Rogatory to MStar Semiconductor, Inc.

In the United States District Court
For the District of Columbia

| | |
|---|---|
| Hewlett-Packard Company, | |
| Plaintiff (Complainant), | Civil Action No. Misc. 07-335 |
| v. | |
| Acer, Inc. & Acer America Corp., | |
| Defendants (Respondents). | |

## REQUEST FOR INTERNATIONAL ASSISTANCE – LETTERS ROGATORY

The United States District Court for the District of Columbia presents its compliments to the Appropriate Judicial Authority of Taiwan, and respectfully requests international judicial assistance to obtain evidence to be used in an administrative proceeding as approved by this Court in the above captioned matter. Specifically, this Court requests that the Appropriate Judicial Authority in Taiwan, by the proper and usual process of your Courts, compel the appearance of MStar Semiconductor, Inc. ("MStar") statutory representative, 梁公偉("Liang Kung Wei"), to testify under oath and to produce the documents identified below. This Court also requests that Appropriate Judicial Authority compel the testimony of any other MStar representatives that Liang Kung Wei may identify as knowledgeable in the listed topics. MStar is a Taiwanese corporation located at 4F-1, No. 26, Tai-Yuan St. ChuPei Hsinchu Hsien, Taiwan 302.

Based on the representations made by Complainant Hewlett-Packard Company ("HP"), this Court believes that MStar has knowledge regarding material facts and that it is in possession of documents that are relevant for the proper prosecution of the above captioned case. This Court also believes that assistance from the Appropriate Judicial Authority in Taiwan would serve to further the international interests of justice and judicial cooperation.

1

This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the Appropriate Judicial Authority of Taiwan compels the appearance of the below-named individuals to give evidence and produce documents. This matter is set for hearing in the United States on a very short schedule and requires urgent attention from the Appropriate Judicial Authority in Taiwan.

## I.    SUMMARY OF THIS ACTION

HP has accused Respondents, Acer, Inc. and Acer America Corporation (collectively, "Respondents") of violating Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337) by importing computer monitors that infringe United States Patent No. 6,894,706, entitled "Automatic Resolution Detection." The Tariff Act of 1930 makes it illegal to import goods into the United States that, among other things, infringe a United States Patent. Pursuant to HP's complaint of patent infringement, the United States International Trade Commission instituted Investigation No. 337-TA-606, which seeks to examine Respondents' importation activities. Also a party to this Investigation is the International Trade Commission Investigative Staff Attorney.

MStar designs and manufactures chips known as "scalar chips" for use in Respondents' computer monitors. The internal operation of these scalar chips is relevant to HP's infringement claim concerning United States Patent No. 6,894,706. However, it is likely that Respondents will not be able to provide all of the relevant technical detail concerning these chips because Respondents do not design the chips and may not possess all of the relevant technical information for those chips. Therefore, HP is requesting this assistance to obtain the technical information it requires directly from MStar.

## II.    DOCUMENTS AND TESTIMONY REQUESTED

This Court requests the Appropriate Judicial Authority to compel MStar to produce to HP

2

the types of documents listed in Attachment A to this Request.

This Court also requests the Appropriate Judicial Authority to compel MStar to make Liang Kung Wei, or another suitable representative, available to answer questions listed in Attachment B to this Request.

There is a protective order in this case to protect the confidentiality of any documents MStar produces. The protective order is included in this Request as Attachment C.

Therefore, this Court respectfully requests that, in the interests of justice, you issue appropriate orders, subpoenas, or other compulsory process necessary to compel the production of the above mentioned documents and the attendance of a MStar representative for oral testimony on the above mentioned topics. This Court also request that you specifically authorize that the oral testimony may be videotaped and audiotaped, in addition to being transcribed by a qualified court reporter.

This Court stands ready to extend similar assistance to the Courts of Taiwan in like cases. To the extent there are expenses associated with providing assistance in response to this Request, this Court will see that the Appropriate Judicial Authority in Taiwan is reimbursed by HP. HP may be contacted in Taiwan through Ms. Daisy Wang of Lee and Li, Attorneys-at-Law. Her offices are located at 7F, No. 201, Tun Hua N. Road, Taipei 105, Taiwan. She may be contacted by telephone at 866-2-2715-3300 ext. 2335.

Dated: _____, 2007
      Month, Day

 

                    _____
                    District Court Judge
                    District Court of the District of Columbia

## ATTACHMENT A

## DEFINITIONS

The following definitions apply to these Document Requests.

1.      "HP" shall mean Hewlett-Packard Company including, without limitation, all of its subsidiaries, affiliates, divisions, Related entities, predecessors (including but not limited to Compaq Computer Corporation and Digital Equipment Corporation), successors, and Any present or former officers, directors, trustees, employees, agents, or representatives.

2.      "MStar" shall mean MStar Semiconductor, Inc. and all of its subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys, others acting on behalf of MStar Semiconductor, Inc., and any entities controlled or owned by MStar Semiconductor, Inc.

3.      "Respondents" shall mean Acer, Inc., and Acer America Corporation, including without limitation all of its subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys, others acting on behalf of Acer, Inc. (including, but not limited to, its ODMs or Original Design Manufacturers), and any entities controlled or owned by Acer, Inc.

4.      The terms "Document" and "Documents" shall mean and include anything in MStar's possession, custody, or control that is printed, recorded, or stored in electronic form. Some examples of "Documents" include letters, email, memoranda, reports, agreements, technical Documents, engineering specifications, hardware specifications, software specifications, product specifications, computer code, hand written notes, financial reports, and invoices.  Any request for a "Document" includes a request for all drafts and revisions of the foregoing.

5.      "Host Computer" shall mean a desktop, notebook, server, or other type of computer that is connected to a monitor using a digital connector (*e.g.*, a DVI-D cable).

6.      "Input Detection" shall mean receiving video or graphics signals from a Host

4

Computer over a digital connector (*e.g.*, a DVI-D cable) and determining the input resolution of the signals or the underlying image corresponding to those signals (*e.g.*, number of pixels per line and number of lines per screen).

7.     "Scaling" shall mean changing the resolution of video or graphics signals received from a Host Computer, or the underlying image corresponding to such signals, to a different resolution.

8.     "MStar Products" shall mean all products designed, developed, manufactured, or sold by MStar that performs or is capable of performing Input Detection and/or Scaling, including, but not limited to, the products with the following model numbers:  TSU56AK, 9131B, TSU66AJ, 9251, 9251HA, 9251HA-205.

9.     "DVI Specification" shall mean the document titled "Digital Visual Interface, Revision 1.0" and dated April 2, 1999, and any prior or subsequent version thereof.

10.    "Litigation" shall mean any lawsuit between Hewlett-Packard Company, on the one hand, and Respondents on the other hand.

11.    "'706 Patent" shall mean U.S. Patent No. 6,894,706, titled "Automatic Resolution Detection."

## DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION No. 1:

For each MStar Product:

a.     Electrical schematics, Verilog code, HDL or Hardware Description Language code, firmware code, software code, block diagrams, specifications, datasheets, application notes, white papers, design reviews, testing reports, qualification reports, user manuals, installation guides, theories of operation, and marketing documents relating to the MStar Product.

5

b.    Documents disclosing or describing the monitor resolutions supported by the MStar Product.

c.    Documents disclosing or describing the process or algorithm by which the MStar Product performs Input Detection, including, but not limited to:

    i.    Documents disclosing or describing all of the signals (e.g., HSync, VSync, pixel clock, Data Enable) received from the Host Computer, or that are generated internally within the monitor or the MStar Product, that are used in performing Input Detection.

    ii.    Documents disclosing or describing how the product performs Input Detection, including but not limited to, how the MStar Product determines the horizontal resolution and vertical resolution of the image received from the Host Computer.

    iii.    Documents disclosing or describing the particular hardware, software, and firmware components within the MStar Product that are involved in Input Detection and the role played by each.

d.    Documents disclosing or describing the process by which the MStar Product performs Scaling, including, but not limited to:

    i.    Documents disclosing or describing how the value corresponding to the native or maximum resolution of the monitor is provided to the MStar Product.

    ii.    Documents disclosing or describing how the MStar Product performs Scaling.

    iii.    Documents disclosing or describing the particular hardware, software, and firmware components within the MStar Product that are involved in Scaling and the role played by each.

e.    Documents disclosing or describing the MStar Product's compliance with the DVI Specification.

REQUEST FOR PRODUCTION No. 2:

Documents relating to or discussing, HP, the '706 Patent, and/or the Litigation.

REQUEST FOR PRODUCTION No. 3:

All correspondence between MStar and Respondents regarding any changes or proposed changes to any MStar Product or any device containing an MStar Product.

REQUEST FOR PRODUCTION No. 4:

Documents that all of the MStar Products by part number and/or model number, internal name, marketing number, and by any other unique designation.

## ATTACHMENT B

## DEFINITIONS

The following definitions apply to these Topics of Testimony.

    1.    "HP" shall mean Hewlett-Packard Company including, without limitation, all of its subsidiaries, affiliates, divisions, Related entities, predecessors (including but not limited to Compaq Computer Corporation and Digital Equipment Corporation), successors, and Any present or former officers, directors, trustees, employees, agents, or representatives.

    2.    "MStar" means MStar Semiconductor, Inc. and all of its subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys, others acting on behalf of MStar Semiconductor, Inc., and any entities controlled or owned by MStar Semiconductor, Inc.

    3.    "Respondents" means Acer, Inc. and Acer America Corporation, including without limitation all of its subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys, others acting on behalf of Acer, Inc. (including, but not limited to, its ODMs or Original Design Manufacturers), and any entities controlled or owned by Acer, Inc.

    4.    The terms "Document" and "Documents" shall mean and include anything in MStar's possession, custody, or control that is printed, recorded, or stored in electronic form. Some examples of "Documents" include letters, email, memoranda, reports, agreements, technical Documents, engineering specifications, hardware specifications, software specifications, product specifications, computer code, hand written notes, financial reports, and invoices. Any request for a "Document" includes a request for all drafts and revisions of the foregoing.

    5.    "Host Computer" means a desktop, notebook, server, or other type of computer that is connected to a monitor using a digital connector (*e.g.*, a DVI-D cable).

    6.    "Input Detection" means receiving video or graphics signals from a Host

Computer over a digital connector (*e.g.*, a DVI-D cable) and determining the input resolution of the signals or the underlying image corresponding to those signals (*e.g.*, number of pixels per line and number of lines per screen).

7.    "Scaling" means changing the resolution of video or graphics signals received from a Host Computer, or the underlying image corresponding to such signals, to a different resolution.

8.    "MStar Products" means all products designed, developed, manufactured, or sold by MStar that performs or is capable of performing Input Detection and/or Scaling, including, but not limited to, the products with the following model numbers:  TSU56AK, 9131B, TSU66AJ, 9251, 9251HA, 9251HA-205.

9.    "DVI Specification" means the document titled "Digital Visual Interface, Revision 1.0" and dated April 2, 1999, and any prior or subsequent version thereof.

10.    "Litigation" means any lawsuit between Hewlett-Packard Company on the one hand, and Respondents on the other hand.

11.    "'706 Patent" means U.S. Patent No. 6,894,706, titled "Automatic Resolution Detection."


## TOPICS OF TESTIMONY


Topic No. 1:

For each MStar Product:

    a.  Describe the process or algorithm by which the MStar Product performs Input Detection.

    b.  Identify and describe all signals (e.g., HSync, VSync, pixel clock, Data Enable) received from the Host Computer that are used in performing Input Detection, and describe how those signals are used to perform Input Detection.

c.  State whether the MStar Product counts pixels between horizontal sync pulses to
    determine the horizontal resolution of the input signal received from the Host
    Computer, and if it does, describe the process.

d.  State whether the MStar Product counts pixel clock pulses between horizontal
    sync pulses to determine the horizontal resolution of the input signal received
    from the Host Computer, and if it does, describe the process.

e.  State whether the MStar Product counts horizontal lines between vertical sync
    pulses to determine the vertical resolution of the input signal received from the
    Host Computer, and if it does, describe the process.

f.  State whether the MStar Product counts horizontal sync pulses between vertical
    sync pulses to determine the vertical resolution of the input signal received from
    the Host Computer, and if it does, describe the process.

g.  Describe how the MStar Product uses the Data Enable signal in determining the
    horizontal and vertical resolutions of the input signal received from the Host
    Computer.

h.  Identify and describe the hardware (including but not limited all counters),
    software, and firmware components within the MStar Product involved in Input
    Detection and the role played by each.

i.  Describe the process or algorithm by which the MStar Product performs Scaling.

j.  Describe how the value corresponding to the native or maximum resolution of the
    monitor is provided to the portion of the MStar Product that performs Scaling.

k.  Identify and describe the hardware, software, and firmware components within
    the MStar Product involved in Scaling and the role played by each.

l.  State whether the MStar Product complies with the DVI Specification, and if it
    does not comply, identify the specific portions of the DVI Specification with
    which the MStar Product does not comply.

    m.  State whether the MStar Product complies with the HDMI Specification, and if it does not comply, identify the specific portions of the HDMI Specification with which the MStar Product does not comply.

    n.  Identify all possible resolutions received from the Host Computer upon which the MStar Product can perform Input Detection and Scaling.

Topic No. 2:

Describe all communications within MStar or between MStar and any third-party (including, but not limited to, Respondents) regarding HP, the Litigation, or the '706 Patent.

Topic No. 3:

Describe all communications between MStar and Respondents regarding any changes or proposed changes to any MStar Product or any device containing an MStar Product.

Topic No. 4:

Identify all of the MStar Products by part number and/or model number, internal name, marketing number, and by any other unique designation.

Topic No. 5:

State whether all Documents produced by MStar in this Litigation are authentic MStar documents and state whether such documents were prepared or kept by MStar in the ordinary course of its business activities.

ATTACHMENT C

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| CERTAIN PERSONAL COMPUTERS | ) | Investigation No. 337-TA-606 |
| AND DIGITAL DISPLAY DEVICES | ) | |
| | ) | |

Order No. 2: Protective Order

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information, as such terms are used in the Commission's Rules, 19 C.F.R. Section 210.34(a)(7),

IT IS HEREBY ORDERED THAT:

1. Confidential business information is information which has not been made public and which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, the disclosure of which information is likely to have the effect of either (1) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or (2) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such information.

2. Any information submitted, either voluntarily or pursuant to order, in this investigation, which is asserted by a supplier to contain or constitute confidential business

information shall be so designated by such supplier in writing, or orally at a deposition, conference or hearing, and shall be segregated from other information being submitted. Documents shall be clearly and prominently marked on their face with the legend: "[supplier's name] CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER," or a comparable notice. Information obtained during discovery and asserted by the supplier to be confidential under this order will be deemed to be confidential unless the administrative law judge or the Commission rules that it is not. When such information is made part of a pleading, or is offered into the evidentiary record, the party offering it must state the basis for its claimed confidentiality. Confidential information whether submitted in writing or in oral testimony shall be disclosed at a hearing only on the in camera record and shall not be made part of the public record of this proceeding. The administrative law judge or the Commission may determine that information alleged to be confidential is not confidential, or that its disclosure is necessary for the proper disposition of the proceeding, at any time before, during or after the close of the hearing herein. If such a determination is made by the administrative law judge, opportunity shall be provided to the supplier of such information to argue its confidentiality, prior to the time that such ruling becomes final.

3. In the absence of written permission from the supplier or an order by the Commission or the administrative law judge, any confidential documents or business information submitted in accordance with the provisions of paragraph 2 above shall not be disclosed to any person other than: (i) outside counsel for parties to this investigation, including necessary secretarial and clerical personnel assisting such counsel, (ii) qualified persons taking testimony involving such documents or information and necessary stenographic and clerical personnel thereof, (iii)

2

technical experts and their staff who are employed by outside counsel under (i) above for the purposes of this litigation (unless they are otherwise employed by, consultants to, or otherwise affiliated with a non-governmental party, or are employees of any domestic or foreign manufacturer, wholesaler, retailer, or distributor of certain personal computers and digital display devices, which are the subject of this investigation), and (iv) the Commission, the administrative law judge, the Commission staff, and personnel of any governmental agency as authorized by the Commission. However see Commission rule 210.5 (b) which conforms to 19 U.S.C. § 1337(n)(2), which clarifies the list of government officers and employees who may have access to confidential business information, and (c) which alerts suppliers to the possibility that confidential business information may be transmitted to a federal district court, subject to such protective order as the district court determines necessary. This result might occur in a limited class of cases because of 28 U.S.C. § 1659. Past Commission practice has been to permit the transfer of confidential business information to another court only with permission of the supplier of the information. Particularly where the supplier is a third party who is involved in neither the Commission investigation nor the district court case, it is important that the supplier be made aware that treatment of confidential information would be governed by the district court's protective order and not that of the Commission following transmittal of the record under this provision. See also Commission rule 210.39 which outlines the circumstances in which the Commission's record, including the in camera record, may be transmitted to a federal district court, subject to such protective order as the district court determines necessary. In addition, referring to Commission Administrative Order No. 97-06, dated February 4, 1997, information submitted under this Protective Order may be disclosed to technical contract personnel who are

3

acting in the capacity of Commission employees, for developing or maintaining the records of this investigation or related proceedings, or in internal audits and investigations relating to the programs and operations of the Commission pursuant to 5 U.S.C. Appendix 3. Any contract personnel will sign appropriate non-disclosure agreements.[1] Where the supplier of information under this order is a third party who is not involved in the Commission investigation, it is important that the supplier be made aware of the disclosure of such information to contract personnel by being provided a copy of the protective order.

 4. Confidential business information submitted in accordance with the provisions of paragraph 2 above shall not be made available to any person designated in paragraph 3(i) and (iii) unless he or she shall have first read this order and shall have agreed, by letter filed with the Secretary of this Commission (letter of acknowledgment): (i) to be bound by the terms thereof; (ii) not to reveal such confidential business information to anyone other than another person designated in paragraph 3; and (iii) to utilize such confidential business information solely for purposes of this investigation. Such letter shall also acknowledge that the signatory(ies) has (have) read the order. Such letter shall further state which parties the person filing the letter is involved with and shall state in what capacity he or she is a signatory to the Protective Order (e.g., as an attorney under Paragraph 3(i) or technical expert under Paragraph 3(iii) and, in the case of an attorney, in what jurisdictions he or she is admitted to practice. Each attorney seeking access to confidential business information shall sign such letter individually, but clerical and support personnel (including law clerks and paralegals) of that attorney need not sign. All letters

---

[1] A supplier of confidential business information may request that the administrative law judge identify said contract personnel.

of acknowledgment of this Protective Order shall be served on all non-parties who have

theretofore submitted confidential business information in accordance with the provisions of

paragraph 2, above.

5. Confidential business information obtained in the Commission proceeding may be

used with the consent of the supplier in a parallel district court proceeding under a protective

order issued by the district court without losing its confidential status under the protective order

in this proceeding as long as the information is not made public in the district court proceeding or

by someone who obtains the information from that source or by anyone else.

6. Confidential business information furnished by a supplier may lose its protection

under this order if it is disseminated to anyone not authorized to see it either by this protective

order or by a protective order issued by a district court in a parallel proceeding protecting

confidential business information obtained by the parties under the Commission's protective

order. Information obtained pursuant to the Commission's protective order, however, may be

produced to the district court under the district court protective order only with the consent of the

suppliers of that information.

7. If the Commission or the administrative law judge orders, or if the supplier and all

parties to the investigation agree, that access to, or dissemination of, information submitted as

confidential business information shall be made to persons not included in paragraphs 3, 5 or 6

above, such matter shall only be accessible to, or disseminated to, such persons based on the

conditions pertaining to, and obligations arising from, this order, and such persons shall be

considered subject to it unless the Commission or the administrative law judge finds that the

information is not confidential business information as defined in paragraph 1 hereof.

8. Any confidential business information submitted to the Commission or the administrative law judge in connection with a motion or other proceeding within the purview of this investigation shall be submitted under a designation that confidential information is contained or attached therein, pursuant to paragraph 2 above. When any confidential business information submitted in accordance with paragraph 2 above is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such confidential portions and separately label them "[supplier's name], CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER." Before a court reporter receives any such information, he or she shall have first read this order and shall have agreed in writing to be bound by the terms thereof. Alternatively, he or she shall sign the agreement included as Attachment A hereto. Copies of each such signed agreement shall be provided to the supplier of such confidential business information and to the Secretary of the Commission.

9. The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Commission or the administrative law judge rules, after proper notice and hearing, was publicly known at the time it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

10. The administrative law judge acknowledges that any document or information submitted as confidential business information pursuant to paragraph 2 above is to be treated as such within the meaning of 5 U.S.C. § 522(b)(4) and 18 U.S.C. § 1905, subject to a challenge by

6

any party pursuant to paragraph 12 below or to a final ruling by the Commission, the administrative law judge or its Freedom of Information Act Officer to the contrary, or by appeal of such a ruling, interlocutory or otherwise.

11. If no determination has been made by the administrative law judge or the Commission that the information designated as confidential by the submitter is not confidential, the persons who are recipients of such information shall take all necessary and proper steps to preserve the confidentiality of, and to protect each supplier's rights with respect to, any confidential business information designated by the supplier in accordance with paragraph 2 above.

12. The supplier of any confidential information is hereby notified that Commission regulations 19 C.F.R. § 201.19(c) through (e) generally require that the Commission will give notice to a submitter of confidential information upon the Commission's receipt of an FOIA request.

13. The supplier of any confidential information is put on notice that Commission rule 210.20 provides that only a party may move to declassify and that only then are such motions, whether brought at any time during or after the conclusion of an investigation, addressed to and ruled upon by an administrative law judge. Other requests to declassify made by non-parties, such as an FOIA request, will not be referred to the administrative law judge for consideration under the protective order.

14. If a party to this order who is a recipient of any business information designated as confidential and submitted in accordance with paragraph 2, disagrees with respect to such a designation, in full or in part, it shall notify the supplier in writing, and they will thereupon

7

confer as to the status of the subject information proffered within the context of this order. If prior to, or at the time of, such a conference, the supplier withdraws its designation of such information as being subject to this order, but nonetheless submits such information for purposes of the investigation, such supplier shall express the withdrawal in writing and shall serve such withdrawal upon all parties, the administrative law judge, and the Commission investigative attorney. If the recipient and supplier are unable to concur upon the status of the subject information submitted as confidential business information within ten days from the date of notification of such disagreement, any party to this order may raise the issue of the designation of such a status to the Commission or to the administrative law judge, and the Commission or the administrative law judge may raise the issue of designation of the confidential status without any request from a party. Upon notice that such confidential status of information is at issue, the party to the investigation which submitted the information and designated it as confidential shall have the burden of proving such confidential status.

15. No less than ten days (or any other period of time designated by the administrative law judge) prior to the initial disclosure to the proposed expert of any confidential information submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in writing the name of such proposed expert and his or her educational and employment history to the supplier. If the supplier objects to the disclosure of such confidential business information to such proposed expert as inconsistent with the language or intent of this order or on other grounds, it shall notify the recipient in writing of its objection and the grounds therefor prior to the initial disclosure. If the dispute is not resolved on an informal basis within ten days of receipt of such notice of objection, motion may be made to the administrative law judge for a ruling on

8

such objection. The submission of such confidential business information to such proposed expert shall be withheld pending the ruling of the administrative law judge. The terms of this paragraph shall be inapplicable to experts within the Commission or to experts from other governmental agencies who are consulted with, or used by, the Commission.

16. If confidential business information submitted in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this protective order, the party responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the supplier and the administrative law judge and, without prejudice to other rights and remedies of the supplier, make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

17. Nothing in this order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Commission, its Freedom of Information Act Officer, or the administrative law judge concerning the issue of the status of confidential business information.

18. Upon final termination of this investigation, each party that is subject to this order shall destroy or return to the supplier all items containing confidential business information submitted in accordance with paragraph 2 above, including all copies of such matter which may have been made, but not including copies containing notes or other attorney's work product that may have been placed thereon by counsel for the receiving party. All copies containing such notes or other attorney's work product shall be destroyed. Receipt of material returned to the supplier shall be acknowledged in writing. This paragraph shall not apply to the Commission, including its investigative attorney, and the administrative law judge, which shall retain such

9

material pursuant to statutory requirements and for other recordkeeping purposes, but may

destroy those additional copies in its possession which are regarded as surplusage.

19. If any confidential business information which is supplied in accordance with

paragraph 2 above is supplied by a non-party to this investigation, such a non-party shall be

considered a "supplier" within the meaning of that term as it is used in the context of this order.

20. At or before the final termination of the investigation, copies of confidential

information that was in the hands of expert witnesses must be retrieved or destroyed.

21. Except as provided in Commission rule 210.20, the jurisdiction of the administrative

law judge over this order terminates upon filing of the initial determination issued at the end of

the case. After that date, the Commission has jurisdiction to enforce this order and to issue

reprimands and other sanctions.

22. The parties may move to amend this order, but any proposed amendment that would

broaden the range of persons having access to confidential business information must be

proposed and adopted before such information is supplied in reliance upon the terms of this

order, unless all suppliers of confidential information consent to the amendment.

23. The Secretary shall serve a copy of this order upon all parties.

Paul J. Luckern
Administrative Law Judge

Issued: May 17, 2007

ATTACHMENT A

NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, _____, do solemnly swear that I will not divulge any

information communicated to me in any confidential portion of the investigation or hearing in

Certain Personal Computers And Digital Display Devices, Inv. No. 337-TA-606, except as

permitted in the protective order issued in this case. I will not directly or indirectly use, or allow

the use of such information for any purpose other than that directly associated with my official

duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any

person reveal the nature of content of any information communicated during any confidential

portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the

participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is a

violation of the Federal Criminal Code and punishable by a fine of up to $10,000, imprisonment

of up to ten (10) years, or both.

Signed _____

Dated _____

Firm or affiliation

_____

_____

11

**CERTAIN PERSONAL COMPUTERS AND DIGITAL**     **Investigation No. 337-TA-606**
**DISPLAY DEVICES**

<u>CERTIFICATE OF SERVICE</u>

I, Marilyn R. Abbott, hereby certify that the attached **Order** was served by hand upon
Commission Investigative Attorney Bryan Moore, Esq., and upon the following parties via first
class mail, and air mail where necessary, on May 18, 2007.

Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, SW – Room 112
Washington, DC 20436

For Complainant Hewlett-Packard Company:

    John Allock, Esq.
    Sean C. Cunningham, Esq.
    **DLA PIPER US LLP**
    401 B Street, Suite 1700
    San Diego, CA 92101-4297

    Andrew P. Valentine, Esq.
    Alan A. Limbach, Esq.
    **DLA PIPER US LLP**
    2000 University Avenue
    East Palo Alto, CA 64303-2248

    James M. Heintz, Esq.
    **DLA PIPER US LLP**
    1200 Nineteenth Street, NW
    Washington, DC 20036-2412

**CERTAIN PERSONAL COMPUTERS AND DIGITAL    Investigation No. 337-TA-606
DISPLAY DEVICES**

CERTIFICATE OF SERVICE pg. 2

Respondents:

Acer Incorporated
SF, 88, Sec. 1
Hsin Tai Ru Rd., Hsichih
Taipei, Hsien 221
Taiwan, R.O.C.

Acer America Corporation
333 West San Carlos Street
Suite 1500
San Jose, CA   95110

**CERTAIN PERSONAL COMPUTERS AND DIGITAL**     **Investigation No. 337-TA-606**
**DISPLAY DEVICES**

## PUBLIC MAILING LIST

Sherry Robinson
LEXIS-NEXIS
8891 Gander Creek Drive
Miamisburg, OH   45342

Ronnita Green
Thomson West
1100 – 13th Street NW
Suite 200
Washington, DC   20005

**(PARTIES NEED NOT SERVE COPIES ON LEXIS OR WEST PUBLISHING)**

**Proposed Letter Rogatory to
Realtek Semiconductor, Inc.**

**In the United States District Court**
**For the District of Columbia**

| | |
|---|---|
| Hewlett-Packard Company, | |
| Plaintiff (Complainant), | Civil Action No. Misc. 07-335 |
| v. | |
| Acer, Inc. & Acer America Corp., | |
| Defendants (Respondents). | |

## REQUEST FOR INTERNATIONAL ASSISTANCE – LETTERS ROGATORY

The United States District Court for the District of Columbia presents its compliments to the Appropriate Judicial Authority of Taiwan, and respectfully requests international judicial assistance to obtain evidence to be used in an administrative proceeding as approved by this Court in the above captioned matter.  Specifically, this Court requests that the Appropriate Judicial Authority in Taiwan, by the proper and usual process of your Courts, compel the appearance of Realtek Semiconductor, Inc. ("Realtek") statutory representative, 葉博任 ("Yeh Po Jen") to testify under oath and to produce the documents identified below.  This Court also requests that Appropriate Judicial Authority compel the testimony of any other Realtek representatives that Yeh Po Jen may identify as knowledgeable in the listed topics.  Realtek is a Taiwanese corporation located at 新竹科學工業園區新竹市創新二路2號 ("No.2, Innovation Road Ii, Hsinchu Science Park, Hsinchu 300, Taiwan, R.O.C.").

Based on the representations made by Complainant Hewlett-Packard Company ("HP"), this Court believes that Realtek has knowledge regarding material facts and that it is in possession of documents that are relevant for the proper prosecution of the above captioned case. This Court also believes that assistance from the Appropriate Judicial Authority in Taiwan would serve to further the international interests of justice and judicial cooperation.

This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the Appropriate Judicial Authority of Taiwan compels the appearance of the below-named individuals to give evidence and produce documents. This matter is set for hearing in the United States on a very short schedule and requires urgent attention from the Appropriate Judicial Authority in Taiwan.

## I.   SUMMARY OF THIS ACTION

HP has accused Respondents, Acer, Inc. and Acer America Corporation (collectively, "Respondents") of violating Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337) by importing computer monitors that infringe United States Patent No. 6,894,706, entitled "Automatic Resolution Detection." The Tariff Act of 1930 makes it illegal to import goods into the United States that, among other things, infringe a United States Patent. Pursuant to HP's complaint of patent infringement, the United States International Trade Commission instituted Investigation No. 337-TA-606, which seeks to examine Respondents' importation activities. Also a party to this Investigation is the International Trade Commission Investigative Staff Attorney.

Realtek designs and manufactures chips known as "scalar chips" for use in Respondents' computer monitors. The internal operation of these scalar chips is relevant to HP's infringement claim concerning United States Patent No. 6,894,706. However, it is likely that Respondents will not be able to provide all of the relevant technical detail concerning these chips because Realtek, and not Respondents, designs the chips. Thus, it is likely that Realtek is exclusively in possession of all of the relevant technical information for those chips. Accordingly, HP is requesting this assistance to obtain the technical information it requires directly from Realtek.

## II.  DOCUMENTS AND TESTIMONY REQUESTED

This Court requests the Appropriate Judicial Authority to compel Realtek to produce to

2

HP the types of documents listed in Attachment A to this Request.

This Court also requests the Appropriate Judicial Authority to compel Realtek to make Yeh Po Jen, or another suitable representative, available to answer questions listed in Attachment B to this Request.

There is a protective order in this case to protect the confidentiality of any documents Realtek produces. The protective order is included in this Request as Attachment C.

Therefore, this Court respectfully requests that, in the interests of justice, you issue appropriate orders, subpoenas, or other compulsory process necessary to compel the production of the above mentioned documents and the attendance of a Realtek representative for oral testimony on the above mentioned topics. This Court also request that you specifically authorize that the oral testimony may be videotaped and audiotaped, in addition to being transcribed by a qualified court reporter.

This Court stands ready to extend similar assistance to the Courts of Taiwan in like cases. To the extent there are expenses associated with providing assistance in response to this Request, this Court will see that the Appropriate Judicial Authority in Taiwan is reimbursed by HP. HP may be contacted in Taiwan through Ms. Daisy Wang of Lee and Li, Attorneys-at-Law. Her offices are located at 7F, No. 201, Tun Hua N. Road, Taipei 105, Taiwan. She may be contacted by telephone at 866-2-2715-3300 ext. 2335.

Dated: _____, 2007
　　　　Month, Day

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　District Court Judge
　　　　　　　　　　　　　　　　District Court of the District of Columbia

3

## ATTACHMENT A

## DEFINITIONS

The following definitions apply to these Document Requests.

1.      "HP" shall mean Hewlett-Packard Company including, without limitation, all of its subsidiaries, affiliates, divisions, Related entities, predecessors (including but not limited to Compaq Computer Corporation and Digital Equipment Corporation), successors, and Any present or former officers, directors, trustees, employees, agents, or representatives.

2.      "Realtek" shall mean Realtek Semiconductor, Inc. and all of its subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys, others acting on behalf of Realtek Semiconductor, Inc., and any entities controlled or owned by Realtek Semiconductor, Inc.

3.      "Respondents" shall mean Acer, Inc., and Acer America Corporation, including without limitation all of its subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys, others acting on behalf of Acer, Inc. (including, but not limited to, its ODMs or Original Design Manufacturers), and any entities controlled or owned by Acer, Inc.

4.      The terms "Document" and "Documents" shall mean and include anything in Realtek's possession, custody, or control that is printed, recorded, or stored in electronic form. Some examples of "Documents" include letters, email, memoranda, reports, agreements, technical Documents, engineering Specifications, hardware Specifications, software Specifications, product Specifications, computer code, hand written notes, financial reports, and invoices. Any request for a "Document" includes a request for all drafts and revisions of the foregoing.

5.      "Host Computer" shall mean a desktop, notebook, server, or other type of computer that is connected to a monitor using a digital connector (*e.g.*, a DVI-D cable).

4

6.    "Input Detection" shall mean receiving video or graphics signals from a Host Computer over a digital connector (*e.g.*, a DVI-D cable) and determining the input resolution of the signals or the underlying image corresponding to those signals (*e.g.*, number of pixels per line and number of lines per screen).

7.    "Scaling" shall mean changing the resolution of video or graphics signals received from a Host Computer, or the underlying image corresponding to such signals, to a different resolution.

8.    "Realtek Products" shall mean all products designed, developed, manufactured, or sold by Realtek that performs or is capable of performing Input Detection and/or Scaling.

9.    "DVI Specification" shall mean the document titled "Digital Visual Interface, Revision 1.0" and dated April 2, 1999, and any prior or subsequent version thereof.

10.    "Litigation" shall mean any lawsuit between Hewlett-Packard Company, on the one hand, and Respondents on the other hand.

11.    "'706 Patent" shall mean U.S. Patent No. 6,894,706, titled "Automatic Resolution Detection."

## **DOCUMENT REQUESTS**

### REQUEST FOR PRODUCTION No. 1:

For each Realtek Product:

a.    Electrical schematics, Verilog code, HDL or Hardware Description Language code, firmware code, software code, block diagrams, Specifications, datasheets, application notes, white papers, design reviews, testing reports, qualification reports, user manuals, installation guides, theories of operation, and marketing documents relating to the Realtek Product.

b.    Documents disclosing or describing the monitor resolutions supported by the Realtek Product.

c.    Documents disclosing or describing the process or algorithm by which the Realtek Product performs Input Detection, including, but not limited to:

    i.    Documents disclosing or describing all of the signals (e.g., HSync, VSync, pixel clock, Data Enable) received from the Host Computer, or that are generated internally within the monitor or the Realtek Product, that are used in performing Input Detection.

    ii.    Documents disclosing or describing how the product performs Input Detection, including but not limited to, how the Realtek Product determines the horizontal resolution and vertical resolution of the image received from the Host Computer.

    iii.    Documents disclosing or describing the particular hardware, software, and firmware components within the Realtek Product that are involved in Input Detection and the role played by each.

d.    Documents disclosing or describing the process by which the Realtek Product performs Scaling, including, but not limited to:

    i.    Documents disclosing or describing how the value corresponding to the native or maximum resolution of the monitor is provided to the Realtek Product.

    ii.    Documents disclosing or describing how the Realtek Product performs Scaling.

    iii.    Documents disclosing or describing the particular hardware, software, and firmware components within the Realtek Product that are involved in Scaling and the role played by each.

e.    Documents disclosing or describing the Realtek Product's compliance with the DVI Specification.

6

REQUEST FOR PRODUCTION No. 2:

Documents relating to or discussing, HP, the '706 Patent, and/or the Litigation.

REQUEST FOR PRODUCTION No. 3:

All correspondence between Realtek and Respondents regarding any changes or proposed changes to any Realtek Product or any device containing an Realtek Product.

REQUEST FOR PRODUCTION No. 4:

Documents that identify all of the Realtek Products by part number and/or model number, internal name, marketing number, and by any other unique designation.

## ATTACHMENT B

## DEFINITIONS

The following definitions apply to these Topics of Testimony.

1.    "HP" shall mean Hewlett-Packard Company including, without limitation, all of its subsidiaries, affiliates, divisions, Related entities, predecessors (including but not limited to Compaq Computer Corporation and Digital Equipment Corporation), successors, and Any present or former officers, directors, trustees, employees, agents, or representatives.

2.    "Realtek" means Realtek Semiconductor, Inc. and all of its subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys, others acting on behalf of Realtek Semiconductor, Inc., and any entities controlled or owned by Realtek Semiconductor, Inc.

3.    "Respondents" means Acer, Inc. and Acer America Corporation, including without limitation all of its subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys, others acting on behalf of Acer, Inc. (including, but not limited to, its ODMs or Original Design Manufacturers), and any entities controlled or owned by Acer, Inc.

4.    The terms "Document" and "Documents" shall mean and include anything in Realtek's possession, custody, or control that is printed, recorded, or stored in electronic form. Some examples of "Documents" include letters, email, memoranda, reports, agreements, technical Documents, engineering Specifications, hardware Specifications, software Specifications, product Specifications, computer code, hand written notes, financial reports, and invoices.  Any request for a "Document" includes a request for all drafts and revisions of the foregoing.

5.    "Host Computer" means a desktop, notebook, server, or other type of computer that is connected to a monitor using a digital connector (*e.g.*, a DVI-D cable).

6.    "Input Detection" means receiving video or graphics signals from a Host

8

Computer over a digital connector (*e.g.*, a DVI-D cable) and determining the input resolution of the signals or the underlying image corresponding to those signals (*e.g.*, number of pixels per line and number of lines per screen).

7.    "Scaling" means changing the resolution of video or graphics signals received from a Host Computer, or the underlying image corresponding to such signals, to a different resolution.

8.    "Realtek Products" means all products designed, developed, manufactured, or sold by Realtek that performs or is capable of performing Input Detection and/or Scaling.

9.    "DVI Specification" means the document titled "Digital Visual Interface, Revision 1.0" and dated April 2, 1999, and any prior or subsequent version thereof.

10.    "Litigation" means any lawsuit between Hewlett-Packard Company on the one hand, and Respondents on the other hand.

11.    "'706 Patent" means U.S. Patent No. 6,894,706, titled "Automatic Resolution Detection."

## TOPICS OF TESTIMONY

Topic No. 1:

For each Realtek Product:

    a.    Describe the process or algorithm by which the Realtek Product performs Input Detection.

    b.    Identify and describe all signals (e.g., HSync, VSync, pixel clock, Data Enable) received from the Host Computer that are used in performing Input Detection, and describe how those signals are used to perform Input Detection.

9

c. State whether the Realtek Product counts pixels between horizontal sync pulses to determine the horizontal resolution of the input signal received from the Host Computer, and if it does, describe the process.

d. State whether the Realtek Product counts pixel clock pulses between horizontal sync pulses to determine the horizontal resolution of the input signal received from the Host Computer, and if it does, describe the process.

e. DesState cribe whether the Realtek Product counts horizontal lines between vertical sync pulses to determine the vertical resolution of the input signal received from the Host Computer, and if it does, describe the process.

f. State whether the Realtek Product counts horizontal sync pulses between vertical sync pulses to determine the vertical resolution of the input signal received from the Host Computer, and if it does, describe the process.

g. Describe how the Realtek Product uses the Data Enable signal in determining the horizontal and vertical resolutions of the input signal received from the Host Computer.

h. Identify and describe the hardware (including but not limited all counters), software, and firmware components within the Realtek Product involved in Input Detection and the role played by each.

i. Describe the process or algorithm by which the Realtek Product performs Scaling.

j. Describe how the value corresponding to the native or maximum resolution of the monitor is provided to the portion of the Realtek Product that performs Scaling.

k. Identify and describe the hardware, software, and firmware components within the Realtek Product involved in Scaling and the role played by each.

l. State whether the Realtek Product complies with the DVI Specification, and if it does not comply, identify the specific portions of the DVI Specification with which the Realtek Product does not comply.

m.  State whether the Realtek Product complies with the HDMI Specification, and if it does not comply, identify the specific portions of the HDMI Specification with which the Realtek Product does not comply.

n.  Identify all possible resolutions received from the Host Computer upon which the Realtek Product can perform Input Detection and Scaling.

<u>Topic No. 2:</u>

Describe all communications within Realtek or between Realtek and any third-party (including, but not limited to, Respondents) regarding the Litigation or the '706 Patent.

<u>Topic No. 3:</u>

Describe all communications between Realtek and Respondents regarding any changes or proposed changes to any Realtek Product or any device containing an Realtek Product.

<u>Topic No. 4:</u>

Identify all of the Realtek Products by part number and/or model number, internal name, marketing number, and by any other unique designation.

<u>Topic No. 5:</u>

State whether all documents produced by Realtek in this Litigation are authentic Realtek documents and state whether such documents were prepared or kept by Realtek in the ordinary course of its business activities.

11

ATTACHMENT C

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| CERTAIN PERSONAL COMPUTERS | ) Investigation No. 337-TA-606 |
| AND DIGITAL DISPLAY DEVICES | ) |
| | ) |

Order No. 2:  Protective Order

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information, as such terms are used in the Commission's Rules, 19 C.F.R. Section 210.34(a)(7),

IT IS HEREBY ORDERED THAT:

1. Confidential business information is information which has not been made public and which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, the disclosure of which information is likely to have the effect of either (1) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or (2) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such information.

2. Any information submitted, either voluntarily or pursuant to order, in this investigation, which is asserted by a supplier to contain or constitute confidential business

information shall be so designated by such supplier in writing, or orally at a deposition,

conference or hearing, and shall be segregated from other information being submitted.

Documents shall be clearly and prominently marked on their face with the legend: "[supplier's

name] CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE

ORDER," or a comparable notice. Information obtained during discovery and asserted by the

supplier to be confidential under this order will be deemed to be confidential unless the

administrative law judge or the Commission rules that it is not. When such information is made

part of a pleading, or is offered into the evidentiary record, the party offering it must state the

basis for its claimed confidentiality. Confidential information whether submitted in writing or in

oral testimony shall be disclosed at a hearing only on the in camera record and shall not be made

part of the public record of this proceeding. The administrative law judge or the Commission

may determine that information alleged to be confidential is not confidential, or that its

disclosure is necessary for the proper disposition of the proceeding, at any time before, during or

after the close of the hearing herein. If such a determination is made by the administrative law

judge, opportunity shall be provided to the supplier of such information to argue its

confidentiality, prior to the time that such ruling becomes final.

3. In the absence of written permission from the supplier or an order by the Commission

or the administrative law judge, any confidential documents or business information submitted in

accordance with the provisions of paragraph 2 above shall not be disclosed to any person other

than: (i) outside counsel for parties to this investigation, including necessary secretarial and

clerical personnel assisting such counsel, (ii) qualified persons taking testimony involving such

documents or information and necessary stenographic and clerical personnel thereof, (iii)

2

technical experts and their staff who are employed by outside counsel under (i) above for the purposes of this litigation (unless they are otherwise employed by, consultants to, or otherwise affiliated with a non-governmental party, or are employees of any domestic or foreign manufacturer, wholesaler, retailer, or distributor of certain personal computers and digital display devices, which are the subject of this investigation), and (iv) the Commission, the administrative law judge, the Commission staff, and personnel of any governmental agency as authorized by the Commission. However see Commission rule 210.5 (b) which conforms to 19 U.S.C. § 1337(n)(2), which clarifies the list of government officers and employees who may have access to confidential business information, and (c) which alerts suppliers to the possibility that confidential business information may be transmitted to a federal district court, subject to such protective order as the district court determines necessary. This result might occur in a limited class of cases because of 28 U.S.C. § 1659. Past Commission practice has been to permit the transfer of confidential business information to another court only with permission of the supplier of the information. Particularly where the supplier is a third party who is involved in neither the Commission investigation nor the district court case, it is important that the supplier be made aware that treatment of confidential information would be governed by the district court's protective order and not that of the Commission following transmittal of the record under this provision. See also Commission rule 210.39 which outlines the circumstances in which the Commission's record, including the in camera record, may be transmitted to a federal district court, subject to such protective order as the district court determines necessary. In addition, referring to Commission Administrative Order No. 97-06, dated February 4, 1997, information submitted under this Protective Order may be disclosed to technical contract personnel who are

3

acting in the capacity of Commission employees, for developing or maintaining the records of

this investigation or related proceedings, or in internal audits and investigations relating to the

programs and operations of the Commission pursuant to 5 U.S.C. Appendix 3. Any contract

personnel will sign appropriate non-disclosure agreements.[1] Where the supplier of information

under this order is a third party who is not involved in the Commission investigation, it is

important that the supplier be made aware of the disclosure of such information to contract

personnel by being provided a copy of the protective order.

    4. Confidential business information submitted in accordance with the provisions of

paragraph 2 above shall not be made available to any person designated in paragraph 3(i) and (iii)

unless he or she shall have first read this order and shall have agreed, by letter filed with the

Secretary of this Commission (letter of acknowledgment): (i) to be bound by the terms thereof;

(ii) not to reveal such confidential business information to anyone other than another person

designated in paragraph 3; and (iii) to utilize such confidential business information solely for

purposes of this investigation. Such letter shall also acknowledge that the signatory(ies) has

(have) read the order. Such letter shall further state which parties the person filing the letter is

involved with and shall state in what capacity he or she is a signatory to the Protective Order

(e.g., as an attorney under Paragraph 3(i) or technical expert under Paragraph 3(iii) and, in the

case of an attorney, in what jurisdictions he or she is admitted to practice. Each attorney seeking

access to confidential business information shall sign such letter individually, but clerical and

support personnel (including law clerks and paralegals) of that attorney need not sign. All letters

---

[1] A supplier of confidential business information may request that the administrative law judge identify said contract personnel.

4

of acknowledgment of this Protective Order shall be served on all non-parties who have

theretofore submitted confidential business information in accordance with the provisions of

paragraph 2, above.

5. Confidential business information obtained in the Commission proceeding may be

used with the consent of the supplier in a parallel district court proceeding under a protective

order issued by the district court without losing its confidential status under the protective order

in this proceeding as long as the information is not made public in the district court proceeding or

by someone who obtains the information from that source or by anyone else.

6. Confidential business information furnished by a supplier may lose its protection

under this order if it is disseminated to anyone not authorized to see it either by this protective

order or by a protective order issued by a district court in a parallel proceeding protecting

confidential business information obtained by the parties under the Commission's protective

order. Information obtained pursuant to the Commission's protective order, however, may be

produced to the district court under the district court protective order only with the consent of the

suppliers of that information.

7. If the Commission or the administrative law judge orders, or if the supplier and all

parties to the investigation agree, that access to, or dissemination of, information submitted as

confidential business information shall be made to persons not included in paragraphs 3, 5 or 6

above, such matter shall only be accessible to, or disseminated to, such persons based on the

conditions pertaining to, and obligations arising from, this order, and such persons shall be

considered subject to it unless the Commission or the administrative law judge finds that the

information is not confidential business information as defined in paragraph 1 hereof.

5

8. Any confidential business information submitted to the Commission or the administrative law judge in connection with a motion or other proceeding within the purview of this investigation shall be submitted under a designation that confidential information is contained or attached therein, pursuant to paragraph 2 above. When any confidential business information submitted in accordance with paragraph 2 above is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such confidential portions and separately label them "[supplier's name], CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER." Before a court reporter receives any such information, he or she shall have first read this order and shall have agreed in writing to be bound by the terms thereof. Alternatively, he or she shall sign the agreement included as Attachment A hereto. Copies of each such signed agreement shall be provided to the supplier of such confidential business information and to the Secretary of the Commission.

9. The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Commission or the administrative law judge rules, after proper notice and hearing, was publicly known at the time it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

10. The administrative law judge acknowledges that any document or information submitted as confidential business information pursuant to paragraph 2 above is to be treated as such within the meaning of 5 U.S.C. § 522(b)(4) and 18 U.S.C. § 1905, subject to a challenge by

6

any party pursuant to paragraph 12 below or to a final ruling by the Commission, the

administrative law judge or its Freedom of Information Act Officer to the contrary, or by appeal

of such a ruling, interlocutory or otherwise.

11. If no determination has been made by the administrative law judge or the

Commission that the information designated as confidential by the submitter is not confidential,

the persons who are recipients of such information shall take all necessary and proper steps to

preserve the confidentiality of, and to protect each supplier's rights with respect to, any

confidential business information designated by the supplier in accordance with paragraph 2

above.

12. The supplier of any confidential information is hereby notified that Commission

regulations 19 C.F.R. § 201.19(c) through (e) generally require that the Commission will give

notice to a submitter of confidential information upon the Commission's receipt of an FOIA

request.

13. The supplier of any confidential information is put on notice that Commission rule

210.20 provides that only a party may move to declassify and that only then are such motions,

whether brought at any time during or after the conclusion of an investigation, addressed to and

ruled upon by an administrative law judge. Other requests to declassify made by non-parties,

such as an FOIA request, will not be referred to the administrative law judge for consideration

under the protective order.

14. If a party to this order who is a recipient of any business information designated as

confidential and submitted in accordance with paragraph 2, disagrees with respect to such a

designation, in full or in part, it shall notify the supplier in writing, and they will thereupon

confer as to the status of the subject information proffered within the context of this order. If prior to, or at the time of, such a conference, the supplier withdraws its designation of such information as being subject to this order, but nonetheless submits such information for purposes of the investigation, such supplier shall express the withdrawal in writing and shall serve such withdrawal upon all parties, the administrative law judge, and the Commission investigative attorney. If the recipient and supplier are unable to concur upon the status of the subject information submitted as confidential business information within ten days from the date of notification of such disagreement, any party to this order may raise the issue of the designation of such a status to the Commission or to the administrative law judge, and the Commission or the administrative law judge may raise the issue of designation of the confidential status without any request from a party. Upon notice that such confidential status of information is at issue, the party to the investigation which submitted the information and designated it as confidential shall have the burden of proving such confidential status.

15. No less than ten days (or any other period of time designated by the administrative law judge) prior to the initial disclosure to the proposed expert of any confidential information submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in writing the name of such proposed expert and his or her educational and employment history to the supplier. If the supplier objects to the disclosure of such confidential business information to such proposed expert as inconsistent with the language or intent of this order or on other grounds, it shall notify the recipient in writing of its objection and the grounds therefor prior to the initial disclosure. If the dispute is not resolved on an informal basis within ten days of receipt of such notice of objection, motion may be made to the administrative law judge for a ruling on

8

such objection.  The submission of such confidential business information to such proposed

expert shall be withheld pending the ruling of the administrative law judge.  The terms of this

paragraph shall be inapplicable to experts within the Commission or to experts from other

governmental agencies who are consulted with, or used by, the Commission.

16.  If confidential business information submitted in accordance with paragraph 2 is

disclosed to any person other than in the manner authorized by this protective order, the party

responsible for the disclosure must immediately bring all pertinent facts relating to such

disclosure to the attention of the supplier and the administrative law judge and, without prejudice

to other rights and remedies of the supplier, make every effort to prevent further disclosure by it

or by the person who was the recipient of such information.

17.  Nothing in this order shall abridge the right of any person to seek judicial review or

to pursue other appropriate judicial action with respect to any ruling made by the Commission,

its Freedom of Information Act Officer, or the administrative law judge concerning the issue of

the status of confidential business information.

18.  Upon final termination of this investigation, each party that is subject to this order

shall destroy or return to the supplier all items containing confidential business information

submitted in accordance with paragraph 2 above, including all copies of such matter which may

have been made, but not including copies containing notes or other attorney's work product that

may have been placed thereon by counsel for the receiving party.  All copies containing such

notes or other attorney's work product shall be destroyed.  Receipt of material returned to the

supplier shall be acknowledged in writing.  This paragraph shall not apply to the Commission,

including its investigative attorney, and the administrative law judge, which shall retain such

9

material pursuant to statutory requirements and for other recordkeeping purposes, but may destroy those additional copies in its possession which are regarded as surplusage.

19. If any confidential business information which is supplied in accordance with paragraph 2 above is supplied by a non-party to this investigation, such a non-party shall be considered a "supplier" within the meaning of that term as it is used in the context of this order.

20. At or before the final termination of the investigation, copies of confidential information that was in the hands of expert witnesses must be retrieved or destroyed.

21. Except as provided in Commission rule 210.20, the jurisdiction of the administrative law judge over this order terminates upon filing of the initial determination issued at the end of the case. After that date, the Commission has jurisdiction to enforce this order and to issue reprimands and other sanctions.

22. The parties may move to amend this order, but any proposed amendment that would broaden the range of persons having access to confidential business information must be proposed and adopted before such information is supplied in reliance upon the terms of this order, unless all suppliers of confidential information consent to the amendment.

23. The Secretary shall serve a copy of this order upon all parties.

Paul J. Luckern
Administrative Law Judge

Issued: May 17, 2007

ATTACHMENT A

## NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, _____, do solemnly swear that I will not divulge any

information communicated to me in any confidential portion of the investigation or hearing in

Certain Personal Computers And Digital Display Devices, Inv. No. 337-TA-606, except as

permitted in the protective order issued in this case. I will not directly or indirectly use, or allow

the use of such information for any purpose other than that directly associated with my official

duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any

person reveal the nature of content of any information communicated during any confidential

portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the

participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is a

violation of the Federal Criminal Code and punishable by a fine of up to $10,000, imprisonment

of up to ten (10) years, or both.

Signed _____

Dated _____

Firm or affiliation

_____

_____

11

**CERTAIN PERSONAL COMPUTERS AND DIGITAL**     Investigation No. 337-TA-606
**DISPLAY DEVICES**

<u>CERTIFICATE OF SERVICE</u>

I, Marilyn R. Abbott, hereby certify that the attached **Order** was served by hand upon
Commission Investigative Attorney Bryan Moore, Esq., and upon the following parties via first
class mail, and air mail where necessary, on May 18, 2007.

Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, SW - Room 112
Washington, DC 20436

For Complainant Hewlett-Packard Company:

    John Allock, Esq.
    Sean C. Cunningham, Esq.
    **DLA PIPER US LLP**
    401 B Street, Suite 1700
    San Diego, CA  92101-4297

    Andrew P. Valentine, Esq.
    Alan A. Limbach, Esq.
    **DLA PIPER US LLP**
    2000 University Avenue
    East Palo Alto, CA  64303-2248

    James M. Heintz,Esq.
    **DLA PIPER US LLP**
    1200 Nineteenth Street, NW
    Washington, DC  20036-2412

**CERTAIN PERSONAL COMPUTERS AND DIGITAL**    **Investigation No. 337-TA-606**
**DISPLAY DEVICES**

<u>CERTIFICATE OF SERVICE</u> pg. 2

Respondents:

       Acer Incorporated
       SF, 88, Sec. 1
       Hsin Tai Ru Rd., Hsichih
       Taipei, Hsien 221
       Taiwan, R.O.C.

       Acer America Corporation
       333 West San Carlos Street
       Suite 1500
       San Jose, CA   95110

**CERTAIN PERSONAL COMPUTERS AND DIGITAL   Investigation No. 337-TA-606**
**DISPLAY DEVICES**

<u>**PUBLIC MAILING LIST**</u>

Sherry Robinson
LEXIS-NEXIS
8891 Gander Creek Drive
Miamisburg, OH   45342

Ronnita Green
Thomson West
1100 – 13th Street NW
Suite 200
Washington, DC   20005

**(PARTIES NEED NOT SERVE COPIES ON LEXIS OR WEST PUBLISHING)**

# Proposed Letter Rogatory to
# Silicon Integrated Systems Corporation

**In the United States District Court
For the District of Columbia**

| |
|---|
| Hewlett-Packard Company, |
|         Plaintiff (Complainant), |
|     v. |
| Acer, Inc. & Acer America Corp., |
|         Defendants (Respondents). |

Civil Action No. Misc.07-335

## REQUEST FOR INTERNATIONAL ASSISTANCE – LETTER ROGATORY TO THE TAIWANESE JUDICIAL AUTHORITIES

The United States District Court for the District of Columbia presents its compliments to the Appropriate Judicial Authority of Taiwan, and respectfully requests international judicial assistance to obtain evidence to be used in an administrative proceeding as approved by this Court in the above captioned matter. Specifically, this Court requests that the Appropriate Judicial Authority in Taiwan, by the proper and usual process of your Courts, compel the appearance of Silicon Integrated Systems Corporation ("SIS") statutory representative, 宣明智 ("Hsuan Ming Chih"), to testify under oath and to produce the documents identified below. This Court also requests that Appropriate Judicial Authority compel the testimony of any other SIS representatives that Hsuan Ming Chih may identify as knowledgeable in the listed topics. SIS is a Taiwanese corporation located at 新竹科學工業園區新竹縣寶山鄉新一路16號 ("No. 16 Creation Road I, Science Based Industrial Park, Hsinchu, Taiwan, R.O.C.").

Based on the representations made by Complainant Hewlett-Packard Company ("HP"), this Court believes that SIS has knowledge regarding material facts and that it is in possession of documents that are relevant for the proper prosecution of the above captioned case. This Court also believes that assistance from the Appropriate Judicial Authority in Taiwan would serve to

1

further the international interests of justice and judicial cooperation.

This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the Appropriate Judicial Authority of Taiwan compels SIS to give evidence and produce documents. This matter is set for hearing in the United States on a very short schedule and requires urgent attention from the Appropriate Judicial Authority in Taiwan.

## I.    SUMMARY OF THIS ACTION

HP has accused Respondents, Acer, Inc. and Acer America Corporation (collectively, "Respondents") of violating Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337) by importing, certain products that infringe one or more of HP's patents. The Tariff Act of 1930 makes it illegal to import goods into the United States that, among other things, infringe a United States Patent. In particular, HP accuses Respondents of importing desktop computers, portable computers (including notebook computers and table PCs), and computer monitors (the "Accused Products") that infringe United States Patent No. 6,691,236 B1 (the "'236 Patent"); United States Patent No. 6,029,119 (the "'119 Patent"); and/or United States Patent No. 5,353,415 (the "'415 Patent") (collectively, the "Patents-at-Issue"). Pursuant to HP's complaint of patent infringement, the United States International Trade Commission instituted Investigation No. 337-TA-606, which seeks to examine Respondents' importation activities. The United States Office of Unfair Import Investigations is also a party to this Investigation.

The Patents-at-Issue cover a variety of features and components in the Accused Products. The '415 Patent relates to the roles played by a central processing unit ("CPU") and its associated cache memory system and memory controller in performing concurrent bus operations. The '119 Patent relates to a computer's ability to regulate its internal temperature based on monitoring the temperature and/or activities of various locations within the computer, including the central processing unit. The '236 Patent relates to portable computer systems that

conserve power by changing the performance of video graphics controller depending on the system's power source, battery condition, demands on the CPU, and/or the system state being saved to non-volatile memory (for example, when the computer goes into hibernation).

On information and belief, SIS creates computer components that are involved in implementing the claimed inventions of the '236 patent, the '415 patent, and the '119 patent in Respondents' Accused Products. SIS sells these components to Respondents and Respondents' original design manufacturers. Accordingly, SIS possesses documents and information concerning the design, development, and operation of its components within Respondents' Accused Products. It is likely that Respondents do not possess these documents because some of them will relate to functions performed inside the component and, thus, are not shared by SIS with Respondents. Therefore, HP requests this assistance to obtain the required technical information about SIS's computer components directly from SIS.

## II.   DOCUMENTS AND TESTIMONY REQUESTED

This Court requests the Appropriate Judicial Authority to compel SIS to produce to HP the types of documents listed in Attachment A to this Request.

This Court also requests the Appropriate Judicial Authority to compel SIS to make Hsuan Ming Chih, or another suitable representative, available to answer questions listed in Attachment B to this Request.

There is a protective order in this case to protect the confidentiality of any documents SIS produces. The protective order is included in this Request as Attachment C.

Therefore, this Court respectfully requests that, in the interests of justice, you issue appropriate orders, subpoenas, or other compulsory process necessary to compel the production of the above mentioned documents and the attendance of a SIS representative for oral testimony on the above mentioned topics. This Court also request that you specifically authorize that the oral testimony may be videotaped and audiotaped, in addition to being transcribed by a

3

qualified court reporter.

This Court stands ready to extend similar assistance to the Courts of Taiwan in like cases. To the extent there are expenses associated with providing assistance in response to this Request, this Court will see that the Appropriate Judicial Authority in Taiwan is reimbursed by HP. HP may be contacted in Taiwan through Ms. Daisy Wang of Lee and Li, Attorneys-at-Law. Her offices are located at 7F, No. 201, Tun Hua N. Road, Taipei 105, Taiwan. She may be contacted by telephone at 866-2-2715-3300 ext. 2335.


Dated: _____, 2007
            Month, Day


                                    _____
                                    District Court Judge
                                    District Court of the District of Columbia

**ATTACHMENT A**

**DEFINITIONS**

The following definitions apply to these Document Requests.

1.    "HP" shall mean Hewlett-Packard Company including, without limitation, All of its subsidiaries, affiliates, divisions, Related entities, predecessors (including but not limited to Compaq Computer Corporation and Digital Equipment Corporation), successors, and Any present or former officers, directors, trustees, employees, agents, or representatives.

2.    "SIS" shall mean Silicon Integrated Systems Corporation and all of its subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys, others acting on behalf of Silicon Integrated Systems Corporation, and any entities controlled or owned by Silicon Integrated Systems Corporation.

3.    "Respondents" shall mean Acer, Inc., and Acer America Corporation, including without limitation all of its subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or former officers, directors, trustees, employees, agents, or representatives, attorneys, others acting on behalf of Acer, Inc. (including, but not limited to, its ODMs or Original Design Manufacturers), and any entities controlled or owned by Acer, Inc.

4.    The terms "Document" and "Documents" shall mean and include anything in SIS's possession, custody, or control that is printed, recorded, or stored in electronic form.  Some examples of "Documents" include letters, email, memoranda, reports, agreements, technical Documents, engineering specifications, hardware specifications, software specifications, product specifications, computer code, hand written notes, financial reports, and invoices.  Any request for a "Document" includes a request for all drafts and revisions of the foregoing.

5.    "Communication" or "Communications" shall mean Any transfer or exchange between two or more persons of Any information whether by written, oral, electronic or other

5

means, including but not limited to personal conversations, correspondence, electronic mail, telephone calls, facsimile communications, or telegrams.

6.      "Imported" shall mean imported into the United States.

7.      "Relevant SIS Product" or "Relevant SIS Products" shall mean, when used without reference to Any specific product, all chipsets, North Bridge chips, South Bridge chips, graphics processors, controllers, subsystems and/or products that SIS has sold, distributed and/or licensed to Acer or HP or used in any Acer or HP portable computer (e.g., including, but not limited to, notebook computers and tablet PCs) or desktop computer sold or Imported in the United States, including but not limited to products sold and/or marketed under the following names: SISM760GX; SISM661MX; SISM661GX; SISM661FX; SIS671; and/or SIS968, as well as any SIS product used in an Acer or HP portable computer (e.g., including, but not limited to, notebook computers and tablet PCs) or desktop computer that incorporates the Mirage™ 2 graphics engine.

8.      "Part" or "Component" shall mean Any device contained within a Relevant SIS Product, shipped by SIS with a Relevant SIS Product, imported by SIS into the United States and subsequently shipped with a Relevant SIS Product, recommended for use with a Relevant SIS Product, or manufactured, produced, or sold with a Relevant SIS Product.

9.      "Relate To," "Related To," or "Relating To" shall mean embodying, pertaining, concerning, involving, constituting, commenting upon, comprising, reflecting, discussing, evidencing, mentioning, referring to, consisting of, responding to, or having Any logical or factual connection whatever with the subject matter in question.

10.     The "'236 Patent" shall mean United States Patent No. 6,691,236, titled "System for Altering Operation of a Graphics Subsystem During Run-time to Conserve Power upon Detecting a Low Power Condition or Lower Battery Charge Exists."

11.     The "'415 Patent" shall mean United States Patent No. 5,353,415, titled "Method and apparatus for concurrency of bus operations."

12.   The "'119 Patent" shall mean United States Patent No. 6,029,119, titled "Thermal Management of Computers."

13.   The "Patents-At-Issue" shall mean the '236 Patent, the '415 Patent, and the '119 Patent.

14.    "Litigation" shall mean any lawsuit between Hewlett-Packard Company, on the one hand, and Acer, Inc. and/or Acer America Corporation on the other hand.

## DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION No. 1:

For each Relevant SIS Product:

   a.  Datasheets, databooks, specifications, programmer's guides, user manuals, hardware guides, white papers, design reviews, design documents, driver design guides, development documents, installation guides, and block diagrams for the Relevant SIS Product.

   b.  Documents Relating to any interactions between the Relevant SIS Product and a CPU external to the Relevant SIS Product (such as an Intel or AMD CPU product), including but not limited to, any interactions between the Relevant SIS Product and a cache system or cache controller located in such external CPU.

   c.  Documents Relating to any interactions between the Relevant SIS Product and a memory device located outside of the Relevant SIS Product, including, but not limited to, Documents showing all connections between each Relevant SIS Product.

   d.  Documents describing each bus or connection to which the Relevant SIS Product is designed to connect.

e.  Documents Relating to the procedure by which the Relevant SIS Product handles requests from a graphics processor or graphics system to a CPU external to each Relevant SIS Product (such as an Intel or AMD CPU product).

f.  Documents Relating to the protocol for transactions or posting requests on a bus between an Intel CPU and the Relevant SIS Product.

g.  Documents Relating to the procedure by which the Relevant SIS Product initiates a transaction on a bus external to the Relevant SIS Product (such as a read operation on a Hypertransport bus, an LPC bus, an AGP bus, a PCI bus, or a PCI-X bus), including, but not limited to, Documents showing the circuits involved in such procedure.

h.  Documents Relating to the procedure by which the Relevant SIS Product reads or obtains data from a BIOS ROM chip.

i.  Documents Relating to the procedures by which the Relevant SIS Product initiates an I/O operation (such as a read from an I/O port) or receives an I/O operation or command from an external CPU (such as an Intel or AMD CPU), including, but not limited to, Documents showing the circuits involved in such procedures.

j.  Documents Relating to the procedures by which the Relevant SIS Product will obtain data or perform a read operation from chips or devices outside of each Relevant SIS Product itself (or to ports or pins on the Relevant SIS Product connected to such chips or devices) or receives a read operation or command from an external CPU (such as an Intel or AMD CPU), including, but not limited to, Documents showing the circuits involved in such procedures.

k.  Documents Relating to the procedures by which the Relevant SIS Product will post data or perform a write operation to chips or devices outside of the Relevant SIS Product itself (or to ports or pins on the Relevant SIS Product connected to such chips or devices) or receives a post data or write operation or command from

an external CPU (such as an Intel or AMD CPU), including, but not limited to, Documents showing the circuits involved in such procedures.

l.  Documents Relating to the procedure by which the Relevant SIS Product will access or read data from a graphics chip, graphics system, VRAM, or frame buffer.

m.  Documents identifying or Relating to the memory space that is addressable by each Relevant SIS Product.

n.  Documents Relating to any register that defines the addressable memory space, including, but not limited to, Documents describing the contents of such a register or describing its values upon initialization.

o.  Documents identifying or relating to the I/O space that is addressable by the Relevant SIS Product.

p.  All Documents Relating to any register that defines the addressable I/O space, including, but not limited to, all documents describing the contents of such a register or describing its values upon initialization.

q.  All timing diagrams relating to any bus transactions.

r.  All firmware source code and software source code contained or used in the Relevant SIS Product, including, but not limited to, all firmware source code and software source code that is relevant to power management functions.

s.  All Documents related to the ability of the Relevant SIS Product and/or any of its Components to switch and/or change a clock frequency, a core voltage, and/or an operating speed or performance, of a graphics processor in a portable computer (e.g., including, but not limited to, notebook computers and tablet PCs).

t.  All Documents discussing or disclosing the circumstances in which the Relevant SIS Product and/or any of its Components change a clock speed, a core voltage and/or an operating speed or performance, of a graphics processor in a portable computer (e.g., including, but not limited to, notebook computers and tablet PCs).

9

u. All Documents related to any communication, interface, and/or interaction between the Relevant SIS Product and the Microsoft Windows XP Operating System.

v. All Documents relating to how the Relevant SIS Product determines or detects a computer system AC power source, battery power source, low battery condition, demand on a CPU, and/or that the system state is being saved to non-volatile memory (e.g., hibernation) in a portable computer (e.g., including, but not limited to, notebook computers and tablet PCs).

w. Documents discussing or disclosing the hardware, software, and firmware involved in power management.

REQUEST FOR PRODUCTION No. 2:

For each Relevant SIS Product that contains graphics functionality (in addition to documents requested elsewhere):

a. Documents sufficient to show the type, size, and location of any memory (including, but not limited to, any VRAM or frame buffer) contained within the Relevant SIS Product and Documents sufficient to show all buses and other interfaces and connections connected to such memory.

b. Documents Relating to the way in which the Relevant SIS Product uses main memory located outside of the Relevant SIS Product, including, but not limited to, Documents Relating to instances in which the Relevant SIS Product will request or obtain data from main memory.

c. Documents Relating to any interactions between the Relevant SIS Product and a cache system, cache controller, or cache memory located in a CPU external to the Relevant SIS Product (such as an Intel or AMD CPU).

d. Documents Relating to the design and operation of any cache system, cache controller, and cache memory contained within the Relevant SIS Product,

10

including, but not limited to: (i) Documents Relating to any buses or other electrical paths to which each cache controller is connected, (ii) Documents Relating to cache coherency, cache consistency, or cache verification, (iii) Documents Relating to any snooping performed by any cache controller, and (iv) Documents Relating to write back cycles performed by any cache controller.

e. Documents Relating to any graphics processor or other cache controller activity that can occur within the Relevant SIS Product while the cache controller within the Relevant SIS Product is performing snooping.

f. Documents Relating to any situation where a device external to the Relevant SIS Product can affect or alter the contents of a cache system or cache memory contained within the Relevant SIS Product.

g. Documents Relating to any situation where a device external to the Relevant SIS Product can affect or alter the contents of memory (including, but not limited to, VRAM) contained within the Relevant SIS Product.

h. Documents Relating to products other than the Relevant SIS Product that can request or obtain data from the Relevant SIS Product or any memory located therein.

## REQUEST FOR PRODUCTION No. 3:

Documents Relating To how each Relevant SIS Product and/or any of its Components communicate a clock speed, a core voltage and/or an operating speed, performance or condition, of a graphics processor in a portable computer (e.g., including, but not limited to, notebook computers and/or tablet PCs) to the processor, operating system and/or BIOS of the portable computer.

## REQUEST FOR PRODUCTION No. 4:

Documents Relating To how each Relevant SIS Product responds to a determined or

detected computer system AC power source, battery power source, and/or low battery condition, in a portable computer (e.g., including, but not limited to, notebook computers and/or tablet PCs).

### REQUEST FOR PRODUCTION No. 5:

Documents Relating To or discussing HP, the Patents-at-Issue, or this Lawsuit.

### REQUEST FOR PRODUCTION No. 6:

Communications between SIS and Acer regarding HP, the Patents-at-Issue, and/or this Litigation.

### REQUEST FOR PRODUCTION No. 7:

Communications with Acer regarding changes to each Relevant SIS Products.

### REQUEST FOR PRODUCTION No. 8:

Documents relating to communications between SIS and Acer relating to each Relevant SIS Products.

### REQUEST FOR PRODUCTION No. 9:

Documents that identify all Relevant SIS Products by part number and/or model number, internal name, marketing number, and/or all other unique designations.

12

# ATTACHMENT B

## DEFINITIONS

The following definitions apply to these Topics of Testimony.

1.    "HP" shall mean Hewlett-Packard Company including, without limitation, All of
its subsidiaries, affiliates, divisions, Related entities, predecessors (including but not limited to
Compaq Computer Corporation and Digital Equipment Corporation), successors, and Any
present or former officers, directors, trustees, employees, agents, or representatives.

2.    "SIS" shall mean Silicon Integrated Systems Corporation and all of its
subsidiaries, affiliates, divisions, related entities, predecessors, successors, and any present or
former officers, directors, trustees, employees, agents, or representatives, attorneys, others acting
on behalf of Silicon Integrated Systems Corporation, and any entities controlled or owned by
Silicon Integrated Systems Corporation.

3.    "Respondents" shall mean Acer, Inc., and Acer America Corporation, including
without limitation all of its subsidiaries, affiliates, divisions, related entities, predecessors,
successors, and any present or former officers, directors, trustees, employees, agents, or
representatives, attorneys, others acting on behalf of Acer, Inc. (including, but not limited to, its
ODMs or Original Design Manufacturers), and any entities controlled or owned by Acer, Inc.

4.    The terms "Document" and "Documents" shall mean and include anything in
SIS's possession, custody, or control that is printed, recorded, or stored in electronic form.  Some
examples of "Documents" include letters, email, memoranda, reports, agreements, technical
Documents, engineering specifications, hardware specifications, software specifications, product
specifications, computer code, hand written notes, financial reports, and invoices.  Any request
for a "Document" includes a request for all drafts and revisions of the foregoing.

5.    "Communication" or "Communications" shall mean Any transfer or exchange
between two or more persons of Any information whether by written, oral, electronic or other

means, including but not limited to personal conversations, correspondence, electronic mail, telephone calls, facsimile communications, or telegrams.

6.     "Imported" shall mean imported into the United States.

7.     "Relevant SIS Product" or "Relevant SIS Products" shall mean, when used without reference to Any specific product, all chipsets, North Bridge chips, South Bridge chips, graphics processors, controllers, subsystems and/or products that SIS has sold, distributed and/or licensed to Acer or HP or used in any Acer or HP portable computer (e.g., including, but not limited to, notebook computers and tablet PCs) or desktop computer sold or Imported in the United States, including but not limited to products sold and/or marketed under the following names: SISM760GX; SISM661MX; SISM661GX; SISM661FX; SIS671; and/or SIS968, as well as any SIS product used in an Acer or HP portable computer (e.g., including, but not limited to, notebook computers and tablet PCs) or desktop computer that incorporates the Mirage™ 2 graphics engine.

8.     "Part" or "Component" shall mean Any device contained within a Relevant SIS Product, shipped by SIS with a Relevant SIS Product, imported by SIS into the United States and subsequently shipped with a Relevant SIS Product, recommended for use with a Relevant SIS Product, or manufactured, produced, or sold with a Relevant SIS Product.

9.     "Relate To," "Related To," or "Relating To" shall mean embodying, pertaining, concerning, involving, constituting, commenting upon, comprising, reflecting, discussing, evidencing, mentioning, referring to, consisting of, responding to, or having Any logical or factual connection whatever with the subject matter in question.

10.    The "'236 Patent" shall mean United States Patent No. 6,691,236, titled "System for Altering Operation of a Graphics Subsystem During Run-time to Conserve Power upon Detecting a Low Power Condition or Lower Battery Charge Exists."

11.    The "'415 Patent" shall mean United States Patent No. 5,353,415, titled "Method and apparatus for concurrency of bus operations."

14

12.    The "'119 Patent" shall mean United States Patent No. 6,029,119, titled "Thermal Management of Computers."

13.    The "Patents-At-Issue" shall mean the '236 Patent, the '415 Patent, and the '119 Patent.

14.    "Litigation" shall mean any lawsuit between Hewlett-Packard Company, on the one hand, and Acer, Inc. and/or Acer America Corporation on the other hand.

## TOPICS OF TESTIMONY

Topic No. 1:

Identify the person or people who will testify on behalf of SIS for each of the following topics.

Topic No. 2:

For each Relevant SIS Product:

    a.  Describe the interactions between the Relevant SIS Product and a CPU external to the Relevant SIS Product (such as an Intel or AMD CPU product), including but noted limited to, any interactions between the Relevant SIS Product and a cache system or cache controller located in such external CPU.

    b.  Describe the interactions between the Relevant SIS Product and a memory device located outside of the Relevant SIS Product, including, but not limited to, connections between the Relevant SIS Product and the memory device.

    c.  Identify each bus or connection to which the Relevant SIS Product is designed to connect.

d.  Describe the procedure by which the Relevant SIS Product handles requests from a graphics chip or graphics system to a CPU external to the Relevant SIS Product (such as an Intel or AMD CPU product).

e.  Describe the procedure for initiating transactions or posting requests on a bus or connection between an external CPU (such as an Intel or AMD CPU) and a Relevant SIS Product.

f.  Describe the procedure by which the Relevant SIS Product initiates a transaction on a bus external to the Relevant SIS Product (such as a read operation on a Hypertransport bus, an LPC bus, an AGP bus, a PCI bus, or a PCI-X bus), and identify the circuits involved in such procedure.

g.  Describe the procedure by which the Relevant SIS Product reads or obtains data from a BIOS ROM chip.

h.  Describe the procedures by which the Relevant SIS Product initiates an I/O operation (such as a read from an I/O port) or receives an I/O operation or command from an external CPU (such as an Intel or AMD CPU), and identify the circuits involved in such procedures.

i.  Describe the procedures by which the Relevant SIS Product will obtain data or perform a read operation from chips or devices outside of the Relevant SIS Product itself (or to ports or pins on the Relevant SIS Product connected to such chips or devices) or receives a read operation or command from an external CPU (such as an Intel or AMD CPU), and identify the circuits involved in such procedures.

j.  Describe the procedures by which the Relevant SIS Product will post data or perform a write operation to chips or devices outside of the Relevant SIS Product itself (or to ports or pins on the Relevant SIS Product connected to such chips or devices) or receives a post data or write operation or command from an external

16

CPU (such as an Intel or AMD CPU), and identify the circuits involved in such procedures.

k. Describe the procedure by which the Relevant SIS Product will access or read data from a graphics chip, graphics system, VRAM, or frame buffer.

l. Describe the memory space that is addressable by the Relevant SIS Product.

m. Describe each register that defines the addressable memory space, including, the contents of such a register or describing its values upon initialization.

n. Describe the I/O space that is addressable by the Relevant SIS Product.

o. Describe the registers that defines the addressable I/O space, including, the contents of such a register or describing its values upon initialization.

p. Describe all timing diagrams relating to any bus transactions.

q. Identify all the documents describing the Relevant SIS Product, including all electrical schematics, block diagrams, specifications, datasheets, application notes, white papers, design reviews, testing reports, qualification reports, user manuals, and installation guides.

r. Identify all the firmware source code and software source code contained or used in the Relevant SIS Product, including, but not limited to, all firmware source code and software source code that is relevant to power management.

s. Describe the ability of the Relevant SIS Product to switch or change a clock frequency, core logic voltage, and/or an operating speed or performance, of a graphics processor in a portable computer (e.g., including, but not limited to, notebook computers and tablet PCs).

t. Describe how the Relevant SIS Product determines when to switch or change a clock frequency, a core logic voltage, and/or an operating speed or performance, of a graphics processor in a portable computer (e.g., including, but not limited to, notebook computers and tablet PCs).

17

u. Describe how the Relevant SIS Product determines or detects a computer system
AC power source, battery power source, low battery condition, demand on a CPU,
and/or that the system state is being saved to non-volatile memory (e.g.,
hibernation) in a portable computer (e.g., including, but not limited to, notebook
computers and tablet PCs).

v. Describe the communications, interfaces, and/or interactions between the
Relevant SIS Product and the Microsoft Windows XP Operating System.

w. Identify of the hardware, software, and firmware involved in power management.

Topic No. 3:

For each Relevant SIS Product that contains graphics functionality (in addition to
documents requested elsewhere):

a. Describe the type, size, and location of any memory (including, but not limited to,
any VRAM) contained within the Relevant SIS Product, including, any buses and
other interfaces connected to such memory.

b. Describe the procedure by which the Relevant SIS Product uses main memory
located outside of the Relevant SIS Product, including, instances in which the
Relevant SIS Product will request or obtain data from main memory.

c. Describe the interactions between the Relevant SIS Product and a cache system,
cache controller, or cache memory located in a CPU external to the Relevant SIS
Product (such as an Intel or AMD CPU).

d. Describe the design and operation of any cache system, cache controller, and
cache memory contained within the Relevant SIS Product, including: (i) any
buses or other electrical paths to which each cache controller is connected, (ii)
cache coherency, cache consistency, or cache verification, (iii) any snooping
performed by any cache controller, and (iv) any write back cycles performed by
any cache controller.

18

   e. Describe any graphics processor or other cache controller activity that can occur within the Relevant SIS Product while the cache controller within the Relevant SIS Product is performing snooping.

   f. Describe the situation where a device external to the Relevant SIS Product can affect or alter the contents of a cache system or cache memory contained within the Relevant SIS Product.

   g. Describe the situation where a device external to the Relevant SIS Product can affect or alter the contents of memory (including, but not limited to, VRAM) contained within the Relevant SIS Product.

   h. Describe the types of products other than the Relevant SIS Product that can request or obtain data from the Relevant SIS Product or any memory located therein.

## Topic No. 4:

Describe how the Relevant SIS Product and/or any of its Components communicate a clock speed, a core voltage and/or an operating speed, performance or condition, of a graphics processor in a portable computer (e.g., including, but not limited to, notebook computers and/or tablet PCs) to the processor, operating system and/or BIOS of the portable computer.

## Topic No. 5:

Describe how the Relevant SIS Product responds to a determined or detected computer system AC power source, battery power source, and/or low battery condition, in a portable computer (e.g., including, but not limited to, notebook computers and/or tablet PCs).

## Topic No. 6:

Describe SIS's discussions within SIS or between SIS and another person or entity regarding HP, the Patents-at-Issue, or this Litigation.

<u>Topic No. 7:</u>

Describe the Communications between SIS and Acer regarding HP, the Patents-at-Issue, or this Litigation.

<u>Topic No. 8:</u>

Describe the Communications with Acer regarding changes to any Relevant SIS Products.

<u>Topic No. 9:</u>

Identify all Relevant SIS Products by part number and/or model number, internal name, marketing number, and/or all other unique designations.

<u>Topic No. 10:</u>

State whether the documents produced by SIS are authentic, and whether such documents were prepared or kept by SIS in the ordinary course of its business activities.

ATTACHMENT C

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| CERTAIN PERSONAL COMPUTERS | )    Investigation No. 337-TA-606 |
| AND DIGITAL DISPLAY DEVICES | ) |
| | ) |

Order No. 2: Protective Order

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information, as such terms are used in the Commission's Rules, 19 C.F.R. Section 210.34(a)(7),

IT IS HEREBY ORDERED THAT:

1. Confidential business information is information which has not been made public and which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, the disclosure of which information is likely to have the effect of either (1) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or (2) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such information.

2. Any information submitted, either voluntarily or pursuant to order, in this investigation, which is asserted by a supplier to contain or constitute confidential business

information shall be so designated by such supplier in writing, or orally at a deposition,

conference or hearing, and shall be segregated from other information being submitted.

Documents shall be clearly and prominently marked on their face with the legend: "[supplier's

name] CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE

ORDER," or a comparable notice. Information obtained during discovery and asserted by the

supplier to be confidential under this order will be deemed to be confidential unless the

administrative law judge or the Commission rules that it is not. When such information is made

part of a pleading, or is offered into the evidentiary record, the party offering it must state the

basis for its claimed confidentiality. Confidential information whether submitted in writing or in

oral testimony shall be disclosed at a hearing only on the in camera record and shall not be made

part of the public record of this proceeding. The administrative law judge or the Commission

may determine that information alleged to be confidential is not confidential, or that its

disclosure is necessary for the proper disposition of the proceeding, at any time before, during or

after the close of the hearing herein. If such a determination is made by the administrative law

judge, opportunity shall be provided to the supplier of such information to argue its

confidentiality, prior to the time that such ruling becomes final.

3. In the absence of written permission from the supplier or an order by the Commission

or the administrative law judge, any confidential documents or business information submitted in

accordance with the provisions of paragraph 2 above shall not be disclosed to any person other

than: (i) outside counsel for parties to this investigation, including necessary secretarial and

clerical personnel assisting such counsel, (ii) qualified persons taking testimony involving such

documents or information and necessary stenographic and clerical personnel thereof, (iii)

2

technical experts and their staff who are employed by outside counsel under (i) above for the purposes of this litigation (unless they are otherwise employed by, consultants to, or otherwise affiliated with a non-governmental party, or are employees of any domestic or foreign manufacturer, wholesaler, retailer, or distributor of certain personal computers and digital display devices, which are the subject of this investigation), and (iv) the Commission, the administrative law judge, the Commission staff, and personnel of any governmental agency as authorized by the Commission. However see Commission rule 210.5 (b) which conforms to 19 U.S.C. § 1337(n)(2), which clarifies the list of government officers and employees who may have access to confidential business information, and (c) which alerts suppliers to the possibility that confidential business information may be transmitted to a federal district court, subject to such protective order as the district court determines necessary. This result might occur in a limited class of cases because of 28 U.S.C. § 1659. Past Commission practice has been to permit the transfer of confidential business information to another court only with permission of the supplier of the information. Particularly where the supplier is a third party who is involved in neither the Commission investigation nor the district court case, it is important that the supplier be made aware that treatment of confidential information would be governed by the district court's protective order and not that of the Commission following transmittal of the record under this provision. See also Commission rule 210.39 which outlines the circumstances in which the Commission's record, including the in camera record, may be transmitted to a federal district court, subject to such protective order as the district court determines necessary. In addition, referring to Commission Administrative Order No. 97-06, dated February 4, 1997, information submitted under this Protective Order may be disclosed to technical contract personnel who are

3

acting in the capacity of Commission employees, for developing or maintaining the records of

this investigation or related proceedings, or in internal audits and investigations relating to the

programs and operations of the Commission pursuant to 5 U.S.C. Appendix 3. Any contract

personnel will sign appropriate non-disclosure agreements.[1] Where the supplier of information

under this order is a third party who is not involved in the Commission investigation, it is

important that the supplier be made aware of the disclosure of such information to contract

personnel by being provided a copy of the protective order.

4. Confidential business information submitted in accordance with the provisions of

paragraph 2 above shall not be made available to any person designated in paragraph 3(i) and (iii)

unless he or she shall have first read this order and shall have agreed, by letter filed with the

Secretary of this Commission (letter of acknowledgment): (i) to be bound by the terms thereof;

(ii) not to reveal such confidential business information to anyone other than another person

designated in paragraph 3; and (iii) to utilize such confidential business information solely for

purposes of this investigation. Such letter shall also acknowledge that the signatory(ies) has

(have) read the order. Such letter shall further state which parties the person filing the letter is

involved with and shall state in what capacity he or she is a signatory to the Protective Order

(e.g., as an attorney under Paragraph 3(i) or technical expert under Paragraph 3(iii) and, in the

case of an attorney, in what jurisdictions he or she is admitted to practice. Each attorney seeking

access to confidential business information shall sign such letter individually, but clerical and

support personnel (including law clerks and paralegals) of that attorney need not sign. All letters

---

[1] A supplier of confidential business information may request that the administrative law judge identify said contract personnel.

4

of acknowledgment of this Protective Order shall be served on all non-parties who have

theretofore submitted confidential business information in accordance with the provisions of

paragraph 2, above.

5. Confidential business information obtained in the Commission proceeding may be

used with the consent of the supplier in a parallel district court proceeding under a protective

order issued by the district court without losing its confidential status under the protective order

in this proceeding as long as the information is not made public in the district court proceeding or

by someone who obtains the information from that source or by anyone else.

6. Confidential business information furnished by a supplier may lose its protection

under this order if it is disseminated to anyone not authorized to see it either by this protective

order or by a protective order issued by a district court in a parallel proceeding protecting

confidential business information obtained by the parties under the Commission's protective

order. Information obtained pursuant to the Commission's protective order, however, may be

produced to the district court under the district court protective order only with the consent of the

suppliers of that information.

7. If the Commission or the administrative law judge orders, or if the supplier and all

parties to the investigation agree, that access to, or dissemination of, information submitted as

confidential business information shall be made to persons not included in paragraphs 3, 5 or 6

above, such matter shall only be accessible to, or disseminated to, such persons based on the

conditions pertaining to, and obligations arising from, this order, and such persons shall be

considered subject to it unless the Commission or the administrative law judge finds that the

information is not confidential business information as defined in paragraph 1 hereof.

5

8. Any confidential business information submitted to the Commission or the administrative law judge in connection with a motion or other proceeding within the purview of this investigation shall be submitted under a designation that confidential information is contained or attached therein, pursuant to paragraph 2 above. When any confidential business information submitted in accordance with paragraph 2 above is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such confidential portions and separately label them "[supplier's name], CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER." Before a court reporter receives any such information, he or she shall have first read this order and shall have agreed in writing to be bound by the terms thereof. Alternatively, he or she shall sign the agreement included as Attachment A hereto. Copies of each such signed agreement shall be provided to the supplier of such confidential business information and to the Secretary of the Commission.

9. The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Commission or the administrative law judge rules, after proper notice and hearing, was publicly known at the time it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

10. The administrative law judge acknowledges that any document or information submitted as confidential business information pursuant to paragraph 2 above is to be treated as such within the meaning of 5 U.S.C. § 522(b)(4) and 18 U.S.C. § 1905, subject to a challenge by

6

any party pursuant to paragraph 12 below or to a final ruling by the Commission, the administrative law judge or its Freedom of Information Act Officer to the contrary, or by appeal of such a ruling, interlocutory or otherwise.

11. If no determination has been made by the administrative law judge or the Commission that the information designated as confidential by the submitter is not confidential, the persons who are recipients of such information shall take all necessary and proper steps to preserve the confidentiality of, and to protect each supplier's rights with respect to, any confidential business information designated by the supplier in accordance with paragraph 2 above.

12. The supplier of any confidential information is hereby notified that Commission regulations 19 C.F.R. § 201.19(c) through (e) generally require that the Commission will give notice to a submitter of confidential information upon the Commission's receipt of an FOIA request.

13. The supplier of any confidential information is put on notice that Commission rule 210.20 provides that only a party may move to declassify and that only then are such motions, whether brought at any time during or after the conclusion of an investigation, addressed to and ruled upon by an administrative law judge. Other requests to declassify made by non-parties, such as an FOIA request, will not be referred to the administrative law judge for consideration under the protective order.

14. If a party to this order who is a recipient of any business information designated as confidential and submitted in accordance with paragraph 2, disagrees with respect to such a designation, in full or in part, it shall notify the supplier in writing, and they will thereupon

7

confer as to the status of the subject information proffered within the context of this order. If

prior to, or at the time of, such a conference, the supplier withdraws its designation of such

information as being subject to this order, but nonetheless submits such information for purposes

of the investigation, such supplier shall express the withdrawal in writing and shall serve such

withdrawal upon all parties, the administrative law judge, and the Commission investigative

attorney. If the recipient and supplier are unable to concur upon the status of the subject

information submitted as confidential business information within ten days from the date of

notification of such disagreement, any party to this order may raise the issue of the designation of

such a status to the Commission or to the administrative law judge, and the Commission or the

administrative law judge may raise the issue of designation of the confidential status without any

request from a party. Upon notice that such confidential status of information is at issue, the

party to the investigation which submitted the information and designated it as confidential shall

have the burden of proving such confidential status.

    15. No less than ten days (or any other period of time designated by the administrative

law judge) prior to the initial disclosure to the proposed expert of any confidential information

submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in

writing the name of such proposed expert and his or her educational and employment history to

the supplier. If the supplier objects to the disclosure of such confidential business information to

such proposed expert as inconsistent with the language or intent of this order or on other

grounds, it shall notify the recipient in writing of its objection and the grounds therefor prior to

the initial disclosure. If the dispute is not resolved on an informal basis within ten days of receipt

of such notice of objection, motion may be made to the administrative law judge for a ruling on

such objection. The submission of such confidential business information to such proposed expert shall be withheld pending the ruling of the administrative law judge. The terms of this paragraph shall be inapplicable to experts within the Commission or to experts from other governmental agencies who are consulted with, or used by, the Commission.

16. If confidential business information submitted in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this protective order, the party responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the supplier and the administrative law judge and, without prejudice to other rights and remedies of the supplier, make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

17. Nothing in this order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Commission, its Freedom of Information Act Officer, or the administrative law judge concerning the issue of the status of confidential business information.

18. Upon final termination of this investigation, each party that is subject to this order shall destroy or return to the supplier all items containing confidential business information submitted in accordance with paragraph 2 above, including all copies of such matter which may have been made, but not including copies containing notes or other attorney's work product that may have been placed thereon by counsel for the receiving party. All copies containing such notes or other attorney's work product shall be destroyed. Receipt of material returned to the supplier shall be acknowledged in writing. This paragraph shall not apply to the Commission, including its investigative attorney, and the administrative law judge, which shall retain such

9

material pursuant to statutory requirements and for other recordkeeping purposes, but may destroy those additional copies in its possession which are regarded as surplusage.

19. If any confidential business information which is supplied in accordance with paragraph 2 above is supplied by a non-party to this investigation, such a non-party shall be considered a "supplier" within the meaning of that term as it is used in the context of this order.

20. At or before the final termination of the investigation, copies of confidential information that was in the hands of expert witnesses must be retrieved or destroyed.

21. Except as provided in Commission rule 210.20, the jurisdiction of the administrative law judge over this order terminates upon filing of the initial determination issued at the end of the case. After that date, the Commission has jurisdiction to enforce this order and to issue reprimands and other sanctions.

22. The parties may move to amend this order, but any proposed amendment that would broaden the range of persons having access to confidential business information must be proposed and adopted before such information is supplied in reliance upon the terms of this order, unless all suppliers of confidential information consent to the amendment.

23. The Secretary shall serve a copy of this order upon all parties.

Paul J. Luckern
Administrative Law Judge

Issued: May 17, 2007

## ATTACHMENT A

## NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, _____, do solemnly swear that I will not divulge any

information communicated to me in any confidential portion of the investigation or hearing in

Certain Personal Computers And Digital Display Devices, Inv. No. 337-TA-606, except as

permitted in the protective order issued in this case. I will not directly or indirectly use, or allow

the use of such information for any purpose other than that directly associated with my official

duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any

person reveal the nature of content of any information communicated during any confidential

portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the

participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is a

violation of the Federal Criminal Code and punishable by a fine of up to $10,000, imprisonment

of up to ten (10) years, or both.

Signed _____

Dated _____

Firm or affiliation

_____

_____

11

**CERTAIN PERSONAL COMPUTERS AND DIGITAL      Investigation No. 337-TA-606
DISPLAY DEVICES**

## CERTIFICATE OF SERVICE

I, Marilyn R. Abbott, hereby certify that the attached **Order** was served by hand upon
Commission Investigative Attorney Bryan Moore, Esq., and upon the following parties via first
class mail, and air mail where necessary, on May 18, 2007.

Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, SW - Room 112
Washington, DC  20436

For Complainant Hewlett-Packard Company:

John Allock, Esq.
Sean C. Cunningham, Esq.
**DLA PIPER US LLP**
401 B Street, Suite 1700
San Diego, CA  92101-4297

Andrew P. Valentine, Esq.
Alan A. Limbach, Esq.
**DLA PIPER US LLP**
2000 University Avenue
East Palo Alto, CA  64303-2248

James M. Heintz, Esq.
**DLA PIPER US LLP**
1200 Nineteenth Street, NW
Washington, DC  20036-2412

**CERTAIN PERSONAL COMPUTERS AND DIGITAL     Investigation No. 337-TA-606
DISPLAY DEVICES**

<u>CERTIFICATE OF SERVICE</u> pg. 2

Respondents:

Acer Incorporated
SF, 88, Sec. 1
Hsin Tai Ru Rd., Hsichih
Taipei, Hsien 221
Taiwan, R.O.C.

Acer America Corporation
333 West San Carlos Street
Suite 1500
San Jose, CA   95110

**CERTAIN PERSONAL COMPUTERS AND DIGITAL     Investigation No. 337-TA-606
DISPLAY DEVICES**

## <u>PUBLIC MAILING LIST</u>

Sherry Robinson
LEXIS-NEXIS
8891 Gander Creek Drive
Miamisburg, OH   45342

Ronnita Green
Thomson West
1100 – 13th Street NW
Suite 200
Washington, DC   20005

**(PARTIES NEED NOT SERVE COPIES ON LEXIS OR WEST PUBLISHING)**

**In the United States District Court**
**For the District of Columbia**

| | |
|---|---|
| Hewlett-Packard Company, <br><br>          Plaintiff (Complainants), <br><br>         v. <br><br> Acer, Inc. and Acer America Corporation, <br><br>          Defendants (Respondents). | **Misc. Action No.:07-335** <br> Judge: Thomas F. Hogan |

### PROPOSED ORDER

This matter having arisen upon the motion of Plaintiff, Hewlett-Packard Company for a letter rogatory for the examination by deposition of and the production of documents by Quanta Computer, Inc., Compal Electronics, Inc., MStar Semiconductor, Inc., Realtek Semiconductor, Inc. and Silicon Integrated Systems Corporation ("the Taiwanese companies"), and it appearing that such letter rogatory is appropriate,

IT IS ORDERED, that the Clerk of this Court shall issue the letter of request in the form attached to this order.

Dated: August ____, 2007          By: _____

                                          United States District Judge

WASHI\4917956.1